UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

AMERICAN BROADCASTING COMPANIES, INC.,
DISNEY ENTERPRISES, INC., CBS BROADCASTING
INC., CBS STUDIOS INC., NBCUNIVERSAL MEDIA,
LLC, NBC STUDIOS, LLC, UNIVERSAL NETWORK
TELEVISION, LLC, TELEMUNDO NETWORK GROUP
LLC and WNJU-TV BROADCASTING LLC,

        Plaintiffs,

        v.

AEREO, INC.,

        Defendant.

------------------------------------------------------------------------X

 

 

 

 

------------------------------------------------------------------------X

WNET, THIRTEEN, FOX TELEVISION STATIONS, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
WPIX, INC., UNIVISION TELEVISION GROUP, INC.,
THE UNIVISION NETWORK LIMITED PARTNERSHIP
and PUBLIC BROADCASTING SERVICE,

        Plaintiffs,

        v.

AEREO, INC. f/k/a BAMBOOM LABS, INC.,

        Defendant.

------------------------------------------------------------------------X

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

12 Civ. 1540 (AJN)

Bruce P. Keller (bpkeller@debevoise.com)
Jeffrey P. Cunard (jpcunard@debevoise.com)
Michael R. Potenza (mpotenza@debevoise.com)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000

*Attorneys for ABC Plaintiffs*

12 Civ. 1543 (AJN)

Steven B. Fabrizio (sfabrizio@jenner.com)
Steven R. Englund (senglund@jenner.com)
Scott B. Wilkens (swilkens@jenner.com)
JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, D.C. 20001
(202) 639-6000

*Attorneys for WNET Plaintiffs*

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Redacted Public Filing

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1
II.     Proposed Findings of Fact ..............................................................................4
        A.      The Plaintiffs..........................................................................................4
        B.      Aereo.......................................................................................................4
        C.      Aereo Is A Full-Fledged Internet Video Service. ...............................6
        D.      Aereo Sells "Live TV." .......................................................................10
        E.      The Aereo System.................................................................................12
                1.      Aereo's Shared System Resources .........................................13
                2.      Aereo's Buffer Copies. ...........................................................13
        F.      The Aereo Antenna...............................................................................15
        G.      Aereo Causes Irreparable Harm. ........................................................17
                1.      Loss Of Control Over Content Distribution...........................18
                2.      Loss Of Advertising Revenue. ................................................20
                3.      Loss Of Retransmission Fees..................................................23
                4.      Aereo Disrupts Plaintiffs' Relationships With Other Licensees............25
                5.      Plaintiffs Did Not Delay. ........................................................26
III.    PROPOSED CONCLUSIONS OF LAW .....................................................29
        A.      The Substantive Elements Of A Copyright Infringement Claim............30
        B.      The Public Performance Right. ............................................................31
                1.      The Transmit Clause. ..............................................................32
                2.      Cablevision Was Limited To "Time-Shifting." ......................38
                3.      The Court Must Interpret Cablevision According To The Facts
                        And Circumstances Before The Second Circuit. ....................45
                4.      Consumers' Ability To Access Broadcast Television Signals Does
                        Not Authorize Aereo's Internet Transmissions. .....................46
                5.      Aereo's Transmissions Are Different From Sony And Cablevision
                        Time-Shifting...........................................................................48
                6.      Cablevision Does Not Apply To Aereo, Which
                        Contemporaneously Retransmits Plaintiffs' Copyrighted Programs........49
                7.      Aereo's Interpretation Of Cablevision Undermines The Public
                        Performance Right In Ways Congress Did Not Intend And Is
                        Inconsistent With The Copyright Act. .....................................55
                8.      Aereo, Not Its Subscribers, Transmits The Performances And
                        Makes The Copies. ..................................................................58
        C.      Irreparable Harm...................................................................................60
                1.      Aereo Disrupts The Economic Ecosystem Of Broadcast
                        Television..................................................................................61
                2.      Loss Of Control........................................................................63
                3.      Loss Of Advertising Revenue. .................................................64
                4.      Loss of Retransmission Fees....................................................65
                5.      Direct Competition With Internet Licensees. ..........................67
                6.      Plaintiffs Did Not Delay. .........................................................69

D.     The Balance of Harms Favors An Injunction. ..........................................72
E.     The Public Interest Favors An Injunction. ..............................................73

Redacted Public Filing

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiffs American Broadcasting Companies, Inc., Disney Enterprises, Inc., CBS

Broadcasting Inc., CBS Studios Inc., NBCUniversal Media, LLC, NBC Studios, LLC, Universal

Network Television, LLC, Telemundo Network Group LLC, and WNJU-TV Broadcasting LLC,

12 Civ. 1540, and WNET, Thirteen, Fox Television Stations, Inc., Twentieth Century Fox Film

Corporation, WPIX, Inc., Univision Television Group, Inc., The Univision Network Limited

Partnership and Public Broadcasting Service, 12 Civ. 1543, respectfully submit their Proposed

Findings of Fact and Conclusions of Law.

## I.   INTRODUCTION

1.      This case requires the Court to apply the plain language of the Copyright Act of

1976 (the "Copyright Act"), and to determine the impact of the holding in *Cartoon Network LP*

*v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*").

2.      Defendant Aereo, Inc. ("Aereo") has placed arrays of small antennas in its offices

in Brooklyn, New York.  The antennas receive the over-the-air ("OTA") broadcast signals that

carry Plaintiffs' copyrighted television programming as the signals are transmitted from antennas

atop the Empire State Building in Manhattan.  5/30 Tr. at 23:24-24:3.  Without any license to do

so, Aereo converts the signals from their broadcast modulation format into an Internet protocol

format and streams the programs over the Internet to Aereo subscribers, who can view them on

Internet-connected devices, such as mobile phones, tablets, and computers, within seconds of the

Plaintiffs' OTA broadcast.  5/30 Tr. at 99:5-8 (Kelly).  The question before the Court is whether

Aereo's conduct infringes Plaintiffs' exclusive right to publicly perform their copyrighted works

under Section 106(4) of the Copyright Act, 17 U.S.C. § 106(4).

Redacted Public Filing

3.      Under the Transmit Clause of the Copyright Act, a copyrighted work is publicly performed when it is "transmit[ted] or otherwise communicate[d] . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." 17 U.S.C. § 101.

4.      In *Cablevision*, the Second Circuit held, on the specific undisputed facts in the summary judgment record before it, that the playback to a cable subscriber's set-top box authorized to receive the original transmission, of a copy of a television program that previously had been recorded by that subscriber, was not within the copyright owner's exclusive right of public performance.  *Cablevision*, 536 F.3d at 139.  The central dispute between the parties on this motion is whether *Cablevision*'s holding immunizes Aereo's system, which provides contemporaneous retransmissions of Plaintiffs' OTA programming over a different medium, the Internet.

5.      The Court concludes that the specific holding of *Cablevision*, based on the record presented to the Second Circuit by those parties, *see Barclays Capital, Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 899 (2d Cir. 2011), is limited to the transmission by playback of true time-shifted copies.  It is clear from the record in *Cablevision* that the particular RS-DVR technology at issue in *Cablevision*, unlike "[c]onventional DVRs," could not even "begin playing back a program before recording [was] complete."[1]  As a result of the technology

---

[1]      Brief and Special Appendix for Defendants-Counterclaimant-Appellants at 8, *The Cartoon Network LP  v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) (No. 07-1480 Civ.), 2007 WL 6101602; *see also* Plaintiffs' Local Rule 56.1 Statement at 10, ¶ 49, *Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.*, 478 F. Supp.2d 607 (S.D.N.Y. 2007) (No. 06-

2

at issue in that case, the source of the Cablevision-to-subscriber transmissions considered by the Second Circuit was a true, time-shifted copy – *i.e.*, playback from the copy was severed from the original transmission.  The playback could **only** begin after the original broadcast (or cablecast) had concluded, and could **only** be made to the same place, over the same medium, for viewing over the same device authorized to receive the original broadcast.

6.     That is significant for the Court's public performance analysis on this motion. First, unlike the transmissions in Aereo's live television service, the transmissions in *Cablevision* were temporally distinct from the original transmission.  The court in *Cablevision* found that the unique copy, for later viewing, made and controlled by the user, broke the connected chain of transmissions from the original source in a way that limited both the source and the potential audience of the transmission to the single subscriber who made the copy.  *Cablevision*, 536 F.3d at 137.  In the case of the real-time transmissions to Aereo's subscribers, the potential audience of Aereo's contemporaneous retransmissions is "thousands and thousands and thousands of people" who choose to watch a particular program through Aereo at any given time.  5/30 Tr. at 226:19-23.

7.     Second, unlike the time-shifting at issue in *Cablevision* and *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), Aereo converts Plaintiffs' programming to an Internet format and then delivers it for viewing over the Internet, at any place and on any Internet device.

8.     Neither *Sony* nor *Cablevision* immunizes the broader activities in which Aereo engages.  Aereo's retransmission of Plaintiffs' OTA broadcast programming is a quintessential

---

3990-cv), Dkt. 36 ("Cablevision determined that a Service Subscriber cannot begin to watch a copied Program until the entire Program had been copied.").

public performance, and *Cablevision* does not insulate Aereo from copyright liability.  Because, as explained in more detail below, the Court also finds that, unless Aereo is restrained, Plaintiffs will suffer irreparable harm and that both the balance of hardships and the public interest favor preliminary injunctive relief, the Court grants Plaintiffs' motion for a preliminary injunction.

## II.    PROPOSED FINDINGS OF FACT

### A.    The Plaintiffs.

1.    Plaintiffs own exclusive rights in a broad array of copyrighted television programming and movies.  They also own and operate FCC-licensed television stations that are authorized to broadcast television programming within their communities of license, including the New York City designated market area ("DMA").  Plaintiffs' ownership of valid and subsisting copyrights in the works identified in Plaintiffs' Exhibit 83 is not contested for purposes of this preliminary injunction proceeding.  Pls.' Ex. 83 (Stipulation).  The certificates of registration and notices of advance infringement appended to Exhibit 83 demonstrate compliance with Sections 408(f) and 411 of the Copyright Act, 17 U.S.C. §§ 408(f) and 411, and Copyright Office implementing regulations.  Compl. ¶¶ 11-19, Mar. 1, 2012, ECF No. 1 (Case No. 1:12-cv-1540); Compl. ¶¶ 11-18, Mar. 1, 2012, ECF No. 1 (Case No. 1:12-cv-1543).

### B.    Aereo.

2.    Aereo,[2] through its subscription web-based service at www.aereo.com, streams "[a]ll the broadcasts – NBC, ABC, CBS, PBS, FOX, CW & over 20 local channels" – serving the New York City market.  Pls.' Ex. 11 (Franks Decl. ¶ 5), Pls.' Ex. 16 (Franks Decl. Ex. A (screenshot from aereo.com)).  Aereo's advertising consistently and principally promotes the

---

[2]    Aereo was formerly known as Bamboom Labs, Inc. and Bamboo-Entertainment, Inc.  Def.'s Ex. 9 ¶¶ 12, 17, 18(d) (Kanojia Decl.).

4

ability for its subscribers to "Watch Live TV."  Aereo also offers a virtual DVR to "Record for Later" viewing, but that is barely promoted.  5/30 Tr. at 187:25-193:17Throughout the hearing, the parties referred to the "Live TV" aspect of Aereo as the "Watch Now" mode and the virtual DVR for later viewing as the "Record" mode.  *See, e.g.*, Pls.' Ex. 75 (Kelly Decl. ¶ 5); 5/30 Tr. at 134:10-11, 137:8-13, 140:18-22, 141:5-6 (Kanojia).[3]

     3.     As demonstrated at the hearing, however, it is possible to use the virtual DVR function both to record a television program and to watch it in real time, as it is airing.  During his direct testimony, Mr. Kanojia began recording the CBS program "The Talk," as it was being broadcast OTA, pressed pause and began watching the program a minute and forty seconds later.  5/30 Tr. at 138:3-139:3 (Kanojia).  Plaintiffs' motion seeks to enjoin Aereo from engaging in the public performance of Plaintiffs' works by retransmitting Plaintiffs' copyrighted programming at any time while the Aereo service is still receiving the primary broadcast transmission of such programming, regardless of whether the Aereo subscriber accesses that programming through the "Watch Now" or "Record" mode.  5/31 Tr. at 387:4-8 (the Court).

     4.     Aereo has amassed thousands of dime-sized antennas, arranged in antenna boards, on the tenth floor of its facilities in Brooklyn, New York with a direct line of sight to

---

[3]    Aereo has made this same distinction between its two services from the outset:  "What Plaintiffs fail to recognize is that Aereo's system employs these exact same steps whether the consumer operates it in the 'watch now' mode – *i.e.*, play back at approximately the time the program airs – or whether the consumer waits until a later time to initiate playback of the recorded programming.  In either mode, the consumer makes her own unique copy of the program, and plays that unique copy back to herself and no one else.  ***The only difference is how long the copy is retained and when playback occurs.***  In the "watch now" mode, the consumer can initiate playback within seconds after recording begins, whereas in the "record" mode the ***playback occurs at a later time of the consumer's choosing.***"  Aereo 4/4 Br. at 2 (emphasis added).

the Empire State Building in Manhattan.  5/30 Tr. at 23:24-24:1.  Plaintiffs' OTA broadcasts

emanate from transmission towers located on top of the Empire State Building.  *Id.* 24:1-3.

Aereo has designed its service so that these antennas capture New York City OTA broadcast

television programming.  Aereo processes the broadcast signals and then routes the programs

embodied in those signals through its servers.  5/30 Tr. at 81:17-85:10 (Kelly).  It therefore

does not actually provide consumers access to broadcast signals, but instead an Internet

protocol version of the television program.  *See id.* at 90:18-25 (Kelly).  After a short

"buffering" delay of about seven seconds, Potenza Decl. Ex. 7 (Lipowski Dep. 198:13-199:25),

Aereo sends the processed, transcoded OTA programs from Aereo's servers to the Internet,

which delivers them to its subscribers' Internet-connected devices in real time, whether

through the "Watch Now" or, if in immediate playback, the "Record" mode.  5/30 Tr. at 73:9-

14, 78:22-25 (Kelly).

5.     Aereo has not licensed any of Plaintiffs' copyrighted works for any purpose,

including for public performances.  Aereo Am. Answer ¶ 25, Apr. 2, 2012, ECF No. 29 (Case

No. 1:12-cv-01540); Pls.' Ex. 12 (Segaller Decl. ¶ 3); Pls.' Ex. 8 (Brennan Decl. ¶ 3).

### C.     Aereo Is A Full-Fledged Internet Video Service.

6.     Aereo characterizes itself as a provider of "machinery" "used by consumers" to

"access and copy over-the-air television," no different than "Radio Shack" selling a roof- or

set-top antenna.  5/30 Tr. at 21:11-20.  The record demonstrates that Aereo's characterization is

not accurate.  Aereo is an "online television business," 5/30 Tr. at 183:7-18 (Kanojia), "very

different" from a company that sells "rabbit ears" to consumers.  5/30 Tr. at 91:1-13 (Kelly);

Pls.' Ex. 75 (Kelly Decl. ¶ 59).

6

7.     One of Aereo's experts, Professor Horowitz, testified that he could install equipment to convert OTA broadcast signals into digital code that can be streamed over the Internet.  5/31 Tr. at 281:4-10 (Horowitz).  Even accepting that as true, those technologies – in and of themselves – do not provide the full range of consumer-oriented features that Aereo offers.  5/30 Tr. at 91:21-92:4 (Kelly).  As a result, the service and features offered by Aereo are most comparable to duly-licensed multichannel video programming distributors ("MVPDs") and "Internet delivery systems, such as Netflix or Hulu."  5/30 Tr. at 92:5-10 (Kelly); Pls.' Ex. 75 (Kelly Decl. ¶¶ 4, 65-73).  The chief difference is that, unlike Aereo, those services are authorized and pay to carry Plaintiffs' copyrighted programming.

8.     From the consumer perspective, Aereo already offers functions indistinguishable from other MVPDs like, for example, Verizon's FiOS.  These include features such as a sophisticated user interface, a carousel of featured shows, a programming guide, sophisticated search functionality, social media aspects and artwork.  5/30 Tr. at 91:13-92:20 (Kelly); Pls.' Ex. 75 (Kelly Decl. ¶ 38); 5/30 Tr. at 179:22-180:22 (Kanojia).  These features are added by Aereo; they are not carried on the broadcast signal.  5/30 Tr. at 72:14-73:1 (Kelly).

9.     There also are technological similarities between Aereo and a typical television broadcast "retransmitter."  5/30 Tr. at 100:8-10, 101:2-3 (Kelly).  Like an authorized retransmitter, Aereo takes a broadcast signal and reformats it for further delivery to subscribers, although, in Aereo's case, through the medium of the Internet.  Aereo takes the broadcast signals, receives them on the antenna, demodulates the signal to turn it into digital data, transcodes and compresses the data, and then streams it over the Internet to portable

Redacted Public Filing

devices such as iPhones, iPads, and to Mac computers.  5/30 Tr. at 100:11-23 (Kelly).  As part

of their licensed activities, MVPDs also reformat – *i.e.*, remodulate – broadcast signals.

10.     The time from Aereo's receipt of an OTA broadcast signal to the subscriber's

receipt of the copyrighted program carried on that signal through Internet retransmission is

between six and twenty seconds.  5/30 Tr. at 100:22-101:1 (Kelly).  That, too, is no different

from other, authorized means of transmitting and retransmitting live broadcast programming,

as the unrebutted evidence at the hearing demonstrated.  5/30 Tr. at 99:5-11 (Kelly).  In OTA

broadcast, the typical delay is around three seconds.  5/30 Tr. at 99:12-14 (Kelly).  In cable

retransmissions, the typical delay is around four seconds.  5/30 Tr. at 99:24-25 (Kelly).  In

satellite retransmissions, the typical delay is around seven seconds.  5/30 Tr. at 100:1-2

(Kelly).  These are the minimum delays; there also might be an additional five second

"obscenity delay built in so that things can be bleeped out."  5/30 Tr. at 99:15-20 (Kelly).

11.     The end result of the stream of data from the Aereo service to its subscribers is

that complete strangers, in different locations, can watch the same broadcast television

program at the same time as that broadcast is originally transmitted OTA, 5/30 Tr. at 226:16-23

(Kanojia); Potenza Decl. Ex. 1 (Kanojia Dep. 47:23-49:4), just as a consumers accessing

television programming through authorized cable and satellite providers may do.  This was not

the case in *Cablevision*.

12.     Aereo expressly analogized itself to the community-antenna television

("CATV") systems that arose in the 1960s and 1970s as the predecessors of modern cable

systems.  Like those systems, which placed a single, large antenna on a hill and charged

consumers for a retransmitted broadcast signal delivered via a coaxial cable, Aereo also

retransmits broadcast programming to a community of users.  5/30 Tr. at 221:1–223:2 (Kanojia).

13.     In addition to its similarities to authorized MVPDs, there are also many functional similarities between Aereo and licensed Internet delivery systems like Hulu or Netflix.  5/30 Tr. at 92:5-10 (Kelly).  Both Aereo and the typical Internet video service, such as Netflix, have similar login processes, search processes, video selection processes and rich user interfaces; they also both deliver video content to users' mobile devices.  From the user perspective they are very similar.  5/30 Tr. at 93:2-20, 94:19-23 (Kelly).

14.     From a technological standpoint, in both Aereo and the typical Internet video service:  (a) the buffering (in RAM in the case of the typical Internet video, and in both the disk file and in RAM in the case of Aereo) is necessary for the transmission to occur, 5/30 Tr. at 94:11-18, 109:9-17, 111:2-11 (Kelly); (b) the buffer copies are unique to the requesting user; (c) the transmission over the Internet is one-to-one between the server and the user such that no one else has access to it, 5/30 Tr. at 94:24-95:13 (Kelly); and (d) the buffer copies are made automatically by the service and not requested by the user.  In both, the technical function requested by the user is the delivery of the video stream.  5/30 Tr. at 95:19-98:22 (Kelly).  An Aereo subscriber selects "Watch Now" to stream a live program, *id.* at 73:11-14 (Kelly), and can save a copy of the recording by pressing "Record."  *Id.* at 89:18-21 (Kelly).  In "Record" mode, a subscriber also can select "play" to watch a program "live" while it is still airing, only slightly delayed from its initial receipt.  *Id.* at 140:18-141:13 (Kanojia); *id.* at 73:15-19, 76:24-25 (Kelly).

Redacted Public Filing

15.     Aereo offers OTA broadcast content very similar to cable and satellite retransmitters, 5/30 Tr. at 180:3-22 (Kanojia), but unlike those MVPDs, it pays nothing – whether through retransmission consent agreements or through compulsory copyright royalties – for that content.  Pls.' Ex. 1 (Bond Decl. ¶ 18).  To entice consumers to cancel their cable subscriptions, Aereo advertises that its subscribers can receive Plaintiffs' broadcasts "live" via Aereo with "no cable required."  5/30 Tr. at 200:16-18 (Kanojia); Pls.' Ex. 15 (Aereo homepage).  Styling itself as a "disruptive" force in the television industry, *see* 5/30 Tr. at 203:18-21 (Kanojia); Potenza Decl. Ex. 1 (Kanojia Dep. 293:8-298:16); Pls.' Ex. 13 (Bamboom Ad Agency Brief), Aereo's home page describes its service as "Live Broadcast TV, meet the Internet. . . .  No cable required."  Pls.' Ex. 15 (Screenshot of Aereo home page).

**D.     Aereo Sells "Live TV."**

16.     Whether labeled as "Watch Now" or "Record," the primary purpose of Aereo's online television business, 5/30 Tr. at 183:7-17 (Kanojia), is to stream Plaintiffs' "over-the-air broadcast[s]" to Aereo's subscribers as the programs are airing live on television.  5/30 Tr. at 182:21-183:6 (Kanojia).  Aereo's "core" message is "live TV meets the Internet.  Finally." That message is the "biggest statement in the boldest letters" on Aereo's website.  5/30 Tr. at 188:9–25 (Kanojia); Pls.' Ex. 15 (Aereo homepage).

17.     When Aereo describes itself to the public, it features "live" television to the virtual exclusion of its time-shifting functionality.  5/30 Tr. at 196:23–198:22 (Kanojia); Pls.' Ex. 33 (Aereo New York Launch: Positioning & Messaging Platform); Pls.' Ex. 34 (Introducing Bamboom).  In the 60-second commercial for the Aereo service on Aereo's website, which Aereo's CEO testified reflected Aereo's "key tenets," the DVR function is mentioned for only five seconds at the end of the clip.  5/30 Tr. at 188:19–190:21 (Kanojia).

10

That commercial focuses almost exclusively on live, not time-shifted, television — *i.e.*, the "24/7" TV that consumers "know and love."  5/30 Tr. at 189:4-190:14 (Kanojia).  Prior to this litigation, Aereo openly billed itself as "one of the most exciting online television businesses in the U.S."  Pls.' Ex. 27 (Advertisement for Director, Marketing, Bamboom Labs); 5/30 Tr. at 183:7-18 (Kanojia).

18.     Aereo counts very heavily on sports and other "live" events to bring in customers.  These include the Super Bowl and other live sports, which are a core part of Aereo's value proposition.  5/30 Tr. at 186:20-24, 226:19-23 (Kanojia); Pls.' Ex. 35 (Email from N. Sallon to G. Cherry, Feb. 20, 2012).

19.     As Aereo itself puts it, its current plan is to use Plaintiffs' copyrighted broadcasts to bring subscribers in, 5/30 Tr. at 214:15-24 (Kanojia), then sell them additional copyrighted content that Aereo will acquire as a result of negotiated deals.  5/30 Tr. at 186:5-12 (Kanojia).  That enables Aereo to envision itself as the replacement of the cable company for the 35 and under market, 5/30 Tr. at 198:23-199:17 (Kanojia), a position it hopes to solidify by offering "packages" of content beyond Plaintiffs' broadcasts.  5/30 Tr. at 185:7–187:24 (Kanojia); ███████████████████████.  It was in that context that Aereo reached out to numerous third parties, including Plaintiff Fox, to discuss licensing content, *see* Pls.' Ex. 29 (Email from Nick Sallon to Chaitanya Kanojia); Pls.' Ex. 30 (Email chain between Chaitanya Kanojia and Suzanne Kennedy), including sports programming from the Big Ten network, for which Fox owns the copyright.  5/31 Tr. at 345:24-346:13 (Brennan).  Aereo's planned "packages" are the equivalent of basic, expanded basic, premium and sports packages offered by authorized, duly-licensed MVPDs.  5/30 Tr. at 199:10-201:9 (Kanojia).

Redacted Public Filing

20.     Aereo's internal documents show it has planned, from the very outset, to entice consumers to use Aereo to "cut the cord."  Pls.' Ex. 42 (Bamboom Presentation to First Mark Capital, Nov. 10, 2010 (discussing that Roku users cut the cord)).  Aereo's own research shows that about 30% of Aereo subscribers are likely to cancel their cable or satellite subscriptions if Aereo is not enjoined.  5/30 Tr. at 209:5-13 (Kanojia); Pls.' Ex. 41 (Mobile Entertainment Survey Results).

### E.     The Aereo System.

21.     The Aereo system is a fully integrated video delivery system made up of shared resources.  5/30 Tr. at 83:1-11, 83:21-84:25 (Kelly); Pls.' Ex. 75 (Kelly Decl. ¶¶ 3(b), 49, 59).

22.     Professor John Kelly testified for Plaintiffs as a qualified expert in computer science and Internet technology.  5/30 Tr. at 66:17-69:12 (Kelly).

23.     Computer source code provides the step-by-step instructions that tell a computer precisely what to do at every step as it proceeds through the functionality it has been designed to provide.  5/30 Tr. at 69:23-70:6 (Kelly).  Generally, computer hardware requires source code to operate.  It "wouldn't do anything of use" without it.  5/30 Tr. at 70:7-9 (Kelly).

24.     That the Aereo system has been designed to respond "automatically" to user requests does not mean that Aereo has had no involvement in that response:  "even if everything occurs without further human intervention, the entire system has to have been designed, the source code has to have been written and installed and implemented, and it is that sequence of instructions, operating on that designed platform, that's actually carrying out the predefined set of instructions and functions to satisfy that user request."  5/30 Tr. at 70:10-71:11 (Kelly).  Contrary to Aereo's contentions, Aereo transmits the OTA programming to consumers.  It is not the consumers transmitting that programming to themselves.  5/30 Tr. at

12

212:23-213:1 (Kanojia); *see also id.* at 100:15-23 (Kelly) (Aereo, not its subscribers, transcodes and processes the broadcast signals).  Almost all transmissions on the Internet are made by providers upon consumer request.  *Id.* at 93:16-94:18 (Kelly).

### 1.   Aereo's Shared System Resources.

25.     Aereo houses a pool of antennas in its Brooklyn, New York offices and, for virtually all of its subscribers, assigns antennas "dynamically."  This means the antenna is assigned only for the duration of a program (or login session if shorter), after which the antenna assigned to that subscriber goes back into a large pool of antennas available to be assigned to other users.  A single dynamic antenna can serve multiple users.  5/30 Tr. at 75:7-14, 76:12-14 (Kelly).  Only about 100 subscribers have "static" antennas that remain permanently assigned to those subscribers.  5/30 Tr. at 74:25-75:6 (Kelly); Pls.' Ex. 75 (Kelly Decl. ¶ 47).

26.     "[T]hese antennas are shared resources."  5/30 Tr. at 77:23-78:2 (Kelly); Pls.' Ex. 75 (Kelly Decl. ¶¶ 3(a), 48, 54, 60).

27.     Other Aereo resources are shared as well.  These include, in addition to the antennas, Aereo's demodulators, transcoders and streaming servers.  5/30 Tr. at 83:1-11, 83:21-84:25 (Kelly); Pls.' Ex. 75 (Kelly Decl. ¶¶ 3(b), 49, 59).

### 2.   Aereo's Buffer Copies.

28.     Whether in "Watch Now" or "Record" mode, Aereo makes buffer copies in a file on disk memory and in RAM memory, and these buffer copies are necessary to effect the transmission to the subscriber.  The "buffer"[4] in the disk memory is required by the streaming

---

[4]   Aereo's expert took issue with the use of the word "buffer" to describe the temporary copy through which Plaintiffs' digitized programming flows on its way to Aereo subscribers.

Redacted Public Filing

software Aereo uses – Apple's HTTP Live Streaming.  5/30 Tr. at 86:1-9, 87:2-8, 87:11-19, 88:4-14 (Kelly).

29.     Aereo set the buffer for the disk file to be seven seconds in length because it wanted the user to receive the stream in a reliable manner as quickly as possible.  5/30 Tr. at 249:1-9 (Lipowski).

30.     In "Watch Now" mode, the file in disk memory is, by default, automatically deleted at the end of the program unless the subscriber chooses to override the default by saving it to Aereo's servers; in "Record" mode, the file in disk memory containing the buffer is automatically saved.  5/30 Tr. at 89:7-12, 89:18-90:9, 113:13-114:12 (Kelly); 5/31 Tr. at 314:1-4 (Horowitz).

31.     The portion of the file in disk memory that is maintained beyond the period that is necessary for buffering when using Apple's HTTP Live Streaming is not necessary to stream the show; it is there solely for pause and rewind features.  5/30 Tr. at 112:13-21 (Kelly); 5/31 Tr. at 314:24-315:1 (Horowitz).

32.     If a user is recording a program in the "Record" mode, but watching the program while it is recording, the disk and RAM copies in the streaming server are actually the

---

5/31 Tr. at 313:21-314:4 (Horowitz).  As illustrated by Professor Kelly's demonstrative exhibit, Pls.' Ex. 85, simultaneously with writing approximately seven seconds of data to the temporary data file, as reflected by the red box in that exhibit, Aereo transmits that data to the RAM buffer.  As described by Aereo's expert, Professor Horowitz, this flow of data segments is like water through a fire hose.  5/31 Tr. at 310:8-19.  Those data segments cumulate and are maintained in a temporary copy that is stored for the duration of the program for purposes of enabling subscribers to pause and rewind.  While the segments are being used for contemporaneous retransmission, however, their purpose is to act as a buffer and, therefore, they serve a function no different than that of any buffer copy used to stream digital content over the Internet.  5/30 Tr. at 88:8-14 (Kelly).

same copies as are made in the "Watch Now" mode; the only difference is the default as to whether the disk file is deleted at the end of the program.  5/30 Tr. at 121:15-25 (Kelly).

33.     As a result of Aereo's processes, the digital data stream that leaves the Aereo system is not a broadcast signal at all.  It is a stream of digital data formatted so it can be transmitted from Aereo's facilities in Brooklyn over the Internet to the Internet-connected devices of Aereo's subscribers.  5/30 Tr. at 83:3-8 (Kelly).  Aereo subscribers cannot access broadcast signals through Aereo.

**F.     The Aereo Antenna.**

34.     The existence of individual antennas, the number of those antennas and the extent to which they actually operate independently to capture an OTA broadcast signal that is then processed, retransmitted and viewed by Aereo subscribers are immaterial.  Regardless of whether Aereo has one or thousands of antennas, "if multiple Aereo users are watching the same show at the same time, . . . all the data for that show for those users derive[s] from the same broadcast signal."  5/30 Tr. at 119:9-18 (Kelly); *id.* at 103:8-14 ("[t]he broadcast signal impinges on all the antennas all the time"); *id.* at 105:17-23 ("the broadcast signal would be available to any user that was tuned in to that station")).

35.     The evidence adduced at the preliminary injunction hearing, however, raises material questions as to whether Aereo's antennas truly work independently, as Aereo claims.

36.     Professor Volakis, the Roy & Lois Chope Chair Professor and Director of the ElectroScience Laboratory at The Ohio State University, concluded after conducting multiple tests of the Aereo antenna board, that, ██████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

15

Redacted Public Filing

███████████████████████████████████████████

███████████████████████████████████████████

██████████

37.     Professor Volakis explained that the theoretical foundation for his conclusion is fully supported in basic antenna principles: "metal conducts and 'radiates' in the presence of an electromagnetic field. . . . put an antenna near other metal and its reception properties change."  Volakis Decl. ¶ 70. ██████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████

38.     Professor Horowitz deferred to Professor Pozar's greater expertise in antennas and further acknowledged that he did not perform any of his own tests of how a single Aereo loop performs, and instead relied on the single loop test performed by Professor Pozar.  5/31 Tr. at 320:12-21, 332:5-21 (Horowitz).

39.     Professor Pozar, however, did not conduct any tests of the actual antenna board at all, nor did he do any theoretical analyses or computer modeling of the Aereo antenna board to determine how it worked.  Pls.' Ex. 88 at 26:19-27:7 (Pozar Dep.); *id.* at 23:13-18; *id.* at

27:17-19; *id.* at 93:21-94:6.  Instead, Professor Pozar's conclusions about the ability of the

Aereo antenna loops to receive a signal independent of the substructure are based on his so-

called "single loop" test.  Pls.' Ex. 88 (Pozar Dep. 176:7-11); *id.* at 185:8-21 (test "critical").

40. ████████████████████████████████████████

████████████████████████████████████████████████

**G.    Aereo Causes Irreparable Harm.**

41.    Plaintiffs identified several ways that Aereo inevitably will injure them in ways

that cannot be measured or remedied by money damages and therefore constitute irreparable

harm.  This harm is imminent and inevitable.  Potenza Suppl. Decl. Ex. 3 (Bond Dep. 56:8,

106:2); *see also* Pls.' Ex. 1 (Bond Decl. ¶ 11) (potential harm is great to networks that license

very expensive television rights); Pls.' Ex. 4 (Anthony Crupi, *NFL Hammers Out Nine-Year*

*Rights Renewals with NBC, CBS, Fox*, AdWeek).

17

### 1.   Loss Of Control Over Content Distribution.

42.     Aereo's business model is based on retransmitting Plaintiffs' live, "24/7" OTA broadcast streams over the Internet.  5/30 Tr. at 189:7–190:2 (Kanojia).  Plaintiffs' business model depends on retaining the ability to control the time, place, manner and quality of their programming transmissions and the use of their copyrighted content.  Pls.' Ex. 11 (Franks Decl. ¶¶ 8-13).  For a variety of business reasons, Plaintiffs themselves do not license others to use the Internet as a distribution medium for their linear, 24/7 programming nor have they authorized anyone else to do it.  5/30 Tr. at 60:22-62:3 (Franks); 5/31 Tr. at 382:10-15 (Brennan); Pls.' Ex. 10 (Davis Decl. ¶ 31).

43.     When asked at the hearing whether Fox has "ever allowed any third parties to do what Aereo wanted to do and is now doing, which is streaming telecasts over the Internet at the same time telecasts are playing live on TV," Sherry Brennan from Fox answered "No." 5/31 Tr. at 382:10-15 (Brennan).  Similarly, Martin D. Franks, Executive Vice President for Policy, Planning and Government Relations at CBS, testified that, although CBS itself streams selected individual programs over the Internet, such as sporting events like the NCAA March Madness Tournament, "no one has rights to [CBS's] live 24/7 stream for the Internet."  5/30 Tr. at 60:22-61:3 (Franks).

44.     One of the reasons for this is that making Plaintiffs' OTA live feed available in real time over the Internet would cannibalize advertising revenue, which hinges on Nielsen ratings.  5/30 Tr. at 61:10-12 (Franks).  Another relates to rights clearance issues and another piracy concerns, particularly from abroad.  5/30 Tr. at 61:13-62:3 (Franks); Pls.' Ex. 11 (Franks Decl. ¶ 8) ("Loss of the ability to decide when and over what medium that content is distributed threatens the economic structure of the television industry.").

18

45.     Plaintiffs make their content available over many different platforms, including the Internet, linear cable channels and video-on-demand, for substantial consideration.  Pls.' Ex. 11 (Franks Decl. ¶¶ 10, 12).  Aereo's unauthorized distribution of content over the Internet without compensation disrupts Plaintiffs' ability to license their content.  Pls.' Ex. 8 (Brennan Decl. ¶ 15); Pls.' Ex. 11 (Franks Decl. ¶ 12).  Plaintiffs' ability to license their content through such avenues will decrease dramatically if Aereo's service continues.  Pls.' Ex. 8 (Brennan Dep. 210:17-211:11); Pls.' Ex. 1 (Bond Decl. ¶ 19); Pls.' Ex. 10 (Davis Decl. ¶ 31); Pls.' Ex. 11 (Franks Decl. ¶ 10).  The resulting injury is difficult to quantify.

46.     Plaintiffs have invested and continue to invest millions of dollars to create, operate and maintain their web sites.  Pls.' Ex. 10 (Davis Decl. ¶ 29); Pls.' Ex. 8 (Brennan Decl. ¶ 18); Pls.' Ex. 12 (Segaller Decl. ¶ 8); Pls.' Ex. 11 (Franks Decl. ¶ 18).  When Plaintiffs have the necessary rights and choose to make their programs available on their websites, viewers can watch episodes they missed by visiting those sites.  Pls.' Ex. 8 (Brennan Decl. ¶ 18).  Such visitors represent a significant marketing opportunity for Plaintiffs.  Pls.' Ex. 8 (Brennan Decl. ¶ 18).  While they are on Plaintiffs' websites, viewers have an opportunity to look at the upcoming schedule of Plaintiffs' programs, to shop for products related to Plaintiffs' content, and are exposed to promotions and advertising benefitting Plaintiffs.  Pls.' Ex. 10 (Davis Decl. ¶ 30); Pls.' Ex. 8 (Brennan Decl. ¶ 18).  To the extent Aereo diverts these Internet viewers from Plaintiffs' websites, Plaintiffs lose not only revenue but the opportunity to establish such a "link" and brand identification with its viewers.  Pls.' Ex. 8 (Brennan Decl. ¶ 18).

Redacted Public Filing

47.     Plaintiffs also plan to enter the mobile, out-of-home viewing market.  NBCU, Fox, and a few other television broadcasters are finalizing plans, through a joint venture called the Mobile Content Venture ("MCV"), and a service now branded "DYLE," to make their OTA signals available in real-time on mobile devices.  Pls.' Ex. 1 (Bond Decl. ¶ 21); Pls.' Ex. 8 (Brennan Decl. ¶ 15); Pls.' Ex. 9 (Dalvi Decl. ¶¶ 7-8).

48.     "Dyle is not an internet service," but rather "is a mobile video service that allows a customer with a handset equipped with a special antenna to receive over-the-air television signals."  5/31 Tr. at 377:2-6 (Brennan).  The DYLE partners have invested large sums of money in the infrastructure necessary to deliver OTA signals to mobile devices.  Pls.' Ex. 1 (Bond Decl. ¶ 21); Pls.' Ex. 9 (Dalvi Decl. ¶ 9).

49.     By taking the DYLE partners' content for free, Aereo threatens the survival of MCV.  Neither the television stations nor consumer device manufacturers likely will be willing to incur the expenses associated with bringing OTA broadcasts to mobile devices if Aereo is not enjoined.  Pls.' Ex. 1 (Bond Decl. ¶¶ 22, 24); Pls.' Ex. 9 (Dalvi Decl. ¶ 13).

50.     The live streaming done by Aereo competes directly both with the live broadcast itself and with broadcasters' chosen means of online distribution, be it through the broadcaster's own website, a duly-licensed third-party site (such as Hulu), or innovative authorized services like DYLE.  Pls.' Ex. 1 (Bond Decl. ¶¶ 20-22); Pls.' Ex. 10 (Davis Decl. ¶ 31); Pls.' Ex. 11 (Franks Decl. ¶¶ 16-18); Pls.' Ex. 8 (Brennan Decl. ¶ 15).

## 2.   Loss Of Advertising Revenue.

51.     Aereo adversely affects Plaintiffs' advertising revenue, "the most important revenue stream to a broadcast station."  5/31 Tr. at 351:8-11, 357:14-19 (Brennan); *see also* Pls.' Ex. 10 (Davis Decl. ¶ 12); Pls.' Ex. 1 (Bond Decl. ¶ 7); Pls.' Ex. 8 (Brennan Decl. ¶ 7).

20

52.     Commercial television time cannot be sold to potential advertisers unless the advertisers know the expected reach of those advertisements – that is, the number of people who are anticipated to watch those programs.  Estimates and promises about audience size are, therefore, the backbone of the television industry.  The bigger the audience, all other things being equal, the more an advertiser is willing to pay for air-time.  Pls.' Ex. 10 (Davis Decl. ¶ 13).

53.     The broadcast industry uses "ratings" provided by Nielsen to assess the size of an audience for a program.  Ratings measure the percentage of households, out of all the households in a given market, that have television sets and that are watching a particular program.  Pls.' Ex. 10 (Davis Decl. ¶ 14-15).

54.     To measure ratings, Nielsen has traditionally used "Set Meters," which are small devices connected to televisions in a panel of households that record the viewing habits of the home and transmit that information on a daily basis to Nielsen.  Nielsen then uses the data obtained from this sample to determine any given program's rating.  Pls.' Ex. 10 (Davis Decl. ¶ 17); Pls.' Ex. 1 (Bond Decl. ¶ 25).

55.     "[T]he currency by which advertising is sold is based on Nielsen ratings," and "[s]o if viewing were to occur through Aereo and not be measured by Nielsen, there would be no way for that viewing to be compensated back to the broadcast station through the sale of advertising."  5/31 Tr. at 351:2-15 (Brennan); Pls.' Ex. 38 (Email chain between Chet Kanojia and Josh Freeman describing "ad [money] driven by Nielsen ratings" as the "coin of the realm"); Pls.' Ex. 1 (Bond Decl. ¶ 25); Pls.' Ex. 8 (Brennan Decl. ¶ 7-9); Pls.' Ex. 10 (Davis Decl. ¶ 18).

Redacted Public Filing

56.     Viewers who watch Plaintiffs' content using Aereo are not included in Nielsen's measurement metrics used for advertising sales.  5/31 Tr. at 351:16-20, 357:14-16 (Brennan); Pls.' Ex. 8 (Brennan Decl. ¶ 8); Pls.' Ex. 1 (Bond Decl. ¶ 25); Pls.' Ex. 10 (Davis Decl. ¶ 18-20); Pls.' Ex. 11 (Franks Decl. ¶ 19-20); Potenza Suppl. Decl. Ex. 5 (Franks Dep. 97:10-23); *see also* 5/31 Tr. at 378:14-17 (Brennan) ("The currency on which advertising sales are made is called the Nielsen C3 rating.  I am certain that the C3 rating does not include Internet viewing"); Pls.' Ex. 10 (Davis Decl. ¶ 20); Pls.' Ex. 1 (Bond Decl. ¶ 25).  Even if Aereo does not object to being measured, it remains unmeasured.  5/30 Tr. at 48:10-14; Potenza Suppl. Decl. Ex. 5 (Franks Dep. 97:10-23); Pls.' Ex. 1 (Bond Decl. ¶ 25); Pls.' Ex. 8 (Brennan Decl. ¶ 9); Pls.' Ex. 11 (Franks Decl. ¶¶ 19-20); Pls.' Ex. 10 (Davis Decl ¶¶ 18-19).  As a result, Aereo's retransmission of Plaintiffs' content necessarily results in undercounting Plaintiffs' viewership, which, in turn, adversely affects the amounts advertisers will pay to advertise during broadcasts of Plaintiffs' television programs.  5/31 Tr. at 357:14-19 (Brennan); Pls.' Ex. 1 (Bond Decl. ¶ 25); Pls.' Ex. 8 (Brennan Decl. ¶¶ 8-9); Pls.' Ex. 10 (Davis Decl. ¶ 19); Pls.' Ex. 11 (Franks Decl. ¶ 20); *see also* 5/30 Tr. at 62:20-63:16 (if an Aereo viewer had previously been measured by Nielsen, the effect for Plaintiffs could have a multiplying effect).

57.     Second, Plaintiffs obtain income from advertisers not only due to the size of the audience, but also based upon the demographic profile of the audience.  Pls.' Ex. 8 (Brennan Decl. ¶ 9).  Having additional viewers in desirable demographic categories yields greater advertising revenue for content owners.  Pls.' Ex. 8 (Brennan Decl. ¶ 9).  Because advertisers rely upon Nielsen to ascertain a TV show's demographic profile, and because Nielsen does not report the amount or the demographics of web-based viewing, Aereo's retransmission of the

22

Case 1:12-cv-01543-AJN   Document 114   Filed 06/18/12   Page 26 of 78

Plaintiffs' content undermines Plaintiffs' efforts to ascertain an accurate demographic profile of their audience.  *See* 5/31 Tr. at 357:15-16 (Brennan); Pls.' Ex. 8 (Brennan Decl. ¶ 9).  This adversely affects Plaintiffs' ability to obtain additional revenue from advertisers based upon the demographic profile of the viewers of Plaintiffs' programming.  Pls.' Ex. 8 (Brennan Decl. ¶ 9).

### 3.  Loss Of Retransmission Fees.

58.      Plaintiffs' second major source of revenue is retransmission license fees.  5/31 Tr. at 357:9-14, 357:19-22 (Brennan); Pls.' Ex. 1 (Bond Decl. ¶ 8); Pls.' Ex. 10 (Davis Decl. ¶¶ 21-22); Pls.' Ex. 11 (Franks Decl. ¶¶ 23-24).  Plaintiffs have entered into many agreements with cable and satellite distributors who pay Plaintiffs fees for the right to retransmit Plaintiffs' copyrighted broadcast television content to paying cable and satellite subscribers.  5/31 Tr. at 357:10-14 (Brennan); Pls.' Ex. 1 (Bond Decl. ¶ 15); Pls.' Ex. 8 (Brennan Decl. ¶ 10); Pls.' Ex. 11 (Franks Decl. ¶ 25).  Plaintiffs have hundreds of retransmission agreements and, some of which are actively being negotiated or renegotiated.  5/31 Tr. at 361:10-15 (Brennan).

59.      The potential revenue from retransmission agreements is significant.  The financial research firm SNL Kagan forecasts that such revenues will exceed $3 billion in 2015.  Pls.' Ex. 1 (Bond Decl. ¶ 15); Pls.' Ex. 5 (Harry A. Jessel, *SNL Kagan: Revese Comp to Hit $1.3B in '15*, TVNEWSCHECK (Nov. 1, 2011), http://www.tvnewscheck.com/article/2011/11/01/55125/snl-kagan-reverse-comp-to-hit-13b-in-15).  Plaintiffs rely on that revenue stream to enable them to continue to broadcast marquee events, such as live sports or awards shows, which are enormously expensive to produce.  *See* Pls.' Ex. 1 (Bond Decl. ¶ 12).

60.      If it continues to retransmit broadcasters' signals without authorization, Aereo will disrupt broadcasters' ability to negotiate retransmission fees with Aereo's competitors –

23

duly-licensed MVPDs, such as cable systems and satellite broadcasters.  Cable systems and satellite broadcasters will take the position they should not continue to pay broadcasters at all – or, at the least, pay less – for content on a per subscriber basis because Aereo is transmitting the same content without any payment whatsoever.  Pls.' Ex. 10 (Davis Decl. ¶ 26); Pls.' Ex. 11 (Franks Decl. ¶ 26); Pls.' Ex. 1 (Bond Decl. ¶ 18).

61.     More importantly, if Aereo is not enjoined, MVPDs could modify their operations to mirror Aereo's "individual antenna/copy" model to retransmit, for free, OTA local broadcast programming.  This is not speculative – cable companies have already considered such a model.  Pls.' Ex. 10 (Davis Decl. ¶ 26); Pls.' Ex. 11 (Franks Decl. ¶ 26); Pls.' Ex. 1 (Bond Decl. ¶ 18).

62.     Finally, to the extent that Aereo's retransmission of Plaintiffs' programs over the Internet induces consumers to "cut the cord," MVPDs will pay less money to Plaintiffs for retransmission rights.  Pls.' Ex. 8 (Brennan Decl. ¶ 14); Pls.' Ex. 1 (Bond Decl. ¶ 19); 5/30 Tr. at 59:9-24 (Franks).  Aereo's deliberate plans to take subscribers away from MVPDs translate into higher marketing costs and lost revenue for MVPDs, which drives down the value of retransmission rights to MVPDs.  Pls.' Ex. 1 (Bond Decl. ¶ 19); *see also* 5/30 Tr. at 59:15-18 (Franks); Pls.' Ex. 40 (Moody's Investor Service, Global Credit Research, *Moody's Said That the New Television Streaming Service, Aereo, Faces Long-Shot Odds Against Broadcast Station Lawsuit*, Mar. 16, 2012); 5/30 Tr. at 226:7-10 (Kanojia); Pls.' Ex. 41 at 6 (31% of survey respondents likely to drop cable and other licensed video services if they had Aereo instead).

### 4.   Aereo Disrupts Plaintiffs' Relationships With Other Licensees.

63.   Plaintiffs have licensing agreements with a number of third-party content providers, and these agreements specify when and if certain programs can be streamed over the Internet.  Pls.' Ex. 8 (Brennan Decl. ¶ 17); Pls.' Ex. 11 (Franks Decl. ¶ 12); Pls.' Ex. 10 (Davis Decl. ¶ 31).  For example, these agreements may indicate a "temporal 'window'" for which rights are granted, the medium in which the programs may be shown, and the means by which the program may be made available to the public.  5/30 Tr. at 61:13-16 (Franks); Pls.' Ex. 11 (Franks Decl. ¶ 12).  This applies equally to commercials, some of which cannot be aired over the Internet because the station does not have the necessary music or image rights for such streaming.  Pls.' Ex. 10 (Davis Decl. ¶ 29).

64.   Plaintiffs enter into agreements with distributors of their content, granting exclusive licenses to broadcast programs in the DMAs of local stations.  5/31 Tr. at 348:22-350:2 (Brennan).  The value of that exclusivity necessarily is diminished by unauthorized third-party distribution.

65.   Aereo's current efforts to restrict its subscribers to the New York DMA is not a function of trying to honor these DMA restrictions and boundaries.  *Cf.* 5/31 Tr. at 350:4-350:11 (Brennan).  Instead, it is part of an effort to stay within the Second Circuit to minimize its legal risk.  *See* Pls.' Ex. 18 (Email chain between Joe Lipowski and Steve Harris).

66.   In fact, Aereo subscribers accessing Aereo from outside of the New York market area easily can override Aereo's claimed geolocation limitation by simply attesting that they are in the New York area.  Aereo's geolocation limitation is, therefore, "essentially an honor system."  Pls.' Ex. 75 (Kelly Decl. ¶¶ 74-75); 5/30 Tr. at 225:6-18, 227:1-5 (Kanojia); 5/31 Tr. at 331:13-22 (Horowitz).  As a result, "[e]ven users that Aereo determines are located

25

outside of New York could receive New York television broadcasts over Aereo's system."

Pls.' Ex. 75 (Kelly Decl. ¶ 75).  For example, Aereo's expert, Professor Horowitz, accessed the

Aereo service from Boston and the British Virgin Islands by attesting that he was in the New

York area.  5/31 Tr. at 331:16-22 (Horowitz).  Accordingly, a user in California could access

broadcasts intended for airing in the New York DMA three hours before the broadcast is

available OTA on the West Coast.

67.     The non-profit nature of WNET does not make it any less vulnerable to

irreparable harm.  Just as with the for-profit Plaintiffs, WNET enters into licensing agreements

that frequently either prevent or restrict the distribution of the produced material on the

Internet.  Pls.' Ex. 12 (Segaller Decl. ¶¶ 4, 5, 9).  Aereo's unauthorized Internet streaming

subjects WNET to possible additional licensing fees and fractures WNET's relationships with

licensors.  *Id.*  Parties to those agreements could also refuse to allow their content to be used by

WNET.  *Id.* at ¶ 11.

68.     Aereo's CEO testified that, if enjoined, Aereo has sufficient capital to continue

operations for five to seven months.  5/30 Tr. 232:9-12 (Kanojia); Potenza Decl. Ex. 1 (Kanojia

Dep. 372:19-21, 374:4-6).

### 5.     Plaintiffs Did Not Delay.

69.     Aereo operated in "stealth mode" prior to April 13, 2011.  Def.'s Ex. 9 (Kanojia

Decl. ¶ 17); Potenza Decl. Ex. 1 (Kanojia Dep. 225:9-18); Pls.' Ex. 44 (email chain between

Chaitanya Kanojia and Mike Sheb, Apr. 19, 2011).  During this time, no information about the

company was available to the public.

70.     Beginning on April 13, 2011, Aereo began what it characterized as a "beta test"

of the Aereo technology.  5/30 Tr. at 149:25-150:6 (Kanojia); Def.'s Ex. 9 (Kanojia Decl.

26

¶ 17). This test consisted of hand-picked, technologically savvy individuals who were invited to participate in the closed, private process. 5/30 Tr. at 217:22–218:24 (Kanojia).

71. During this technology test and through early January 2012, Aereo had, at most, 100 users. 5/30 Tr. at 218:25–219:10 (Kanojia).

72. On February 14, 2012, Aereo held a press conference at which it announced (a) having received $20.5 million in additional financing and (b) a March 14, 2012 public launch of its service. Def.'s Ex. 39 (Aereo Press Release, Feb. 14, 2012).

73. Even after the March 14, 2012 public launch, a potential subscriber had to submit a request to Aereo to receive an invitation to subscribe. At the present time, consumers still cannot become subscribers to Aereo without an invitation. Potenza Decl. Ex. 1 (Kanojia Dep. 146:9-12). The service is surrounded by a "velvet rope" to maintain exclusivity. 5/30 Tr. at 165:3-20 (Kanojia).

74. As of today, Aereo has only approximately 3,500 "subscribers," 5/30 Tr. at 219:11-13 (Kanojia), but none of them are yet paying customers. Instead, all are under a 90-day free trial. That trial period has not yet expired for any subscriber. 5/30 Tr. at 199:18-22 (Kanojia). As a result, Aereo has not charged any subscribers for the use of the Aereo service. 5/30 Tr. at 199:23-200:4 (Kanojia).

75. Unless enjoined, however, Aereo has announced it intends to expand to 75–100 markets by the end of 2012, including Chicago and Boston. Pls.' Ex. 2 (Ari Levy, *IAC Chairman Diller Sees Aereo Service in up to 100 Cities Within Year*, BLOOMBERG (Mar. 12, 2012); 5/30 Tr. at 250:23-251:1 (Lipowski).

76.     Given Aereo's "stealth mode" of operation, ABC, CBS, NBCU and Fox did not learn of Aereo until April 2011.[5]  WNET did not become aware of Aereo at all until its February 14, 2012 launch announcement.  Potenza Decl. Ex. 36 (Segaller Dep. 54:2-10); Pls.' Ex. 12 (Segaller Decl. ¶ 16).  Plaintiffs filed this lawsuit on March 1, 2012, ten business days after Aereo's first public announcement that it had functional technology, financial backing and plans for a purported public launch.  Pls.' Ex. 10 (Davis Decl. ¶¶ 34, 35); Pls.' Ex. 11 (Franks Decl. ¶ 33); Pls.' Ex. 1 (Bond Decl. ¶ 30).  This course of conduct is consistent with a reasonable policy of not "su[ing] lightly" and waiting for "Internet vaporware" to become a "real entity" before seeking judicial redress.  5/30 Tr. at 55:20-25 (Franks).  Aereo's contention that Plaintiffs' failure to sue sooner caused prejudice, *see* 5/30 Tr. at 159:13-161:15 (Kanojia) (noting expenditures by Aereo in hiring additional staff, making capital investments and supplier commitments, as well as raising additional capital), is directly contradicted by the admission that everyone at Aereo knew this lawsuit was "likely," including employees and investors.  5/30 Tr. at 173:17-177:11 (Kanojia).

77.     Plaintiffs regularly are presented with Aereo-like startups that have developed "new ways of distributing content."  5/31 Tr. at 356:10-357:4 (Brennan).  Many, however, never move from being an idea to being a company.  5/30 Tr. at 55:20-25 (Franks); Pls.' Ex. 1 (Bond Decl. ¶ 28).  It often is not apparent whether these new business concepts and ideas will

---

[5]     Although representatives of Fox spoke with Aereo CEO Chet Kanojia by telephone in June 2011, Mr. Kanojia was unable or unwilling to answer many of Fox's questions, 5/31 Tr. at 352:3-353:1 (Brennan), and did not follow up with further calls.  5/31 Tr. at 353:18-19 (Brennan).  Fox was surprised by Aereo's February 14, 2012 announcement of its public launch, because Fox "thought [Aereo] would have come back and asked us to license our content if they had planned to have any kind of commercial launch."  5/31 Tr. at 353:20-354:23, 357:1-4 (Brennan).

Redacted Public Filing

"work or not", and whether they are "legal or not."  5/31 Tr. at 356:10-357:4 (Brennan); *see also* 5/30 Tr. at 55:20-25 (Franks).  Plaintiffs do not "rush to sue people because we don't like their idea."  5/31 Tr. at 356:10-19 (Brennan); *see also* 5/30 Tr. at 55:20-25 (Franks); Pls.' Ex. 1 (Bond Decl. ¶ 28); Pls.' Ex. 10 (Davis Decl. ¶ 30).

78.     Plaintiffs did not sue Aereo prior to Aereo's February 14, 2012 announcement regarding its public launch, because Plaintiffs had substantial doubts that Aereo would ever become a viable commercial business, and did not believe that Aereo's technology could work as it had been described.  They believed that "it would violate the laws of physics in order for the product to work that way," and they "had a lot of questions about whether the service would ever get off the ground."  5/31 Tr. at 353:20-354:23, 356:10-25 (Brennan); 5/30 Tr. at 55:20-25 (Franks); Pls.' Ex. 1 (Bond Decl. ¶¶ 28-30); Pls.' Ex. 10 (Davis Decl. ¶ 33).

## III.   PROPOSED CONCLUSIONS OF LAW

1.     This is an action for copyright infringement under Section 501 of the Copyright Act, 17 U.S.C. § 101 *et seq.*

2.     This Court has exclusive subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338.

3.     The Court has personal jurisdiction over Defendant Aereo, and venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b).

4.     Section 502 (a) of the Copyright Act authorizes a court with jurisdiction over a civil action arising under the Act to grant "temporary" injunctions "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."  *See* 2 PAUL GOLDSTEIN, GOLDSTEIN ON COPYRIGHT § 13.1.2 (3d ed. 2012).

Redacted Public Filing

**A.      The Substantive Elements Of A Copyright Infringement Claim.**

5.      To prevail on their motion for a preliminary injunction, Plaintiffs must show:  (1)
(a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits
to make them a fair ground for litigation and a balance of hardships tipping decidedly in
[Plaintiff's] favor"; (2) likely "irreparable injury in the absence of an injunction;" (3) that "the
balance of hardships" tips decidedly in Plaintiffs' favor; and (4) "that the public interest would
not be disserved by the issuance of a preliminary injunction."  *Salinger v. Colting*, 607 F.3d 68,
79-80 (2d Cir. 2010) (internal quotation omitted); *see also Random House, Inc. v. Rosetta Books
LLC*, 283 F.3d 490, 491 (2d Cir. 2002).

6.      To demonstrate a likelihood of success on the merits, Plaintiffs must establish that
they own valid copyrights and that Aereo has violated one of the exclusive rights granted to them
by Section 106 of the Copyright Act.  *See NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476 (2d Cir.
2004).  Under Section 106, "[t]he owner of a copyright has the exclusive right to – or to license
others to – reproduce, perform publicly, display publicly, prepare derivative works of, and
distribute copies of, his copyrighted work."  *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117
(2d Cir. 2010).

7.      Plaintiffs are the legal or beneficial owners of the copyrights in multiple programs
that have been or are scheduled to be exhibited over broadcast television and a variety of other
media outlets.  The validity of Plaintiffs' ownership of these copyrights is established by the
certificates of registration and notices of advance infringement attached as Exhibit 3 to the ABC
Plaintiffs' complaint, 12 Civ. 1450, and Exhibit A to the WNET Plaintiffs' complaint, 12 Civ.
1543.

Redacted Public Filing

8.     For the purposes of this motion, Aereo has not contested that Plaintiffs own valid copyrights in any of the works identified in Exhibit 3 and Exhibit A to the complaints in these actions. *See* Pls.' Ex. 83 (stipulation regarding copyright ownership and validity).

9.     Plaintiffs in this motion challenge only Aereo's alleged violation of their public performance right with respect to Aereo's retransmission of their copyrighted programming contemporaneously with the OTA broadcasts of that programming – *i.e.*, while the Aereo service is still in the process of receiving the original primary broadcast transmission – whether accomplished through Aereo's "Watch Now" or "Record" mode.[6]

## B.     The Public Performance Right.

10.     Aereo's contemporaneous retransmissions of Plaintiffs' copyrighted broadcast programming are public performances under the plain meaning of the "Transmit Clause" of the Copyright Act.  In addition to the plain language, the legislative history of the Copyright Act makes clear that Aereo engages in what Congress intentionally included, in broad, forward-looking language, within the scope of a public performance.

11.     The central issue presented in this case is whether *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 134 (2d Cir. 2008) ("*Cablevision*"), requires a different conclusion. It does not.  This Court is bound to interpret *Cablevision* in light of the facts and circumstances presented to the Second Circuit.  It is clear, as described below, that the facts in *Cablevision* were limited to "time-shifting," as the Supreme Court had defined it in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 421 (1984), and that the holding is confined to the

---

[6]     Plaintiffs have reserved their rights with respect to whether the copies made by Aereo in the course of retransmitting Plaintiffs' OTA broadcast programming infringe their exclusive reproduction right under Section 106(1) of the Copyright Act, 17 U.S.C. § 106(1).  Pls.' 3/21/12 Br. 15 n. 10; 3/13 Tr. at 35:12-36:2.

Redacted Public Filing

transmission of performances from unique copies, which were made and controlled by users for time-shifting purposes, to those same users. The contemporaneous transmissions challenged by Plaintiffs in this motion do not concern time-shifting, as defined by *Sony* or as was before the Second Circuit in *Cablevision*.

12.     Time-shifting, as explained in *Sony* and as presented to the Second Circuit on the undisputed record in *Cablevision*, involved a user recording a copy of an original television broadcast, for playback at a time subsequent to the broadcast, through the same medium as the original broadcast, and at the same place and on the same device – typically a home television set. That is not what Aereo does. Instead, it captures Plaintiffs' OTA broadcast signals, transcodes them and streams the programming in real-time over the Internet, *i.e.*, an entirely different medium, where users are able to view the programming at different places and on different devices than they would or could view the original broadcast. More importantly, Aereo makes the transmissions of those programs available to the public – Aereo subscribers – while the primary OTA broadcast transmissions are still airing and being received by Aereo. *Cablevision* did not speak at all to such contemporaneous retransmissions, because Cablevision was duly-licensed to provide that service.

### 1.     The Transmit Clause.

13.     The Copyright Act of 1976, 17 U.S.C. § 101 *et seq*. ("Copyright Act"), confers upon copyright owners of audiovisual works the exclusive right to, among other things, "perform the copyrighted work publicly." *Id.* § 106(4).

14.     To perform a work "publicly" means:

>   to transmit or otherwise communicate a performance . . . to the
>   public, by means of any device or process, whether the members of

Redacted Public Filing

> the public capable of receiving the performance or display receive
> it in the same place or in separate places and at the same time or at
> different times.

17 U.S.C. § 101.

15.     In turn, to "transmit" a "performance" means "to communicate it ***by any device or***

***process*** whereby images or sounds are received beyond the place from which they are sent."  *Id.*

(emphasis added).  "Transmit" includes "all conceivable forms and combinations of wired or

wireless communications media, including but by no means limited to radio and television

broadcasting as we know them.  ***Each and every method*** by which the images or sounds

comprising a performance or display are picked up and conveyed is a 'transmission,' ***and if the***

***transmission reaches the public in any form,*** the case comes within the scope of clauses (4) or

(5) of section 106."  H.R. REP. NO. 94-1476, 94th Cong., 2d Sess., at 64-65 (1976) ("House

Report") (emphasis added).  The language of the Transmit Clause is broad because it covers "any

device or process" by which a performance to the public may be accomplished.

16.     The language of the Transmit Clause is consistent with the overall structure of the

Copyright Act.  The grants of exclusive rights in Section 106 are to be construed broadly

"subject to" the narrow and specific limitations that follow.  *See* House Report at 61 ("The

approach of the bill is to set forth the copyright owner's exclusive rights in broad terms in

section 106, and then to provide various limitations, qualifications, or exemptions in the 12

sections that follow"); *see also WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 603 (S.D.N.Y. 2011).

17.     The Transmit Clause includes both initial primary transmissions, such as those

made by broadcasters, as well as retransmissions of those primary transmissions.  One specific

purpose of including retransmissions in the Transmit Clause was to ensure that cable system

retransmissions of broadcast signals were deemed public performances, although retransmissions

33

are not limited to only those made by cable systems.  *See* House Report at 63 ("[A] cable

television system is performing when it retransmits the broadcast to its subscribers . . . ."); *id.*

("the concepts of public performance and public display cover not only the initial rendition or

showing, but also any further act by which that rendition or showing is transmitted or

communicated to the public"); *cf.* 17 U.S.C. § 111(f) ("primary transmission[s]" are those "made

to the public by a transmitting facility" itself and "secondary transmission[s]" are those that

"further transmit[] . . . a primary transmission").

18.     By including cable retransmissions within the Transmit Clause, Congress

specifically intended to overturn two Supreme Court decisions from the late 1960s and early

1970s, *Fortnightly Corp. v. United Artists Television*, 392 U.S. 390 (1968) and *Teleprompter

Corp. v. Columbia Broadcasting Systems, Inc.*, 415 U.S. 394 (1974).  Those decisions had read

the public performance clause of the 1909 Copyright Act in a way that meant that cable systems

were not "performing" broadcast programming when retransmitting broadcast signals to their

subscribers.  *See, e.g.*, *ivi, Inc.*, 765 F. Supp. 2d at 602 (discussing congressional intent to

overturn *Fortnightly* and *Teleprompter* by enacting the Transmit Clause).

19.     Based on the language from the then-applicable Copyright Act of 1909, the

Supreme Court reasoned that cable systems "[e]ssentially" do "no more than enhance[] the

viewer's capacity to receive the broadcaster's signals" by "provid[ing] a well-located antenna

with an efficient connection to the viewer's television set."  *Fortnightly*, 392 U.S. at 399.  In

striking resemblance to Aereo's arguments in this case, the Supreme Court held that the

"privilege of receiving the broadcast electronic signals and of converting them into the sights and

sounds of the program inheres in all members of the public who have the means of doing so,"

*Teleprompter*, 415 U.S. at 408, and that the "reception and rechanneling of these signals for

simultaneous viewing is essentially a viewer function." *Teleprompter*, 415 U.S. at 408.[7]   Aereo

makes essentially the same arguments here.  5/31 Tr. at 459:5-12.

20.     As a result of *Fortnightly* and *Teleprompter*, "cable systems had essentially

received authorization to retransmit broadcast television programming without incurring any

costs to the copyright owners." *ivi, Inc.*, 765 F. Supp. 2d at 602.  Congress viewed this result as

an "injustice" and, in overturning the decisions, also rejected the underlying rationale that

retransmitters could operate their business based on any "consumer right" to receive OTA

broadcasts.

21.     Since the enactment of the Transmit Clause, courts consistently have interpreted it

to include contemporaneous retransmissions of primary transmissions.  *See, e.g.*, *Nat'l Football

League v. PrimeTime 24 Joint Venture*, 211 F.3d 10, 13 (2d Cir. 2000) (contemporaneous

retransmission violates public performance right); *WGN Cont'l Broad. Co. v. United Video, Inc.*,

693 F.2d 622, 624-25 (7th Cir. 1982) (concluding that microwave carrier that captures broadcast

signals and retransmits them is not immune from copyright liability, absent application of

passive carrier exception).

22.     The Transmit Clause and judicial decisions applying it make it clear that the

retransmission of copyrighted works embodied in an original transmission only is permitted

---

[7]     Aereo has built a community of pooled antennas, the overwhelming majority of which it
puports to "rent out" on a per-program basis.  5/30 Tr. at 75:7-14 (Kelly).  What now are
commonly referred to as cable systems originally were known as CATV systems, which
stood for "Community ***Antenna*** Television."  *See Fortnightly*, 392 U.S. at 391.  Whether
Aereo's system is viewed as using one antenna or a pool of antennas, it is simply the latest
iteration of "any device or process" that Congress had in mind when it enacted the Transmit
Clause.

Redacted Public Filing

where it is expressly authorized, whether by negotiated or statutory license.  *See* 17 U.S.C.

§ 111(a) (exempting certain secondary transmissions from liability).

      23.    The Transmit Clause must be read in the context of the Copyright Act and

consistent with its overall purpose.  *See Samantar v. Yousuf*, 130 S. Ct. 2278, 2289 (2010) ("We

do not . . . construe statutory phrases in isolation; we read statutes as a whole." (quotation

omitted)).  Courts look to the object and policy of a law to implement true congressional intent.

*See Dolan v. Postal Serv.*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends

upon reading the whole statutory text, considering the purpose and context of the statute, and

consulting any precedents or authorities that inform the analysis."); *Langhorne v. Ashcroft*, 377

F.3d 175, 180 (2d Cir. 2004) ("It is axiomatic . . . that in fulfilling our responsibility in

interpreting legislation, we are not guided by a single sentence or member of the sentence but

(rather) look to the provisions of the whole law, and to its object and policy." (citation omitted)).

      24.    The Transmit Clause covers Aereo's transmissions of performances of Plaintiffs'

copyrighted works because they are "to the public."  Aereo:

- "communicate[s] . . . performance[s]" (*i.e.*, retransmits Plaintiffs' copyrighted broadcast programs);

- contemporaneously with the primary transmission;

- "beyond the place" from which Aereo captures, processes and retransmits performances of Plaintiffs' works;

- through a "device or process" (*i.e.*, Aereo's antennas, cables, transcoders, hard drives and Internet streaming servers);

- to "members of the public capable of receiving the performance" (*i.e.*, Aereo's paid subscribers) "in the same place or in separate places and at the same time or at different times."

Redacted Public Filing

25.     Under the plain language of the Transmit Clause, therefore, Aereo's real-time
retransmissions of Plaintiffs' OTA broadcast programs infringe Plaintiffs' exclusive right of
public performance.

26.     Every other court faced with the question of whether Internet retransmissions are
public performances has held, based on the plain language of the Transmit Clause, that streaming
a copyrighted work over the Internet is a public performance, because it is the functional
equivalent of a radio, television, cable or satellite transmission:

- *United States v. Am. Soc'y of Composers, Authors & Publishers*, 627 F.3d 64, 74 (2d Cir. 2010) (Internet streaming of musical works "constitute[s] public performances" just "like . . . television or radio broadcast[s]");

- *ivi, Inc.*, 765 F. Supp. 2d at 601 ("undisputed" that unauthorized Internet streaming of OTA broadcast signals "is making public performances"), *appeal docketed*, No. 11-788 (2d Cir. Mar. 1, 2011);

- *CBS Broad., Inc. v. FilmOn.com, Inc.*, No. 10-cv-07532 (S.D.N.Y. Nov. 22, 2010) (temporary restraining order) (entering temporary restraining order prohibiting Internet retransmissions of plaintiffs' OTA broadcasts);

- *Warner Bros. Entm't, Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1007 (C.D. Cal. 2011) (Internet streaming of motion pictures played from an individually "rented" remote DVD player was a public performance);

- *Live Nation Motor Sports, Inc. v. Davis*, No. 3:06-CV-276-L, 2007 WL 79311, at *4 (N.D. Tex. Jan. 9, 2007) (audio webcasts of Supercross event are public performances);

- *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 192 F. Supp. 2d 321, 332 (D.N.J. 2002) (transmissions of video clips from motion pictures over the Internet are public performances, even when it is the customer who selects the clip to be shown), *aff'd on other grounds*, 342 F.3d 191 (3d Cir. 2003);

- *Twentieth Century Fox Film Corp. v. iCraveTV*, Nos. Civ.A. 00-121, Civ.A. 00-120, 2000 WL 255989, at *7 (W.D. Pa. Feb. 8, 2000) (retransmission of OTA broadcast signals via the Internet "through use of 'streaming' technology . . . by means of the telephone lines and computers that make up the Internet . . . violates plaintiffs' rights to perform their works publicly and to authorize others to do so").

37

27.    There are no cases to the contrary and it is the position of the Copyright Office itself that Internet transmissions constitute public performances and, unless licensed, infringe. *See ivi, Inc.*, 765 F. Supp. 2d at 609-15.

28.    It also is "significant" that Congress has chosen not to enact any statutory license or exceptions to the Section 106 rights that would authorize Internet retransmissions of television broadcasts despite ample opportunity to have done so. *See ivi, Inc.*, 765 F. Supp. 2d at 616 ("[W]e find it significant that Congress has not taken any action over the decade since the Copyright Office first rejected the applicability of Section 111 to Internet retransmissions.").

29.    For these reasons, Aereo's contemporaneous retransmissions of Plaintiffs' OTA broadcasts to its subscribers violate Plaintiffs' exclusive right of public performance.  For the reasons explained below, *Cablevision* does not immunize Aereo's actions from infringement.

## 2.    *Cablevision* Was Limited To "Time-Shifting."

30.    In *Cablevision*, the Second Circuit determined, on the specific facts in the summary judgment record before it, that the playback to a subscriber of a copy of a television program that had been previously recorded by that subscriber was not a public performance.  The core of the Second Circuit's holding was that the previously recorded, "unique" copy was the source of the transmission to the subscriber on playback.  That copy created a new, stand-alone transmission, not a transmission that contemporaneously retransmitted the primary transmission. The Second Circuit held that it was required to look at the new transmissions, separate from the primary transmission, and that, in determining whether the performance was "to the public," it concluded that the audience for that transmission could only be the subscriber who, the Court found, had recorded the copy and requested the playback.  *See Cablevision*, 563 F.3d at 125 ("To

Redacted Public Filing

begin playback, the customer selects the show from an on-screen list of ***previously recorded*** programs." (emphasis added)).

31.     The "time-shifting" at issue in *Cablevision* and *Sony* also did not involve delivery through a different medium which affected a different commercial market; it was limited to playback on the same device authorized to receive the original transmission.

32.     The core of the dispute in this case is whether *Cablevision*'s holding, that the playback from a time-shifted copy is a private performance, applies beyond the specific facts of that case to Aereo's service.  Plaintiffs contend that *Cablevision* only addressed playback from a time-shifted copy and did not, and had no reason to, address contemporaneous retransmissions, which were fully licensed.  5/31 Tr. at 402:5-6, 418:10-12.

33.     Aereo, however, argues that *Cablevision* protects any service in which a copy is associated with an individual user in the course of a retransmission, regardless of whether the retransmission is contemporaneous with the original OTA broadcast.  5/31 Tr. at 439:13-17.  Aereo bases this argument largely on the fact that the words "time-shifting" do not appear *in haec verba* in the Second Circuit's decision and that the Second Circuit focused on the potential audience for a transmission from a user's copy.  Aereo 5/19/12 Br. at 16-17.

34.     At the hearing in this case, the Court specifically inquired as to the basis for Plaintiffs' position that *Cablevision* addressed only time-shifted copies – copies of entire programs intended to be viewed after the primary transmissions had concluded.  5/31 Tr. at 403:10-15; 455:9-22 (the Court).

35.     Plaintiffs noted the references in *Cablevision* to the fact that programs had been "previously recorded," that the Second Circuit had analogized the RS-DVR system to a video-

Redacted Public Filing

on-demand service insofar as a cable subscriber could, at the time of his or her choosing, view a movie that is "stored" on computers and that playback could be made only to the cable set-top box.  5/31 Tr. at 425:4-17; *see also Cablevision*, 536 F.3d at 124 ("RS-DVR customers may then receive playback of those programs through their home television sets . . . ."); *id.* at 131 ("We do not believe that an RS-DVR customer is sufficiently distinguishable from a VCR user . . . ."); *id.* at 125 (referring to "previously recorded" programs), *id.* at 135 (playback only to the set-top box authorized to receive cable transmissions).

36.    Additionally, although the Second Circuit did not use the words "time shifting," it did repeatedly describe the case as concerning viewers' use of "digital video recorders ('DVRs') instead of video cassette recorders ('VCRs') to record television programs and ***play them back later*** at their convenience."  *Cablevision*, 536 F.3d at 125 (emphasis added).  *See United States v. Carfora*, 489 F.2d 354, 356 (2d Cir. 1973) (noting that while the district court did not state the context "*in haec verba* . . . the entire tenor of the findings when read in the context of the record as a whole" makes the background facts clear).

37.    That the circumstances considered by the Second Circuit Court in *Cablevision* were limited to later playback from copies made for time-shifting purposes is made even clearer by the district court decision in *Cablevision*, which did expressly use the words "time-shifting" to describe the nature of the issue presented by that case.  *See Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.*, 478 F. Supp. 2d 607, 618 (S.D.N.Y. 2007) (discussing "time-shifting" as defined in *Sony* and observing that "apart from their time-shifting functions, the RS-DVR and the VCR have little in common"); *id.* at 609 ("The RS-DVR would permit these customers to . . . play the programs back for viewing at home"); *id.* at 614 ("stored for later playback").

Redacted Public Filing

38.     At the hearing, the Court also referred to a sentence in *Cablevision* that "[u]sing a remote control, the customer can record programming by . . . pressing the record button while viewing a given program."  5/31 Tr. at 398:6-18 (the Court); *cf. Cablevision*, 536 F.3d at 125. The Court questioned whether that reference in the Second Circuit's opinion undermined the argument made by Plaintiffs – that the only form of time-shifting at issue in *Cablevision* was that defined in *Sony*, *i.e.*, the recording of a whole program transmitted only after the OTA broadcast had completed.  5/31 Tr. at 398:14-18.  *See Sony*, 464 U.S. at 421-22 ("time-shifting" is made for the purpose of "later" home viewing of a television program).

39.     The sentence the Court referenced concerns only the recording function of the RS-DVR and is entirely consistent with the undisputed fact in *Cablevision* that, while viewing a program, a viewer could request that a recording be made of it.  It does not at all address the issue of the transmission of a playback from such recordings or mean that the Cablevision subscriber, having requested a recording, also could play back from the copy while the recording of the program was still "in-progress."  This Court can take judicial notice that one of the undisputed facts in *Cablevision* was that, unlike conventional DVRs, Cablevision's RS-DVR system ***did not even permit playback before the time-shifted recording had been completely made***.  *See* Plaintiffs' Local Rule 56.1 Statement at 10, ¶ 49, *Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.*, 478 F. Supp. 2d 607 (S.D.N.Y. 2007) (No. 06-3990-cv), Dkt. 36 (undisputed that RS-DVR subscriber "cannot begin to watch a copied Program ***until the entire Program has been copied***") (emphasis added); Defendant's Response to the Fox Plaintiffs' Local Civil Rule 56.1 Statement at 25-26, ¶ 49, *Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.*, 478 F. Supp. 2d 607 (S.D.N.Y. 2007) (No. 06-3990-cv), Dkt. 49

41

("Cablevision does not dispute that it designed and configured the RS-DVR to function in" that "particular manner"); *see also* Brief and Special Appendix for Defendants-Counterclaimants-Appellants at 8, *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008), No. 07-1480-cv, 2007 WL 6101602 ("Conventional DVRs can begin playing back a program before recording is complete; *the RS-DVR cannot*.") (emphasis added).[8]

40.    The Court also takes notice that, before the district court, Cablevision had emphasized that the case concerned traditional *Sony* time-shifting:

- "Like traditional set-top storage DVRs, Cablevision's RS-DVR . . . allow[s] customers to record and *time-shift* programming that is, in the first instance available to them as part of the cable service *for which they have already paid*. . . . *This is the time-shifting specifically authorized by the Supreme Court in Sony*."  Answer to Complaint and Counterclaim ¶ 56, *Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.*, 478 F. Supp. 2d 607 (S.D.N.Y. 2007) (No. 06 Civ. 3990 (DC)), Dkt. 4 (emphasis added).

- "This case involves Cablevision's Remote Storage Digital Video Recorder ('RS-DVR'), the next generation product offering that allows consumers to record television programming *for private time-shifting purposes*."  Corrected Memorandum of Law in Support of Defendants' Motion for Summary Judgment, at 2, *Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.*, 478 F. Supp. 2d 607 (S.D.N.Y. 2007) (No. 06 Civ. 3990 (DC)), Dkt. 63, 2006 WL 3886939 (emphasis added).

- "Cablevision, by providing RS-DVR, will be doing nothing more than enabling customers to engage in the *long-established and well-accepted practice of time shifting* . . . ."  *Id.* at 6 (emphasis added).

- "Indeed, the viewing by a customer of his or her own copy *of time-shifted programming* within the home is the very essence of a 'private' occurrence."  *Id.* at 33 (emphasis added).

---

[8]    Federal courts may take judicial notice that an assertion was made in a prior proceeding. *See, e.g.*, 21B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE EVIDENCE § 5106.4 (2d ed. & Supp. 2012); *see also Rocciscano v. Menifee*, 293 F.3d 51, 56 (2d Cir. 2002) (taking judicial notice of the arguments made in a prior, unrelated appeal when the previous panel resolved the appeal without reaching the briefed issue).

Redacted Public Filing

- "[A]ll Cablevision is doing through RS-DVR is providing consumers with **'time-shifting' technology**, which *Sony* established as a lawful fair use." Reply Memorandum in Support of Defendants' Motion for Summary Judgment at 2, *Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.*, 478 F. Supp. 2d 607 (S.D.N.Y. 2007) (No. 06 Civ. 3990 (DC)), Dkt. 54, 2006 WL 3607698 (emphasis added).

- "RS-DVR . . . **is a time-shifting technology** that enables customers to make copies of programs that *they* choose to record for **later home viewing from the linear channels they are entitled to receive**." *Id.* at 4 (emphasis added).

- "[T]he initial linear transmission of a program and subsequent playback of the RS-DVR copy are entirely separate transmissions, and **the initial linear transmission is fully licensed** and thus unquestionably lawful." *Id.* at 18 (emphasis added); *see also* 5/31 Tr. at 396:23–397:10 (the Court) (discussing the two separate transmissions).

- "[T]he ultimate transmission of a customer's **time-shifted copy to the customer's own home** is purely private in nature; thus, nothing that Cablevision does along the way can possibly be considered a 'step in the process' by which a work wends its way to a public audience." Reply Memorandum in Support of Defendants' Motion for Summary Judgment at 20 n.12, *Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.*, 478 F. Supp. 2d 607 (S.D.N.Y. 2007) (No. 06 Civ. 3990 (DC)), Dkt. 54, 2006 WL 3607698 (emphasis added).

41.     It further notes how extensively Cablevision's presentation to the Second Circuit focused on *Sony* time-shifting. Cablevision began by framing the "ISSUES PRESENTED" as whether the "use [of] the RS-DVR to make copies of television programs *for later home viewing*" – *i.e.*, time-shifting – "would directly infringe plaintiffs' public performance rights." Brief and Special Appendix for Defendants-Counterclaimant-Appellants at 1, *The Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) (No. 07-1480 Civ.), 2007 WL 6101602 (emphasis added).

42.     Cablevision then continued to argue that time-shifting justified its RS-DVR service:

- "This case concerns whether the Copyright Act proscribes a new technology – Cablevision's Remote Storage Digital Video Recorder or 'RS-DVR' – that . . . enables consumers *to time-shift television programs*." *Id.* at 3 (emphasis added).

- Cablevision's opening brief contained an entire section under the heading, "**Consumer Time-Shifting Technology**." *Id.* at 4.

- "The evidence showed that, to the customer, the RS-DVR and traditional set-top DVR function almost identically.  Both accomplish the same thing: *time-shifting of television programming*." *Id.* at 7 (emphasis added).

- "The program can be viewed *only from the particular set-top box used to record it.*" *Id.* at 9 (emphasis added).

- "Cablevision's RS-DVR performs the same lawful *time-shifting* function as a set-top DVR." *Id.* at 16 (emphasis added).

- "The only significant difference between the RS-DVR and traditional DVRs and VCRs is where the copies are stored.  By moving them to a central location, Cablevision can offer *time-shifting capabilities* more affordably." *Id.* at 18 (emphasis added).

43.    In light of the district court decision and the arguments actually presented to the Second Circuit in *Cablevision*, there can be no doubt about the facts and circumstances before the Second Circuit, which necessarily limited the scope of its holding.  Those facts involved:  (1) copies made by a subscriber for purposes of *Sony* time-shifting; (2) of programming Cablevision was licensed to retransmit in the first instance; (3) played back at a time selected by that same subscriber and exclusively to that subscriber's set top box; (4) through the same medium (the cable system) and through the same device (the in-home television) as is used to receive the original licensed programming; and (5) a playback possible only after the completion of the primary transmission of the program that had been recorded.  The hearing in this case

Redacted Public Filing

demonstrated that none of these limiting facts are present in Aereo's contemporaneous retransmissions.[9]

### 3.    The Court Must Interpret *Cablevision* According To The Facts And Circumstances Before The Second Circuit.

44.    As the Second Circuit recently has cautioned, the governing principles to be derived from its decisions are cabined by the facts and circumstances before the Court:

> It is axiomatic that appellate judges cannot make law except insofar as they reach a conclusion based on the ***specific facts and circumstances presented to the court*** in a particular appeal.  Subordinate courts and subsequent appellate panels are required to follow only these previous appellate legal "holdings."

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 899 (2d Cir. 2011) (emphasis added).

45.    These observations have particular significance in *Cablevision*, where the Second Circuit was careful to limit its decision to the undisputed facts, as it expressly stated multiple times in its decision.  *See Cablevision*, 536 F.3d at 133 ("We conclude only . . . on the facts of this case . . . ."); *id.* at 139 ("We base this decision on the application of undisputed facts . . . ."); *id.* at 130 ("[O]ur inquiry is necessarily fact-specific . . . .").

46.    As then-Solicitor General Kagan observed in the specific context of *Cablevision*, "although scattered language in the Second Circuit's decision could be read to endorse overly broad, and incorrect, propositions about the Copyright Act, the court of appeals was careful to tie its actual holdings to the facts of this case."  Brief of the United States as Amicus Curiae at 6,

---

[9]    The fact that Cablevision was fully licensed for the original (contemporaneous) transmission to subscribers, *Cablevision*, 536 F.3d at 123, further explains why the Court in *Cablevision* simply had no occasion to consider contemporaneous transmissions or playback from incomplete in-progress recordings.  It was the second, unauthorized transmission from the time-shifted copy stored at Cablevision's head-end to the subscriber's set-top box that was at issue in *Cablevision*.  *Cablevision*, 536 F.3d at 125-26.

*Cable News Network, Inc. v. CSC Holdings, Inc.*, 129 S. Ct. 2890 (2009) (No. 08-448); *see also id.* at 20-21 (noting that broad "construction [of Second Circuit's opinion] could threaten to undermine copyright protection in circumstances far beyond those presented here, including with respect to VOD services or situations in which a party streams copyrighted material on an individualized basis over the Internet.").

> **4.    Consumers' Ability To Access Broadcast Television Signals Does Not Authorize Aereo's Internet Transmissions.**

47.    Aereo does not, as it claims, simply make it "easier" for users to receive OTA broadcast television.  Aereo 4/4/12 Br. 1.  In fact, Aereo does not provide consumers with access to broadcast television *signals* at all.  5/30 Tr. at 90:18-25 (Kelly).  "'Broadcast television' is transmitted over public airwaves and can be received with only a television set and an antenna." *Twentieth Century Fox Film Corp.*, 478 F. Supp. 2d at 610 (citing to report submitted by Cablevision's expert Professor Horowitz, also Aereo's expert).  The record in this case demonstrates that Aereo takes broadcast signals and processes them so that the embedded programming can be made available through the Internet, a non-broadcast medium.  *See* 5/30 Tr. at 90:10-25 (Kelly).  The Internet is a different distribution channel and a different commercial market than OTA broadcast television.  Pls.' Ex. 11 (Franks Decl. ¶ 12); 5/30 Tr. at 60:22-61:3 (Franks).

48.    Aereo's position thus blurs the distinction between broadcast *signals*, which are subject to the Communications Act's regulatory framework, and the copyrighted broadcast *programming* transmitted by those signals, for which the Copyright Act grants exclusive rights. *See, e.g., In re Implementation of the Cable Television Consumer Prot. and Competition Act of 1992*, Report and Order, 8 FCC Rcd. 2965, 3004-05 (1993) ("Congress created a new

Redacted Public Filing

communications right in the broadcaster's signal, completely separate from the programming contained in the signal.  Congress made clear that copyright applies to the programming and is thus distinct from signal retransmission rights.").

49.     Neither the Communications Act nor the Copyright Act confers on anyone, in any way relevant to this case, any statutory right to receive and disseminate either television broadcast signals or the programming that they carry.  *See* House Report at 91 (Section 111 compulsory license "does not cover or permit a cable system, or indeed any person, to tape or otherwise record a program off-the-air and later to transmit the program from the tape or record to the public").

50.     Aereo interposes itself between the broadcaster and the consumer for profit, then attempts to rely on what it asserts are consumer rights, which it claims it simply facilitates.  The Second Circuit, however, already has rejected Aereo's "stand in the shoes" argument.  *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 112 (2d Cir. 1998) (holding for-profit radio retransmission service was infringing and could not "stand in the shoes" of its non-infringing customers "[g]iven the potential for large-scale retransmission") (citing *Princeton Univ. Press v. Mich. Document Servs.*, 99 F.3d 1381, 1389 (6th Cir. 1996)).

51.     Furthermore, Aereo's system provides far more to a subscriber than either the receipt of OTA broadcast transmissions using a terrestrial antenna or time-shifting functionality, as defined in *Sony*.  *Sony*, 464 U.S. at 423.  Aereo provides an entire, fully-featured video programming service that currently is based on OTA broadcast programming, ███████████
███████████████████████████████████  *See* Proposed Findings of Fact ¶¶ 8, 14-15, 18-19.

Redacted Public Filing

### 5.    Aereo's Transmissions Are Different From *Sony* And *Cablevision* Time-Shifting.

52.    In *Sony* and in *Cablevision*, time-shifting meant recording a program for later playback, after the original broadcast had concluded.  That playback was over the same medium, to the same location and using the same receiving device, typically the in-home television.  Thus, time-shifted playback was a viewing experience the court considered identical in all material ways to the viewing experience of the original broadcast – just later in time.  Based on the very nature of time-shifting, *Sony* found that it was unlikely that the copyright owners could be harmed by the practice.  *Sony*, 464 U.S. at 456.

53.    By contrast, the record here shows Aereo's transmissions are fundamentally different.  Aereo provides Internet delivery to any place and on any Internet device.  More importantly, it provides contemporaneous viewing of an OTA broadcast program while that program is still being aired.  That is exactly what Aereo itself advertises when it states "Live Broadcast TV, meet the Internet.  Finally. . . .  No cable required."  Pls.' Ex. 15 (Aereo homepage); 5/30 Tr. at 188:9-18 (Kanojia).  Aereo's transmissions are not in any sense time-shifting, as that term was understood in *Sony* or as was presented to the Second Circuit based on the record in *Cablevision*.

54.    Read in context of the circumstances it considered, *Cablevision* held that the playback of a *Sony* time-shifted recording is not a public performance.  Aereo does not present comparable circumstances.  Because *Cablevision* addressed a fundamentally different set of circumstances, it does not require this Court to disregard the fact – plain under the Transmit Clause – that Aereo is making unauthorized public performances of Plaintiffs' programs in violation of the Copyright Act.

48

###### 6.  *Cablevision* Does Not Apply To Aereo, Which Contemporaneously Retransmits Plaintiffs' Copyrighted Programs.

55.     Cablevision subscribers could not, under any scenario, use the RS-DVR to view a program that was still being transmitted live.  *Cablevision*, 536 F.3d at 124-26.  That difference between the facts in *Cablevision* and Aereo's service is significant because the legislative history of the Transmit Clause, other provisions of the Copyright Act and courts confirm that the source of a retransmission that is contemporaneous with the primary transmission is the original (or primary) transmission – here, Plaintiffs' OTA broadcasts.  *See*, *e.g.*, *Nat'l Football League*, 211 F.3d at 13 (contemporaneous retransmission of broadcasts violates public performance right); *WGN Cont'l Broad.*, 693 F.2d at 624-25 (microwave carrier that captures broadcast signals and retransmits them not immune from copyright liability absent application of passive carrier exception in 17 U.S.C. § 110(a)(3)).

56.     In *Cablevision*, the playback from the copies was separated from the original transmission in a temporal sense.  That is because "the RS-DVR" in *Cablevision* could not "begin playing back a program before recording is complete."  *See* Brief and Special Appendix for Defendants-Counterclaimants-Appellants at 8, *The Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) (No. 07-1480 Civ.), 2007 WL 6101602.  The opinion makes clear that the relevance of the copies being "unique," aside from the temporal break with the primary transmission, also is the extent to which the playback from each unique copy, only to the subscriber associated with that copy, "may limit" the "potential audience" for that transmission. *Cablevision*, 536 F.3d at 138.

57.     For this reason, the Second Circuit concluded that the playback of the RS-DVR copies involved a new transmission for which the time-shifted recording of the entire work – not

Redacted Public Filing

the original OTA broadcast – was the sole source.  In the words of that court, in the case of a time-shifted recording, the "self-made copy is used to **create** that transmission."  *Id*. at 137 (emphasis added).

58.     That does not describe the Aereo system.  Aereo captures OTA broadcast signals and, upon conversion to an Internet-ready format, contemporaneously retransmits the programs carried in those signals to any subscriber who so requests, whether through the "Watch Now" service or as the program is being recorded in the "Record" mode, while Aereo is still receiving the primary transmission.  *See* 5/30 Tr. at 73:11-19, 76:24-25, 100:15-23 (Kelly); *id.* at 27:5-7 ("To the extent there are any differences between the two modes [Record and Watch Now], they are not functional differences at all").  That retransmission can begin almost immediately upon Aereo receiving the broadcast signal, *id.* at 100:15-23 (Kelly), whether one is using the "Watch Now" function or, as demonstrated at the hearing, the "Record" and watch at the same time function.  5/30 Tr. at 140:18-141:13 (Kanojia).  The primary OTA broadcast transmission, as captured by the "in-progress" copy of that transmission made on Aereo's server, is the source "used to create" Aereo's retransmission.  The amount and speed of the data that streams from the OTA broadcast directly and contemporaneously to the subscriber led Aereo's expert to compare the flow of data to that of water through a "fire hose."  5/31 Tr. at 310:8-19 (Horowitz).

59.     That incomplete "in-progress" copy is, therefore, unlike the completed, stand-alone copy of an entire program in *Cablevision* from which the time-shifted transmission of a television program originated.  *Cablevision*, 536 F.3d at 123 (explaining that RS-DVR was used to "record television programs" and "play them back later"); *id.* at 125 (explaining that RS-DVR users "can only play content that they previously requested to be recorded"); *id.* at 126

50

(contrasting playback "at a later time" with "real time").  As noted, unlike the "Record" function in Aereo's service, playback in *Cablevision* could not commence until the OTA broadcast of the program had concluded and the recording had completed.  Brief and Special Appendix for Defendants-Counterclaimant-Appellants at 8, *The Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) (No. 07-1480 Civ.), 2007 WL 6101602 ("Conventional DVRs can begin playing back a program before recording is complete; the RS-DVR cannot.").

60.     Under *Cablevision*, in order to limit the audience for a transmission from a copy to a single subscriber, the copy must serve to "break the chain" of the primary transmission to the public.  The copy limits the audience when the chain is broken both because (a) the playback is limited to the specific user and (b) the playback occurs from a completed recording, severed from the primary transmission by playback at a time after the original broadcast has concluded, not through an "in-progress" recording still connected to the primary transmission (*i.e.*, time-shifting is required to break the chain).  The Second Circuit held in *National Football League* that a "public performance . . . includes each step in the process by which a protected work wends its way to its audience."  211 F.3d at 13; *see also Cablevision*, 536 F.3d at 137 ("[A]ny link in a chain of transmissions made by a party constitutes a public performance . . . ."); *David v. Showtime/The Movie Channel, Inc.*, 697 F. Supp. 752, 759 (S.D.N.Y. 1988).

61.     The Second Circuit distinguished *Cablevision* from the facts in *National Football League* because, in its view, the fully time-shifted, user-made copy broke the chain of contemporaneous retransmission.  Only that copy – not the original broadcast – was the basis of the RS-DVR playback and that copy consisted solely of "content that [users] **previously** requested to be recorded."  *Cablevision*, 536 F.3d at 125 (emphasis added).  The RS-DVR

51

playback of that copy was thus viewed by the court as a new transmission and, because it was deemed to be private, neither Cablevision nor the user was engaged in a public performance.

62.     While the original OTA broadcast is still airing (*i.e.*, the primary transmission is still being received by the Aereo service and its subscribers), a copy of the sort Aereo makes does not break the transmission chain and in no way limits the audience for that transmission. During the broadcast, that an in-progress copy is being made does not limit any Aereo subscriber from receiving Aereo's contemporaneous retransmissions.  As long as the live programming is streaming through Aereo's system, the connection to the contemporaneous OTA transmission remains intact, as demonstrated visually in Professor Kelly's demonstrative and that link remains unbroken.  *See* Pls.' Ex. 85.  The source of Aereo's retransmissions always remains the original broadcast simply routed through Aereo servers.  Therefore, the subscriber can view the program "live," even with use of the pause or fast forwarding function, just like a conventional DVR offered by cable retransmitters.  5/30 Tr. at 180:3-22 (Kanojia).

63.     Furthermore, there is no limit to the number of copies that Aereo is making.  For this reason, the in-progress copies made while the original broadcast is still airing do not, in any meaningful way, "limit" the potential or actual audience for the retransmitted broadcast.  As Aereo's CEO Mr. Kanojia admitted at the hearing, it is "possible, given Aereo's current capabilities, for thousands and thousands and thousands of people to watch the Superbowl on Aereo," all at the same time.  5/30 Tr. at 226:19-23 (Kanojia); *see also* Potenza Decl. Ex. 1 (Kanojia Dep. 47:23-49:4) (admitting that multiple viewers, "strangers" to one another, can watch the same television program in different places at the same time).  He also admitted, as did Professor Horowitz, that it was possible to watch television programs on Aereo, as they aired, on

Redacted Public Filing

a plane, on a train and even from the Caribbean, well beyond the scope of Plaintiffs' original U.S. transmissions.  5/30 Tr. at 225:6-18, 227:1-5 (Kanojia); 5/31 Tr. at 331:13-22 (Horowitz).

64.     The "in progress" copying, therefore, is just a step in a connected and contemporaneous process that culminates in a performance to many "members of the public," all of whom are capable of receiving that retransmission simultaneously.  It is unlike the transmission of a performance from true time-shifted copies, which limit an audience, at a minimum, to those who have both pre-recorded a program and, on an individualized basis, play the program back at individualized times, in a manner that is severed from the original broadcast transmission.  5/31 Tr. at 494:5-495:21.

65.     This is no minor point.  The record demonstrates that when Aereo advertises itself to potential subscribers, it actively promotes, above all else, that Aereo is a means to "watch live TV" without a cable subscription.  Pls.' Ex. 34 (Introducing Bamboom); Pls.' Ex. 15 (screenshot of https://aereo.com/home); Pls.' Ex. 33 (Aereo New York Launch: Positioning & Messaging Platform); 5/30 Tr. at 188:13-21 (Kanojia); *id.* at 189:1-190:14 (60 second Aereo promotional clip discusses "Live TV" for 55 seconds).

66.     Aereo's own characterization of its service to its customers is relevant.  *See* Pls.' 5/1/12 Br. 20-21 (citing *Cablevision*, 536 F.3d at 125 ("***To the customer***, however, the processes of recording and playback on the RS-DVR ***are similar*** to that of a standard set-top DVR." (emphasis added)).  Consumer perception of a service matters in determining whether a copyright right has been violated.  *See, e.g., N.Y. Times Co. v. Tasini*, 533 U.S. 483, 499 (2001) (analyzing copyright claim based on how works are "presented to" and "perceptible by" users).

Redacted Public Filing

Here, Aereo sells itself as a real-time retransmission service, not as enabling subscribers to watch OTA broadcasts through time-shift recordings.

67.     Once again, the arguments presented to the Second Circuit in *Cablevision* reinforce this point.  The Cablevision appellants distinguished *PrimeTime 24* from its RS-DVR service specifically because, in *PrimeTime 24*, the transmissions were "*proximate*" in time "to a program's ultimate delivery" – i.e., *not* time-shifted.  Reply Brief for Defendants-Counterclaimants-Appellants at 36, *The Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) (No. 07-1480), 2007 WL 6101594 (emphasis in original); *see also* Reply Memorandum in Support of Defendants' Motion for Summary Judgment at 20 n.12, *Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.*, 478 F. Supp. 2d 607 (S.D.N.Y. 2007) (No. 06 Civ. 3990 (DC)), Dkt. 54, 2006 WL 3607698 ("In *Primetime 24*, the ultimate transmission clearly was to a public audience.  By contrast here, the ultimate transmission of a customer's **time-shifted** copy to the **customer's own home** is purely private in nature; thus, nothing that Cablevision does along the way can possibly be considered a 'step in the process' by which a work wends its way to a public *audience*") (bold, italic emphasis added; italic emphasis in original).  With the RS-DVR, "by contrast, the processes are not proximate to a program's ultimate delivery" because "[such processes] occur before . . . a customer even chooses to *record* a program, let alone play it back."  Reply Brief for Defendants-Counterclaimants-Appellants at 36 (emphasis in original).

68.     Because the Aereo in-progress copies do not break the chain of transmission or otherwise "limit" the audience for Aereo's retransmissions of an OTA broadcast, *Cablevision* does not apply.  *Cablevision*, 536 F.3d at 138.

Redacted Public Filing

**7.   Aereo's Interpretation Of *Cablevision* Undermines The Public Performance Right In Ways Congress Did Not Intend And Is Inconsistent With The Copyright Act.**

69.   The failure of Aereo's in-progress copies to break the chain means that under Aereo's approach to *Cablevision*, the exclusive right of public performance for OTA television broadcasts would become non-exclusive.  If all it took were to pass the data stream through an individual subscriber's "file" on a computer server before retransmission, not only Aereo, but anyone, without worrying about the public performance right, could establish a commercial business selling Internet access to the programs contemporaneously with their original airing. 5/31 Tr. at 452:20-453:1.  Beyond that, as the Court observed in its questioning at the hearing, the same might very well hold true more broadly for other Internet transmissions, as long as a unique user copy was interposed between the storage copy and the transmission to the user.  5/31 Tr. at 451:18-452:22.[10]

---

[10]   Aereo's response is to distinguish the unique "buffer" copies made in the course of other Internet transmissions from the buffering function performed by the temporary data file used by Aereo on the basis that those Internet transmission "buffer" copies are not sufficiently fixed.  That purported distinction, however, does not recognize that buffer copies may also be regarded as fixed.  *See Marobie-FL, Inc. v. Nat'l Ass'n of Fire Equip. Dist.*, 983 F. Supp. 1167, 1178 (N.D. Ill. 1997) (copy fixed where "information does not remain in the RAM of [defendant's] computer, but is *immediately* transmitted over the Internet" (emphasis added)). In such case, the differences between Aereo's service and that of other Internet transmissions would evaporate and the interpretation of *Cablevision* urged by Aereo would free other Internet service providers from public performance liability.  To the extent that Aereo contends that copyright owners could nonetheless sue such service providers for violation of the reproduction right, that argument diminishes the public performance right, disregards the independent nature of each exclusive right and ignores that the several rights might be owned by different persons.  Furthermore, it could create incentives for service operators to base their operations (and their unique, though infringing, server copies) outside the United States, which could place them beyond the reach of the United States Copyright Act.  *See, e.g., Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1099 (9th Cir. 1994) ("mere authorization" of extraterritorial infringement "not cognizable under the United States copyright laws because [acts of infringement] occur entirely outside of the United States").

Redacted Public Filing

70.     Aereo argues that, even if the Court holds there is no "unique copy" within the meaning of *Cablevision*, its retransmissions would still be "private performance[s] . . . [b]ecause there are individual antennas," 5/31 Tr. at 443:14-17, assigned to a subscriber for the duration of a particular program.  That argument is unavailing for several reasons.  First, the antennas are just another shared resource "assigned to multiple individuals over time."  5/30 Tr. at 77:23-78:2 (Kelly).  Second, Professor Volakis, at a minimum, has raised serious doubt that the Aereo "antennas" in fact function independently to capture an OTA broadcast signal.  Proposed Findings of Fact ¶¶ 36-40.  Third, courts faced with similar "rental" or "leasing" defenses have uniformly rejected them.  *Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 156 (3d Cir. 1984) (rejecting "euphemistic[]" "rental" label; transmission of performances from centrally located VCR to private booths at back of store infringing public performance); *On Command Video Corp. v. Columbia Pictures Indus.*, 777 F. Supp. 787, 789 (N.D. Cal. 1991) (rejecting "electronic rentals" label); *Warner Bros. Entm't, Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1009-12 (C.D. Cal. 2011) (rejecting "rental" defense involving Internet streaming from individual DVD players).

71.     Aereo's interpretation of *Cablevision* also allows cable operators and other MVPDs to engineer their systems like Aereo to provide retransmissions of OTA broadcasts to their subscribers, while avoiding the copyright and retransmission licenses established by Congress.  Those practices plainly would be contrary to the intent of Congress in ensuring that such distributors pay for the right to retransmit the programming in OTA television broadcasts and for the right to retransmit the signal itself.  *See* S. REP. NO. 102-92, at 35 (1992) ("[The Committee] does not believe that public policy supports a system under which broadcasters in

56

effect subsidize the establishment of their chief competitors."), *reprinted in* 1992 U.S.C.C.A.N. 1133, 1168 ("1992 Act Senate Report"); 17 U.S.C. § 111(c)(1) (permitting statutory license for cable secondary transmissions "of a ***work*** embodied in a primary transmission made by a broadcast station" where "carriage of the ***signals*** comprising the secondary transmission" (emphasis added)); *id.* § 122(a)(1) (providing statutory license for satellite carriers essentially identical to § 111(c)(1)).

72.     Aereo's broad application of *Cablevision*'s public performance analysis has already been called into question by copyright scholars.  Professor Goldstein, for instance, cautions that a broad interpretation of *Cablevision* like Aereo advocates would read the "same place/same time" "different place/different time" language out of the statutory definition of public performance.  *See* 2 Paul Goldstein, Goldstein on Copyright § 7.7.2, at 7:168 (3d ed. 2012 supp.) (cautioning against a reading of *Cablevision* that would effectively render the "same place/same time" "different place/different time" language surplusage).

73.     Ultimately, copyright cases, like all disputes, must be decided based on rules of construction, application of precedent and common sense.  *See, e.g.*, *ASCAP*, 627 F.3d at 72. Because Aereo's interpretation of *Cablevision* disregards time-shifting as a limiting principle, Aereo's interpretation has no limiting principle.  Aereo's position would allow "technology [to] beat the public performance restriction," 5/31 Tr. at 452:3-4, a result that would contravene clear congressional intent to draft the Transmit Clause in broad, forward-looking, technologically neutral language.  *See* House Report at 64-65.  *Cablevision* does not compel the Court to adopt such an extreme interpretation.

Redacted Public Filing

### 8. Aereo, Not Its Subscribers, Transmits The Performances And Makes The Copies.

74.     Finally, contrary to Aereo's contention, it is Aereo that transmits OTA broadcast programming to consumers and not the consumers transmitting to themselves.  5/30 Tr. at 20:7-8; 5/30 Tr. at 212:23–213:1 (Kanojia).  As *Cablevision* noted, its conclusion that "the customer, not Cablevision, 'does' the copying does not dictate a parallel conclusion that the customer, and not Cablevision, 'performs' the copyrighted work.  The definitions that delineate the contours of the reproduction and public performance rights vary in significant ways."  *Cablevision*, 536 F.3d at 134.

75.     To "transmit," as defined in the Copyright Act, means "to ***communicate*** [a performance] by any device or process whereby images or sounds are ***received*** beyond the place from which they are sent."  17 U.S.C. § 101 (emphasis added).  The plain language of the Copyright Act and the ordinary understanding of "transmit" make clear that it takes two – a sender and a receiver – to transmit a work.  It is the transmitter (Aereo) who "communicate[s]" performances "by any device or process," to subscribers who "receive[]" them "beyond the place from which they are sent." 17 U.S.C. § 101.

76.     It is not a reasonable interpretation of the Transmit Clause to conclude that users transmit works to themselves when they click "Watch" or "Play" on Aereo or other Internet websites.  *Cablevision*, 536 F.3d at 134 (assuming that Cablevision, not its subscribers, makes the transmission when a playback occurs).[11]

---

[11]     In addition, it is Aereo, not its subscribers, that transcodes and processes the broadcast signals in order to deliver the programming contained therein to those subscribers over the Internet.  5/30 Tr. at 100:15-23 (Kelly).

Redacted Public Filing

77.     Almost all Internet video streams begin with a user pressing a "play" button, followed by an automated response that initiates a transmission from the server to the user.  5/30 Tr. at 93:16-94:18 (Kelly).  If every such user is transmitting to himself (and only himself), then, by definition, no Internet performance could be "to the public."  Aereo's interpretation would thus write the exclusive right of public performance out of the Copyright Act for all transmissions over the Internet and in other media where a transmission occurs as an automated response to a user pressing a "play" or "watch" button.

78.     Moreover, it is Aereo, not the subscriber, who makes the "buffer" copy that is used to facilitate the retransmission.  That is different from the facts in *Cablevision*, where the Second Circuit's holding that the subscriber made the copy was based on its view that the "necessary element of volition" was "supplie[d]" by the subscriber, who "actually presses the button to make the recording."  *Cablevision*, 536 F.3d at 131.  By contrast, there is no consumer volition in causing the "buffer" copy to be made in connection with Aereo's real-time retransmissions because such copy is made automatically when watching and the subscriber does not press RECORD.  5/30 Tr. at 95:19-98:22 (Kelly).  When the subscriber does, however, volitionally elect to "Save" a program, that is done by clicking on the "RECORD" button.  5/30 Tr. at 89:18-21 (Kelly).  That is the function that corresponds to "press[ing] the button" to make the recording on an RS-DVR in *Cablevision*.  Aereo's "buffer" copies, made in connection with its real-time retransmissions, are directly analogous to the buffer copy in *Cablevision*, which the court concluded was made by *Cablevision*, not the user.  *Cablevision*, 536 F.3d at 133.

79.     In light of the plain meaning of the statutory text, Aereo's interpretation of *Cablevision* is untenable.

59

### C.    Irreparable Harm.

80.    Injunctive relief "has nearly always" been issued "upon a finding of likelihood of success on the merits" in a copyright case. *Salinger*, 607 F.3d at 76.  That is because the factual consequences of a violation of a "right to *exclude*" plainly render monetary remedies inadequate in a wide range of circumstances. *Id.* at 82 (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 395 (2006)).

81.    "Harm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer. . . . [C]ourts have tended to issue injunctions [in the context of copyright infringement cases] because 'to prove the loss of sales due to infringement is . . . notoriously difficult.'" *Salinger*, 607 F.3d at 81 (citation omitted).  Plaintiffs have amply demonstrated the existence of this type of irreparable harm.

82.    The evidence in the record on irreparable harm, including the live testimony of Martin D. Franks, Executive Vice President, Planning, Policy and Government Relations at CBS, and Sherry Brennan, Senior Vice President, Distribution Strategy and Development, at Fox, as well as the declarations of Mr. Franks, Pls.' Ex. 11, Ms. Brennan, David Davis, President and General Manager of WABC-TV, Pls.' Ex. 10, Madison Bond, Executive Vice President of Content Distribution at NBCUniversal Media, Pls.' Ex. 1, Salil Dalvi, Senior Vice President and General Manager of Strategic Ventures at NBCUniversal Digital Distribution, Pls.' Ex. 9, and Steven Segaller, Vice President of Programming for WNET, Pls.' Ex. 12, and the designated deposition transcripts received in evidence, demonstrate that irreparable harm is both imminent and "inevitable."  Potenza Suppl. Decl. 3 (Bond Dep. 56:8, 106:2); Pls.' Ex. 11 (Franks Decl. ¶ 26).

Redacted Public Filing

### 1.    Aereo Disrupts The Economic Ecosystem Of Broadcast Television.

83.    Regardless of the source, producing or licensing top quality television programming is enormously expensive.  For example, as publicly reported, NBCU paid the National Football League ("NFL") nearly $10 billion dollars for the rights to broadcast NFL Sunday Night Football games for the next nine years.  Pls.' Ex. 1 (Bond Decl. ¶ 11); Pls.' Ex. 4 (Anthony Crupi, *NFL Hammers Out Nine-Year Rights Renewals with NBC, CBS, Fox*, AdWeek).

84.    Maintaining both advertising and alternative revenue streams is essential for free, OTA broadcasting to remain a viable competitor to cable and satellite distributors – which enjoy revenues from both advertising and subscription fees – for premiere sports events and other top-quality programming.  Pls.' Ex. 10 (Davis Decl. ¶ 21).

85.    Aereo disrupts all of these revenue streams.  Aereo:

- Devalues broadcasters' live streams, *see* Proposed Findings of Fact ¶¶ 42-45;

- Diverts views away from broadcasters' websites, reducing advertising revenue and goodwill, *see* Proposed Findings of Fact ¶ 46;

- Disrupts Internet businesses licensed by Plaintiffs, such as Netflix and Hulu and disrupts legitimate mobile broadcast services, such as DYLE, *see* Proposed Findings of Fact ¶¶ 47-50;

- Decreases advertising revenue by operating outside of the Nielsen-monitored ecosystem, *see* Proposed Findings of Fact ¶¶ 51-57;

- Undermines retransmission and content carriage negotiations, *see* Proposed Findings of Fact ¶¶ 58-62;

- Injects uncertainty into licensing negotiations that will lead to higher costs for broadcasters to license content and lower revenue from their licensed content, *see* Proposed Findings of Fact ¶¶ 63-67.

86.    Nearly identical harms – "disruption of advertising models," "interference with distribution agreements," and "interference with plaintiffs' licensing of their own and other

61

websites to perform their content" – were found irreparable in *ivi*. *ivi, Inc.*, 765 F. Supp. 2d at 617-18.  The court characterized the damage from those harms as "'notoriously difficult' to prove and nearly impossible to quantify, and accordingly . . . irreparable." *Id.* at 618 (quoting *Salinger*, 607 F.3d at 82).

87.     In *ivi*, as here, *see* 5/31 Tr. at 472:4-473:10, the defendant "insisted that . . . there have been no harms and that there was no submission of any of the speculative alleged harms coming true." *ivi, Inc.*, 765 F. Supp. 2d at 620 (internal quotations omitted).  The court, however, found "[t]here can be no dispute that by taking away viewers from sanctioned entities which compensate or otherwise obtain permission from plaintiffs for the use of their works, defendants are intruding on plaintiffs' copyrights and taking away business opportunities." *Id.*

88.     The *ivi* court also rejected the same argument Aereo raises here – that Plaintiffs face no imminent irreparable harms.  5/31 Tr. at 480:24-483:23.  Preliminary injunction plaintiffs need not wait until they already suffered actual harm for it to be imminent.  *See ivi*, 765 F. Supp. 2d at 620 (prospective harms, including "taking away viewers," is imminent, not speculative). Prospective harm often is enjoined – that is the purpose of an injunction.  *See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37-39 (2d Cir. 1995) (finding irreparable harm based on prospective loss of goodwill and sales); *see also Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 621-22 (S.D.N.Y. 2010) (irreparable harm exists where damage is inevitable, even if prospective); 11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2948.1 (2d ed. 1995 & Supp. 2012) ("[I]njury need not have been inflicted when application is made or [even] be certain to occur; a strong threat of irreparable injury before trial is an adequate basis." (footnote omitted)).

Redacted Public Filing

### 2.    Loss Of Control.

89.    Plaintiffs are broadcasters and content owners; their businesses depend on retaining the ability to control the time, place, manner, and quality of their programming transmissions and the use of their copyrighted content.   Pls.' Ex. 11 (Franks Decl. ¶¶ 8-13).

90.    Networks recoup the expenses of producing and acquiring content by licensing the right to exhibit the content they own to a wide variety of parties by various means, including cable and satellite services via video-on-demand, Internet distributors such as Netflix to stream library programming to their customers, and online retailers (*e.g.*, iTunes) to make programs available for purchase and download.  Each of these distributors acquires certain rights to distribute content in specified media at particular times, subject to negotiated terms and conditions.  Pls.' Ex. 11 (Franks Decl. ¶ 10).

91.    As a free-rider in this system, Aereo adversely affects Plaintiffs' control over their content in two related ways.  First, Aereo is able to market a competitive opportunity to view Plaintiffs' programming at a lesser price, having paid nothing to compensate those who paid the costs and took the risks of creating it.  When forced to compete with Aereo for viewers, parties who otherwise would pay for the rights to exhibit Plaintiffs' programming will either refuse to pay or negotiate for a substantial discount from the market rate, unless the free-rider is stopped.  *Id.* at 11.  Second, Aereo's disregard for the limited "window" Plaintiffs grant others to distribute content in specified media at particular times exacerbates the nature of Aereo's disruption of Plaintiffs' relationships with licensed distributors.  *Id.* at 12.

Redacted Public Filing

92.     Plaintiffs thus have chosen not to license their live 24/7 stream on the Internet, because controlling access to this content allows them to sell windowed distribution rights, *e.g.*, through syndication.  5/30 Tr. at 60:22–63:3 (Franks); 5/31 Tr. at 382:10-15 (Brennan).

93.     Aereo's retransmissions deny Plaintiffs their right to choose whether or not to license their content on the Internet.  *See* 5/30 Tr. at 60:22-62:3 (Franks).  This is a classic loss of control of copyrighted works, recognized to be irreparable.  *See Salinger*, 607 F.3d at 83.

### 3.     Loss Of Advertising Revenue.

94.     The broadcast industry uses "ratings" to determine the size of an audience for a given program.  Ratings measure the percentage of households, out of all the households in a given market, that have television sets and are watching the program.  *See* Pls.' Ex. 10 (Davis Decl. ¶¶ 14-15).

95.     When advertisers consider buying time on a local television station, they think in terms of rating points and the "cost per point" – in other words, how much they are willing to pay to reach the equivalent audience of 1 rating point, which would be 1 percent of the total TV homes.  Broadly speaking, the bigger the audience, the more an advertiser is willing to pay for air time.  Pls.' Ex. 10 (Davis Decl. ¶ 15).

96.     Nielsen is the only accepted standard for measuring and publishing ratings for traditional television audiences.   To make these measurements, Nielsen primarily uses "Set Meters," which are small devices attached to the televisions in a panel of households that record the viewing habits of the house.  Pls.' Ex. 10 (Davis Decl. ¶ 17).

97.     Aereo viewers are not measured by Nielsen.  *See* Pls.' Ex. 10 (Davis Decl. ¶¶ 18-19); Potenza Suppl. Decl. Ex. 5 (Franks Dep. 97:10-23).  Aereo agrees.  *See* Pls.' Ex. 38

Redacted Public Filing

(exchange between Aereo employees describing Nielsen as broadcasters' "coin of the realm" and recognizing that broadcasters will not release content to the Internet until it is measured along with their on-air programming).

98.     If one Nielsen household stops watching broadcast television in favor of Aereo and no longer is measured by Nielsen, it has a magnified multiplier effect because that one household is representative of hundreds of thousands of households. *See* 5/30 Tr. at 62:20–63:16 (Franks).

99.     Even if Aereo has no objection to being measured, this willingness is irrelevant: Aereo is not measured.  5/30 Tr. at 48:10-14 (Franks); Potenza Suppl. Decl. Ex. 5 (Franks Dep. 97:10-23); Pls.' Ex. 1 (Bond Decl. ¶ 25); Pls.' Ex. 8 (Brennan Decl. ¶ 9); Pls.' Ex. 11 (Franks Decl. ¶¶ 19-20); Pls.' Ex. 10 (Davis Decl. ¶¶ 18-19).

### 4.     Loss of Retransmission Fees.

100.     The harm is also clear with respect to retransmission fees:  If Aereo is able to avoid an injunction, it would be cheaper for many of Plaintiffs' licensees to pay the one-time expense to build infrastructure similar to Aereo than to continue paying licensing fees. *See* Pls.' Ex. 1 (Bond Decl. ¶ 18).

101.     Even if Plaintiffs' licensees do not convert to an Aereo-like system to avoid paying licensing fees, they will use the existence of Aereo as leverage to drive down how much they pay.  This is an immediate risk, because Plaintiffs have hundreds of retransmission agreements and are in the process of negotiating or renegotiating some of them.  5/31 Tr. at 361:10-15 (Brennan).  The resulting injury is a type that is hard to measure.

Redacted Public Filing

102.    Furthermore, Aereo harms Plaintiffs' retransmission revenue stream by causing consumers to "cut the cord."  *See* Proposed Findings of Fact ¶ 20.  Under many retransmission agreements, Plaintiffs are paid on a per subscriber basis.  *See* 5/30 Tr. at 59:9-18 (Franks).  When subscribers cut the cord and switch to Aereo, the fees earned under these agreements drop accordingly.

103.    Aereo hopes to have thousands of cord-cutting subscribers who will give up their cable subscriptions, gutting Plaintiffs' per-subscriber retransmission revenue.  *See* 5/30 Tr. at 226:7-10 (Kanojia); Pls.' Ex. 41 at 6 (31% of survey respondents likely to drop cable and other licensed video services if they had Aereo instead); *id.* 59:15-18 (Franks); *see also* Pls.' Ex. 40 (*Moody's Said That the New Television Streaming Service, Aereo, Faces Long-Shot Odds Against Broadcast Station Lawsuit,* Moody's Investor Service, Global Credit Research, Mar. 16, 2012).

104.    Without retransmission fees, Plaintiffs will lose the revenue stream that enables them to continue to broadcast marquee events, such as live sports or awards shows like the Academy Awards or the Grammys, which are enormously expensive.  *See* Pls.' Ex. 1 (Bond Decl. ¶¶ 11, 12).

105.    It would also be increasingly difficult for television networks to continue to bear the billions of dollars a year of production and licensing costs without compensation from cable carriers reflecting, in some measure, the value of the broadcast programming they retransmit to their subscribers.  Pls.' Ex. 1 (Bond Decl. ¶ 12).

Redacted Public Filing

### 5.     Direct Competition With Internet Licensees.

106.     Aereo also disrupts Plaintiffs' licensed Internet delivery services such as Hulu and Netflix, which enable viewers to watch programs in the home or on portable devices during the time windows carefully chosen and authorized by Plaintiffs.  *See* Pls.' Ex. 8 (Brennan Decl. ¶ 15); Pls.' Ex. 52 (http://www.hulu.com/network/fox); Pls.' Ex. 51 (http://www.hulu.com/network/univision).  Aereo's competition for viewers adversely affects these means of Internet delivery, in that Aereo subscribers who use Aereo to watch programming will have no reason to watch the same programming through Plaintiffs' websites and other authorized means.  *See* Pls.' Ex. 8 (Brennan Decl. ¶ 15); Pls.' Ex. 41 at 6 (31% of survey respondents likely to drop current video services – defined to include Internet services as well as cable – if they had Aereo instead); Pls.' Ex. 1 (Bond Decl. ¶¶ 20, 22).

107.     Several of the Plaintiffs have invested in a mobile content distribution system known as "Dyle."  *See* Pls.' Ex. 9 (Dalvi Decl. ¶ 8).  The service, ███████████████ ███████will permit any enabled mobile device to receive OTA broadcast signals in real-time with the exact same copyrighted programming as the OTA signals received by traditional television sets.  *Id.*; Potenza Decl. Ex. 35 (Dalvi Dep. 95:6-17).

108.     Unless enjoined, Aereo will disrupt Dyle and may very well destroy its commercial prospects.  The key to getting other business partners, such as equipment providers, is that Plaintiffs can use Dyle to distribute Plaintiffs' exclusive copyrighted content.  If they lose that exclusivity on the Internet, there will be no incentive to develop and maintain the architecture of any online streaming service, like Dyle.  *See id.*

Redacted Public Filing

109.    The *ivi* court specifically rejected yet another argument that Aereo raises here –
that Plaintiffs are not irreparably harmed by Aereo because DVRs cause more harm.  *See* 5/31
Tr. at 483:4-13.  *But see ivi, Inc.*, 765 F. Supp. 2d at 619 ("We will not accept any argument
premised on the fact that preexisting technologies operating within the law may potentially
devalue plaintiffs' copyrights as a basis to justify defendants' conduct which is unsanctioned and
contrary to law.").

110.    *ivi* also recognized irreparable harm follows when an unauthorized Internet
streaming service makes broadcast programming, intended for viewing in a local market,
available outside that market.  *ivi, Inc.*, 765 F. Supp. 2d at 620 ("By diverting customers who
would otherwise watch their local stations, defendants are weakening plaintiffs' negotiating
position with advertisers, even if ivi's viewers were adequately counted by measurement
agencies.").  Aereo's "geolocation" features exist to mitigate Aereo's legal risks by maintaining
its "Second Circuit status."  *Cf.* Pls.' Ex. 18 (Email chain between J. Lipowski and S. Harris,
May 23, 2011).  As a result, they are easily avoided, *see* Proposed Findings of Fact ¶¶ 65-66, and
Aereo's service causes Plaintiffs the same irreparable harm present in *ivi*.

111.    It will be difficult, if not impossible, adequately to assess the diminished value of
Plaintiffs' content to authorized licensees if unauthorized distribution is allowed to proceed
unabated.  *See Pearson Educ., Inc. v. Vergara*, No. 09 Civ. 6832, 2010 WL 3744033, at *4
(S.D.N.Y. Sept. 27, 2010) (holding in context of a copyright infringement case decided after
*Salinger* that irreparable harm element was satisfied because plaintiff  "should not be expected to
suffer a decline in . . . sales and profits – an injury difficult to quantify – owing to [defendant's]
infringement.").

68

112.    Moreover, a defendant's inability to compensate the plaintiff for the damages it inflicted is a factor in determining whether preliminary injunctive relief is warranted.  *See Omega Importing Corp. v. Petri-Kine Camera Co*., 451 F.2d 1190, 1195 (2d Cir. 1971) (considering the "unlikelihood that defendant . . . would, in any event, be able to satisfy a substantial damage award" to support a finding of irreparable harm); *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 206-07 (3d Cir. 1990) (noting that a defendant's inability to satisfy a judgment can constitute the sort of irreparable injury necessitating injunctive relief).

113.    Aereo's CEO testified that Aereo has sufficient capital to continue operations only for five to seven months.  5/30 Tr. at 232:9-12 (Kanojia).  Aereo retransmits Plaintiffs' OTA television programming 24 hours a day, seven days a week, and has been doing so for nearly three months since its public launch on March 14, 2012.  This means that thousands of Plaintiffs' works have been infringed.  With potential statutory damages from $750 to $150,000 per work infringed, 17 U.S.C. § 504(c)(2), Aereo does not have enough money to satisfy a judgment against Plaintiffs for its widespread infringement.  That is another reason the harm to Plaintiffs is irreparable.

114.    Finally, notwithstanding that Aereo's launch is recent, the record is unrebutted that, absent an injunction against Aereo's unauthorized retransmission of Plaintiffs' programs, the impact of Aereo on retransmission fee negotiations inevitably will reduce, if not eliminate, the revenue stream on which Plaintiffs rely to offer very expensive programming, like NFL football, over-the-air, for free.  Pls.' Ex. 1 (Bond Decl. ¶ 12).

### 6.    Plaintiffs Did Not Delay.

115.    Aereo has argued that it should not be enjoined because Plaintiffs delayed in filing this lawsuit and moving for a preliminary injunction.  5/31 Tr. at 473:1-480:18.  To the

69

extent Aereo's argument is a vestige of the line of cases where delay rebutted a presumption of

irreparable harm, *see* 5/31 Tr. at 475:14-476:10 (citing *Citibank, N.A. v. Citytrust*, 756 F.2d 273

(2d Cir. 1985)), it is irrelevant because, after *eBay*, no such presumption exists to be rebutted.

*See Salinger*, 607 F.3d at 80.

116.    More importantly, the record shows that Plaintiffs did not delay in bringing the

instant lawsuit:

- Before February 14, 2012, when Aereo announced its upcoming launch date, as far as Plaintiffs knew, Aereo was simply an idea – it was barely a company.  At most, it was another start-up software and technology company that had been announced.  Like many start-ups, whether or not it could become a viable business was far from certain, *see* Proposed Findings of Fact ¶ 78.

- From April 2011 until March 13, 2012, Aereo was in a closed, private beta limited to a handful of technology testers.  5/30 Tr. at 218:10-24 (Kanojia).  Until mid-March, then, testing was more akin to what is thought of as vaporware – not even alpha testing, *see* Proposed Findings of Fact ¶¶ 70-71, 76.

- As late as January 2012, Aereo had only 100 hand-picked beta testers privately using its system.  Until February 14, 2012, Aereo did not even accept requests for invitations from the general public, *see* Proposed Findings of Facts ¶¶ 71, 73.

117.    This level of development did not impose any obligation on Plaintiffs to have

acted any sooner.  *See Guinness United Distillers & Vintners B.V. v. Anheuser-Busch, Inc.*, No.

02 Civ. 0861, 2002 WL 1543817, at *6 (S.D.N.Y. July 12, 2002) (no obligation to act, even if

infringer is in true test market mode).

118.    In addition, Aereo suggests that Plaintiffs' failure to sue sooner caused prejudice.

*See* 5/30 Tr. at 159:13-161:15 (noting expenditures by Aereo in hiring additional staff, making

capital investments and supplier commitments, as well as raising additional capital).  Aereo's

Redacted Public Filing

CEO, however, admitted that everyone knew this lawsuit was "likely," including employees and investors – including both those who provided initial seed financing and then a later round of investment.  5/30 Tr. at 173:17-177:11 (Kanojia).

119.    The related suggestion, that Plaintiffs waited to sue until such time as they could inflict maximum harm on Aereo, has no basis in fact.  Although several of Plaintiffs' representatives met with Mr. Kanojia, all of them left those meetings believing that Aereo might never get off the ground and questioned the viability of Aereo's technology.  *See* Potenza Suppl. Dec. Ex. 8 (Dalvi Dep. 119:17-120:25); Pls.' Ex. 71 (Bond Dep. Ex. 9 (MCV Presentation, June 27, 2011)); *cf.* 5/31 Tr. at 350:5-7, 354:12-23.  More importantly, Aereo's CEO knew, notwithstanding these meetings, that Aereo was "likely" to be sued.  5/30 Tr. at 174:6-25 (Kanojia).  At no point at any of these meetings did anyone suggest otherwise.  *Id.* at 178:3– 179:1 (Kanojia).  It is clear that Aereo and its investors knew, all along, litigation could ensue and they budgeted for it.  *Id.* at 178:3–179:1; 174:6–177:11 (Kanojia).

120.    As Fox witness Sherry Brennan and CBS witness Marty Franks testified, there is a constant stream of Aereo-like startups that have developed "new ways of distributing content." Most, however, never advance beyond the idea stage.  Fox frequently questions whether these new business concepts and ideas will "work or not", and whether they are "legal or not."  Fox does not "rush to sue people because we don't like their idea."  5/31 Tr. at 356:10-19 (Brennan); *see also* 5/30 Tr. at 55:20-25 (Franks).

121.    Moreover, all but one of the cases cited by Aereo during summation as support for the proposition that Plaintiffs delayed involved lawsuits and motions for preliminary injunction brought **after** the public launch of the alleged infringement.  *See Citibank*, 756 F.2d at

Redacted Public Filing

276 (suit brought "more than ten weeks *after* [plaintiff] learned directly" that the allegedly infringing office had opened) (emphasis added); *ivi, Inc.*, 765 F. Supp. 2d at 598-600 (no delay when suit brought two weeks *after* public launch); *CBS Broad. Corp. v. Filmon.com, Inc.*, No. 1:10-cv-7532-NRB (S.D.N.Y. Oct. 1, 2010), Dkt. No. 1 (suit brought two weeks *after* public launch); Defendant SenoRx, Inc.'s Opposition to Plaintiffs' Motion for a Preliminary Injunction at 25, *Hologic, Inc. v. SenoRx, Inc.*, No. 08-cv-00133, Dkt. 51 (N.D. Cal. Apr. 25, 2008) (suit brought months *after* "product's full commercial launch").  In contrast to those cases – some of which did not find delay despite suit having been brought after public launch – Plaintiffs in this case brought their suit within two weeks of Aereo's public announcement of its launch, and more than two weeks *prior to* Aereo's "public launch."  In fact, Aereo has still not truly publicly launched.  *See* Potenza Decl. Ex. 1 (Kanojia Dep. 146:9-12) (Aereo still operating on an invitation-only basis).

122.    Therefore, Plaintiffs have demonstrated irreparable harm and an injunction should issue in their favor.

## D.    The Balance of Harms Favors An Injunction.

123.    In contrast to the irreparable harm facing Plaintiffs in the absence of an injunction, Aereo faces no legally cognizable harm if an injunction is granted.

124.    As the *ivi* court recognized, "[i]t is axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product." *ivi, Inc.*, 765 F. Supp. 2d at 621.

125.    Aereo has stated that being enjoined would have a devastating effect on its 60 full-time equivalent employees and would be crippling to the company.  *See* 5/30 Tr. at 171:1–172:12 (Kanojia).  Aereo's CEO testified, however, that he, Aereo's investors and Aereo's

Redacted Public Filing

employees all were aware that a lawsuit was "likely," 5/30 Tr. at 173:17-177:11 (Kanojia), before they invested in or accepted a job with Aereo.

126.     Nevertheless, Aereo's CEO admitted that even if enjoined, Aereo does not plan to stop its operations, but instead plans ███████████████████ and "has sufficient capital to continue operations" for at least the "near term."  Potenza Decl. Ex. 1 (Kanojia Dep. 372:19-21, 374:4-6).

127.     Defendants "cannot complain of the harm that will befall [them] when properly forced to desist from [their] infringing activities."  *WTV Sys.*, 824 F. Supp. 2d at 1014-15.

128.     Therefore, the balance of hardships "sharply" favors plaintiffs.  *See id.* at 1015.

**E.      The Public Interest Favors An Injunction.**

129.     The proposed injunction will serve the public interest because it will protect Plaintiffs' copyrights against increased and unrestrained infringement.  "The object of copyright law is to 'promote the store of knowledge available to the public.'"  *ivi, Inc.*, 765 F. Supp. 2d at 621 (quoting *Salinger*, 607 F.3d at 82).  "In this case," as in *ivi*, "the relevant 'store of knowledge' is network television programming, and the public interest is clearly protected by issuing an injunction.  If plaintiffs lose control over their products or potential revenue sources, they will lose valuable incentives to continue to create programming."  *Id.*; *accord Hounddog Prods., L.L.C. v. Empire Film Group, Inc.*, 826 F. Supp. 2d 619 (S.D.N.Y. 2011); *Pearson Educ., Inc. v. Vergara*, 2010 WL 3744033, * 5 (S.D.N.Y. Sep. 27, 2010); *see also Matthew Bender & Co., Inc. v. West Publ'g Co.*, 240 F.3d 116, 124 n.8 (2d Cir. 2001) ("The public interest that copyright law is designed to promote is the wide availability of creative works."); *Metro– Goldwyn Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1222 (C.D. Cal. 2007) ("[T]he public interest will be served with a permanent injunction, since it will protect Plaintiffs'

73

copyrights against increased infringement.").  Not surprisingly, then, "[p]ermanent injunctions are routinely awarded in favor of copyright owners whose protected works have been misappropriated in order to serve the public's interest in upholding copyright protections." *Broad. Music, Inc. v. Haibo, Inc.*, 2012 WL 843424, at *5 (W.D.N.Y. Mar. 12, 2012) (collecting cases).

130.    Congress expressly recognized that, for decades, "television broadcasting has provided vital local service through its programming, including its news and public affairs offerings and its emergency broadcasts."  1992 Act Senate Report at 42.

131.    Ultimately, television broadcasting "will be jeopardized" if retransmitters are permitted to "carry such signals . . . without proper consideration to the programmer."  Senate Report at 42; *see also WTV Sys.*, 824 F. Supp. 2d at 1014.

132.    Particularly, the inability to obtain compensation for creating very expensive programming, beyond advertising revenues, would make it difficult for the networks to continue to offer such content OTA for free.  *See* Pls.' Ex. 1 (Bond Decl. ¶ 12).  In such a circumstance, expensive programming would migrate to cable, requiring consumers to pay to access such content. *See id.*

133.    The 1992 Act was intended "to ensure that our system of free broadcasting remain vibrant, and not be replaced by a system which requires consumers to pay for television service." 1992 Act Senate Report at 36.

134.    Aereo's free streaming of Plaintiffs' content promises to create the same situation that Congress hoped to avoid in passing the 1992 Act.

135.    Thus, an injunction is in the public interest.

Redacted Public Filing

Respectfully submitted,


/s/ Scott B. Wilkens
Steven B. Fabrizio
(sfabrizio@jenner.com)
Steven R. Englund
(senglund@jenner.com)
Scott B. Wilkens
(swilkens@jenner.com)
JENNER & BLOCK LLP
1099 New York Ave., N.W.
Washington, D.C. 20001
(202) 639-6000


David J. Bradford
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60656-3456
Telephone (312) 222-9350
Facsimile (312) 527-0484


Kenneth D. Klein
JENNER & BLOCK LLP
633 West 5th Street
Los Angeles, CA 90071-2054
Telephone (213) 239-5100
Facsimile (213) 239-5199


*Attorneys for Plaintiffs WNET, Thirteen, Fox Television Stations, Inc., Twentieth Century Fox Film Corporation, WPIX, Inc., Univision Television Group, Inc., The Univision Network Limited Partnership and Public Broadcasting Service*


/s/ Bruce P. Keller
Bruce P. Keller
(bpkeller@debevoise.com)
Jeffrey P. Cunard
(jpcunard@debevoise.com)
Michael R. Potenza
(mpotenza@debevoise.com)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000


*Attorneys for Plaintiffs American Broadcasting Companies, Inc., Disney Enterprises, Inc., CBS Broadcasting Inc., CBS Studios Inc., NBCUniversal Media LLC, NBC Studios, LLC, Universal Network Television, LLC, Telemundo Network Group LLC and WNJU-TV Broadcasting LLC*


Dated:  June 8, 2012

Redacted Public Filing