UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WNET, THIRTEEN, FOX TELEVISION STATIONS, INC., TWENTIETH CENTURY FOX FILM CORPORATION, WPIX, INC., UNIVISION TELEVISION GROUP, INC., THE UNIVISION NETWORK LIMITED PARTNERSHIP, and PUBLIC BROADCASTING SERVICE, | )<br>)<br>)<br>)<br>)   ECF Case<br>)<br>)<br>)   Case No. 12-civ-1540 [Consolidated]<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| AEREO, INC. f/k/a BAMBOOM LABS, INC., | )<br>) |
| Defendant. | )<br>)<br>) |

## PLAINTIFFS' MEMORANDUM OF LAW PURSUANT TO MAGISTRATE JUDGE PITMAN'S FEBRUARY 26, 2013 ORDER REGARDING BRIEFING ON DISCOVERY PERTAINING TO PLAINTIFFS' CLAIM FOR STATUTORY DAMAGES AND AEREO'S FAIR USE DEFENSE
### *(Redacted Public Filing)*

## I.   <u>Introduction</u>

Aereo's motion to compel should be denied (1) because Aereo's discovery requests are overbroad, voluminous and seek documents irrelevant under the substantive law, and it has refused all attempts at reaching a rational compromise, (2) because Plaintiffs have agreed to produce, and have produced, broad categories of documents responsive to almost all of Aereo's requests and (3) Aereo has offered no explanation why this production is inadequate or why the documents Aereo seeks are necessary or relevant.  Further production would be unduly burdensome and unwarranted in relation to the marginal relevance, if any, of the documents Aereo continues to seek.

Specifically, in response to Aereo's 92 overly broad requests, Plaintiffs have agreed to produce all of the following documents to the extent they exist:  (a) documents referring to Aereo and its founder; (b) proof of Plaintiffs' ownership of the copyrights at issue; (c) schedules of shows Plaintiffs aired and Aereo retransmitted; (d) documents that evidence any damages Plaintiffs have suffered due to Aereo; (e) retransmission agreements covering the geographic region in suit, and updates thereto; (f) documents reflecting negotiations of the retransmission consent agreements and license agreements that refer to Aereo or other unauthorized broadcast television Internet retransmission services (*i.e.*, FilmOn, Aereokiller, ivi ("Aereo-like Services")); (g) agreements for licensing the infringed works for performance over the Internet or on mobile devices in existence from Aereo's launch to present[1]; (h) documents reflecting the impact of Aereo on Dyle (the mobile distribution system developed by some of the Plaintiffs for their copyrighted content); (i) reports reflecting viewership of Plaintiffs' works in homes, online

---

[1] The ABC Plaintiffs agreed to produce license agreements with Apple, Netflix, Hulu and Amazon.  Hulu, Amazon and Netflix, however, have objected to the production of their agreements by any of the Plaintiffs.  Apple requires an amendment to the protective order before its agreements may be produced by Plaintiffs.

1

or via mobile devices in 2011 and 2012; (j) Plaintiffs' annual advertising or underwriting (for the non-profit Plaintiffs) revenues for broadcast channels for 2011 and 2012; (k) aggregate revenue on a quarterly basis from Internet and mobile licensing by the WNET Plaintiffs; (l) market research reports pertaining to various aspects of Internet or mobile devices and remote DVRs; and (m) all other documents that Plaintiffs have identified as supporting their claims, including their claim for statutory damages.[2]  This is all in addition to declarations and testimony from Plaintiffs' witnesses during the preliminary injunction proceeding.  Aereo claims, without any support, that the discovery it seeks is "commonly produced in copyright litigation as a matter of course."  Aereo Br. 1.  As explained below, the opposite is true.

In particular, as it affects the key issue of fair use "market harm" (and the related concept of irreparable harm, already found on the preliminary injunction record), Plaintiffs have agreed to produce multiple documents that establish both the existence of relevant markets and how they are harmed by Aereo, Aereo-like Services and others, if Aereo's business model becomes widespread.  Aereo asserts it needs further discovery as to multiple other technologies for the claimed purpose of assessing "how Aereo technology harms [Plaintiffs] in a way that is different than existing technologies acknowledged to be legal."  Aereo Br. at 4.  Indeed, Aereo's principal argument appears to be that "market harm" can be judged only by harms it causes that are somehow *different* in kind from other technologies that preceded it.  *See, e.g.*, Aereo Br. at 4, 5, 8, 10, 11 n.13, 12, 13, 14.  The fair use "market harm" inquiry, however, is different:  it asks whether the unauthorized use at issue, if it were to become widespread, would harm the value or market for the copyrighted works.  *See, e.g., Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569,

---

[2] The specifics are identified in the letter from J. Shepard 2/1/13 letter to Judge Nathan ("Shepard Letter") and the chart attached as Exhibit A to the declaration of Julie Shepard. Unless otherwise noted, all exhibits to Plaintiffs' brief are attached to the Shepard declaration.

590 (1994). Plaintiffs are not aware of a single case – and Aereo does not cite any case – suggesting that technologies used by individual consumers have any relevance to the "market harm" caused by a commercial service, such as Aereo. In fact, Second Circuit law holds to the contrary. *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108, 112 (2d Cir. 1999) (commercial service cannot "stand in the shoes" of its customers for fair use purposes).[3] In seeking documents about consumer technologies, Aereo misstates the law when it claims that consumer technologies are relevant because its subscribers are simply locating home television equipment remotely. Aereo Br. 2. The issue is not what consumers do. It is what Aereo does. The documents relating to consumer devices that Aereo seeks –beyond what Plaintiffs already have agreed to produce – are simply irrelevant.

As to statutory damages, Courts repeatedly have recognized the discovery-limiting effect of a plaintiffs' election of statutory damages. Moreover, the detailed program-by-program, accounting-level profit and expense documents that Aereo seeks also are not relevant. For example, Aereo asks for revenue, profit and expense information broken down on a per program, per month, per source, per platform basis. *See* Aereo Br. 12. Aereo is retransmitting dozens of Plaintiffs' programs on a daily basis. This request would impose an extraordinary burden and require the collection of an enormous amount of commercially-sensitive data.[4] Plaintiffs already have agreed to produce all documents that evidence any damages suffered due to Aereo.

---

[3] Courts other than the Second Circuit have held the same. *See Princeton Univ. Press. v. Mich. Doc. Servs.*, 99 F.3d 1381, 1389 (6th Cir. 1996) (distinguishing copying "performed on a profit-making basis by a commercial enterprise" and copying performed by consumers for "nonprofit or noncommercial uses.").

[4] Illustrating Aereo's unreasonableness, when Plaintiffs sought documents related to Aereo's revenues and profits (which are directly relevant to statutory damages), Aereo objected to producing the detailed documents it now demands of Plaintiffs. Plaintiffs then did what litigants are supposed to do: they compromised and agreed to accept the very sort of higher level documentation that Plaintiffs have agreed to produce to Aereo.

Finally, Aereo's brief ignores that Plaintiffs have already agreed to produce the categories of documents noted above. This is not an oversight; to the contrary, only by this omission is Aereo able to avoid addressing the two key questions before the Court: (1) whether the *additional* documents in dispute are relevant to the legal issues; and (2) whether the marginal relevance, if any, of these *additional* documents would be outweighed by the undue burden of producing them.

Aereo avoids these questions because, fundamentally, Aereo's demands violate the cardinal rule of discovery that the burden imposed by document requests cannot outweigh their relevance, *see* Fed. R. Civ. P. 26(b)(2)(C)(iii), and that relevance must be decided under applicable law. *See U.S. E. Telecomms., Inc. v. U.S. W. Info. Sys., Inc.*, No. 87-cv-2924, 1993 WL 385810 at *31 (S.D.N.Y. Sept. 30, 1993) ("Relevance [for purposes of admissibility] will depend in large part on the controlling substantive law."); *see also WLR Foods, Inc. v. Tyson Foods, Inc.*, 65 F.3d 1172, 1184 (4th Cir. 1995) ("[R]elevance under Rule 26 must be determined by reference to the substantive law which forms the basis of [the parties'] claims and defenses."). Here, the burden imposed by having to produce the additional documents Aereo demands plainly outweighs their marginal relevance, if any.[5]

## II.    Plaintiffs Already Have Agreed To Provide All Documents Properly Within The Scope Of Discovery Potentially Relevant To Aereo's Fair Use Defense

No one disputes that an analysis of the fourth fair use factor will involve a market harm inquiry, but that analysis asks:  Does Aereo now – or would the widespread adoption of Aereo and other unauthorized Internet television retransmission services like Aereo, *i.e.*, FilmOn, ivi and Aereokiller – result in a harm to one or more of the actual or potential markets for Plaintiffs'

---

[5] "Burden" includes not only "the time or expense required to respond to requested discovery" but also "the adverse consequences of the disclosure of sensitive, albeit unprivileged, material." *Johnson v. Nyack Hosp.*, 169 F.R.D. 550, 562 (S.D.N.Y. 1996).

broadcast programming?  *See, e.g., Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 575-76 (1994).  Identifying the markets that Aereo and Aereo-like Services would adversely affect if such services became widespread is necessary for purposes of determining what discovery may be relevant, but the documents Aereo seeks go far beyond that.

Aereo operates as a commercial service that captures, records and retransmits Plaintiffs' local television broadcasts to Aereo subscribers for daily, monthly or yearly fees.  Aereo markets its service as an alternative to cable television and, in its own words, seeks to ***REDACTED***

Exs. B, C.  Aereo touts that its Internet television service is something never before offered with the tag line: ***Redacted***                        Ex. D (emphasis added).  *See also* Ex. E ***Redacted***                 Aereo subscribers can watch Plaintiffs' television programs while they are being broadcast live on smart phones, laptops, iPads and Internet-enabled TVs, among many other devices.  Aereo also records Plaintiffs' programming for Aereo's subscribers later viewing on these same type of devices.  There can be little doubt that – by offering the same content provided by Plaintiffs and their licensees, but at a discounted price that is much lower than cable subscription fees because Aereo avoids paying for the right to retransmit – if Aereo-like Services become widespread, they will cause harm to Plaintiffs' markets for their works.

There are multiple existing (as well as potential) markets for Plaintiffs' programs that are and will be harmed by Aereo and Aereo-like Services.  They include the market for rights to retransmit Plaintiffs' live television broadcasts.  Cable and satellite companies pay to retransmit Plaintiffs' copyrighted works.  Aereo's own documents show Aereo's potential to harm this market by encouraging television viewers to cancel their television subscriptions (also known as cord cutting).  *See, e.g.,* Ex. F.  The markets also include licensing the works for live or

subsequent viewing via the Internet or on mobile devices and streaming of the works on

Plaintiffs' own websites. *See* Hosp Decl., Ex. 8, ¶¶ 15-16, 18. Again, Aereo's own documents

demonstrate the harm it poses to this market: ***Redacted***

Plaintiffs are entering the mobile distribution market, including through a system known as Dyle.

Here too, Aereo's documents reflect that Aereo's service competes in the same market as Dyle.

*See* Ex. H. In fact, every court, including this one, has found that the unauthorized

retransmission of Plaintiffs' television programming will not only cause market harm, but this

harm is irreparable. [6] Aereo recently announced that it has raised an additional $38 million in

funding for expansion into 22 additional markets. Aereo is Expanding!, http://blog.aereo.com

(Jan. 8, 2013). This investment and its future expansion make clear that Aereo itself believes

there are valuable markets in which it intends to enter to compete directly with Plaintiffs.

　　Plaintiffs have agreed to produce to Aereo (and in most cases already have produced) the

following documents which encompass relevant documents related to the foregoing markets: (1)

retransmission agreements for the New York City Designated Marketing or NYC DMA, which is

the only area where Aereo currently operates;[7] (2) representative license agreements with

---

[6] *See WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285-87 (2d Cir. 2012) ("*ivi*"); *Aereo*, 874 F. Supp. 2d at 397-400 ("The evidence establishes that Plaintiffs will suffer irreparable harm in the absence of a preliminary injunction. Plaintiffs have identified a number of categories of irreparable harm, several of which have been accepted in similar cases [such as *ivi*] as supporting the issuance of a preliminary injunction."); *Fox Television Stations, Inc. v. BarryDriller Content Systems, PLC*, CV 12-6921-GW JCX, 2012 WL 6784498, *6 (C.D. Cal. Dec. 27, 2012) ("*Aereokiller*"). None of these courts relied on the type of discovery Aereo seeks to compel.

[7] Plaintiffs collectively have produced over 140 retransmission consent agreements. Aereo has raised objections regarding some limited redactions that were made to some of the agreements produced. However, the production of any redacted agreements is in compliance with the Court's order requiring Plaintiffs to produce retransmission consent agreements.

multiple major Internet video delivery services, including Hulu, iTunes, Amazon and Netflix, among others, for performance of the works over the Internet or on mobile devices through subscription video-on-demand services (SVOD) like Hulu Plus, Hulu and Netflix or for purchase over the Internet (called digital download) like Amazon;[8] (3) documents relating to negotiations of retransmission consent agreements and license agreements that refer to Aereo and Aereo-like Services; (4) documents reflecting the impact of Aereo on the potential market for Dyle and (5) reports reflecting viewership of Plaintiffs' works in homes, online or via mobile devices in 2011 and 2012 from Nielsen (which measures in-home viewing) and from Google Analytics and ComScore (which provide website tracking information).

Aereo does not even attempt to explain how any of the documents Aereo now seeks are needed to establish the relevant issues of whether these markets exist and will be harmed if unauthorized retransmission services such as Aereo's become widespread. Instead, it tries to recast the inquiry into some kind of a competitive harm analysis that has no basis in the fourth

---

The sections redacted by the WNET Plaintiffs do not deal with retransmission consent for broadcast television. To the contrary, the redacted provisions concern carriage of cable channels (an entirely different set of programming not at issue in this case). Given that such channels are not the subject of retransmission consent, are not transmitted over-the-air and are not being retransmitted by Aereo, these portions are irrelevant and not required to be produced under this Court's April 13, 2012 Order or Aereo's request. *Kingsway Fin. Servs., Inc. v. Pricewaterhouse-Coopers LLP*, No. 03-5560, 2007 WL 473726, at *3 (S.D.N.Y. Feb. 14, 2007) (Pitman, J.) (denying motion to compel production of an unredacted document because the party had not "established that the redacted portions" of the document were "responsive to their discovery requests"). Similarly, the ABC Plaintiffs have only redacted portions that concern carriage of cable channels and select provisions pertaining to commercially-sensitive matters not at issue in this case. Plaintiffs will bring unredacted and redacted exemplars of retransmission consent agreements to the March 21 hearing should the Court wish to review them.

[8]   The terms pursuant to which Plaintiffs' programming is offered by their licensees is available on the websites such as Hulu, iTunes, Amazon and Netflix. As specific terms of the license agreements themselves are not at issue, this publicly available information sufficiently identifies the existing markets. Nevertheless, to attempt to resolve its discovery disputes with Aereo, Plaintiffs agreed to produce redacted representative license agreements.

fair use factor. *See* Aereo Br., p. 9-10 ("evidence of how Aereo technology-versus other related technology-caused harmed harm is of great relevance"), p. 13 ("Without information related to other technologies, it is impossible to determine what allegedly has been caused by Aereo rather than by different technologies, by competition from other sources, or by other distribution platforms.")

Aereo's purported justifications are incorrect. Under the market harm fair use analysis, the harm caused by Aereo (were its services to become widespread) is not affected by harms that other technologies might cause. The fourth fair use factor concerns "the extent of market harm caused by the particular actions of the alleged infringer." *Campbell*, 510 U.S. at 590 (emphasis added). Indeed, courts have rejected the very notion that this analysis is influenced by the harm caused by entities other than defendant. *See Sony BMG Music Entm't v. Tenenbaum*, 672 F. Supp. 2d, 217, 231 (D. Mass. 2009) (rejecting defendant's argument that his infringement/file sharing made little economic difference because the songs were popular and available on Kazaa (another infringing site), holding "that is not the framework for this analysis"); *Paramount Pictures Corp. v. Carol Publ'g Grp.*, 11 F. Supp. 2d, 329 (S.D.N.Y. 1998) (rejecting the defendant's argument that plaintiffs' lack of action against other allegedly infringing works indicated that the defendant's infringing work would not damage a potential market; "the lack of earlier litigation against other similar works is simply irrelevant").

Aereo also is wrong when it claims the market harm analysis mandates production of documents enabling a calculation of actual damages. Indeed, the fourth fair use factor does not require a showing of actual damages. *See, e.g., Sony Corp. of America v. Universal Studios, Inc.*, 464 U.S. 417, 449 (1984). A plaintiff need not quantify harm it would suffer. *See Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 81 (2d Cir. 1997) (reversing the district court's fourth

factor analysis because the district court "confuse[d the] lack of one item of specific damages with lack of adverse impact on a potential market," and holding that the copyright owner was "not required to show a decline in the number of licensing requests" after the alleged infringement for the fourth factor to weigh in her favor); *Marcus v. Rowley*, 695 F.2d 1171, 1177 (9th Cir. 1983) (in fourth factor analyses, "mere absence of measurable pecuniary damage does not require a finding of fair use"). For all of these reasons, neither detailed dollar amounts nor distinguishing the harm Aereo causes from "other" technologies (*e.g.,* DVRs, dongles, Slingbox) is relevant.[9]

Aereo's argument that documents relating to consumer technologies are relevant because a consumer's use might be fair is a red herring. *See* Aereo Br., 4-5, 10 n.12. Even assuming *arguendo* that Aereo can establish that a consumers' fair use defense applies because Aereo can only be held secondarily liable, it does not change the fact that the market harm analysis remains essentially the same: whether unrestricted and widespread conduct of the sort engaged in by the Aereo subscriber (*e.g.*, copying Plaintiffs' broadcast programming for retransmission over the Internet) will likely have an adverse impact on Plaintiffs' legitimate markets. *See, e.g.*, *Tenenbaum*, 672 F. Supp. 2d. at 217 (denying fair use defense asserted by individual engaged in unauthorized file sharing who alleged his use was non-commercial). Contrary to what Aereo claims, it is not a Radio Shack renting or selling equipment to an end-user. *See* 2/25 Tr. 45:15-19 (Hosp Arg.). Aereo is a commercial service and is in no way analogous to consumers using home equipment. *See Kirkwood*, 150 F.3d at 108, 112. Consumer use of home equipment has no bearing on whether a commercial service like Aereo, which is positioned to displace

---

[9] Judge Nathan already recognized in the context of a privilege log dispute that logging privileged outside counsel documents relating to the ill-defined concept of "similar technologies" would be "unduly burdensome." 1/11/13 Order, Dkt. 128, at 3. The burden of producing all documents about to such a vaguely-defined set of "similar technologies" would be even greater.

Plaintiffs' authorized licensees, causes harm.[10]  Moreover, whether assessed under direct liability or secondary liability, the impacted markets remain the same and the scope of discovery remains the same.

Nonetheless, in the spirit of compromise, Plaintiffs also agreed to produce certain market research reports related to consumer technologies such as market research reports business forecasts or similar analyses that they commissioned or prepared in 2011 or 2012 pertaining to various aspects of remote DVRs (an aspect of the service Aereo offers) and viewing over the Internet, mobile devices and antennas. *See* Shepard Letter, pp. 4-5.  For example, the WNET Plaintiffs agreed to produce reports regarding (a) market harm or impact from Slingbox; (b) remote DVRs and time-shifting via remote DVRs; (c) the use of any of the infringed works on any mobile device or via remote DVR; and (d) the number of people who watched broadcast television via over-the-air antennas in 2011 and 2012. *Id.*  Similarly, the ABC Plaintiffs agreed to produce any market research, business forecasts or similar analyses created or commissioned in 2011 or 2012, for the purpose of assisting Plaintiffs to make business decisions, based on the impact of remote-storage DVRs, Slingbox, Aereo, and Aereo-like Services on the economics of Plaintiffs' domestic over-the-air retransmission, online and mobile markets for their broadcast programs.

Both sets of Plaintiffs also have produced voluminous Nielsen reports for 2011 and 2012.

---

[10] Aereo attempts to obfuscate the issue by invoking *Sony*.  The *Sony* Court did not hold, as Aereo claims, that any personal or in-home use of a recording device was a fair use. *See* Aereo Br. 2-3.  Rather, the Supreme Court very carefully limited its fair use analysis to a narrowly prescribed definition of time-shifting, a practice which the Court found (under the record presented) did not adversely affect the market for the works.  Unauthorized copying that substitutes for licensed copies, however, are not protected as fair uses. *E.g.*, *Agee v. Paramount Commc'ns, Inc.*, 59 F.3d 317, 323 (2d Cir. 1995) (rejecting *Sony*-based fair-use defense where defendant's unlicensed uses provided value to defendants "apart from time-shifting"); *In re Aimster Copyright Litig.*, 334 F.3d 643, 647 (7th Cir. 2003) (unauthorized copying for purposes of library building or commercial skipping is "unquestionably infringing").

The data produced captures not only live viewing metrics, but also reports on the number of consumers viewing Plaintiffs' broadcast programming over DVRs.  In the industry, these numbers are called "live same day" (time delayed viewing the same of day of broadcast) and "Live +3," "Live +5" and "Live +7" (which means total viewing or programming 3, 5 or 7 days after the live broadcast).  Also, where available, Plaintiffs have produced Nielsen C3 metrics. C3 quantifies the average number of commercials viewed during a particular program when it airs on standard television and for the next three days (in order to capture data from viewers who watch the program later on their DVRs).  Due to advertisers' reliance on Nielsen's C3 metrics, it is essentially the currency by which advertising sales are made.[11]

Aereo ignores that Plaintiffs have produced, or agreed to produce, all of these document because doing so puts the focus on the unreasonableness of Aereo's demands for *additional* documents.  Here, Aereo insists on not only the market reports regarding "similar technologies" (regardless of who prepared them and whether they were solicited by Plaintiffs), but also <u>any communications</u> about such reports from Plaintiffs, all of which are involved in the media and broadcast television industry and have hundreds and, in some cases, thousands of employees.

In addition to seeking irrelevant documents about other technologies, Aereo's demands are unduly burdensome.  This case is about whether <u>Aereo's service</u>, which Aereo says is sui generis (*see, e.g.*, Exs. D, E), is infringing in part because, if it becomes widespread, it will harm the markets for Plaintiffs' works.  Requiring Plaintiffs to search for responsive documents – using such terms like "DVR" or "on-demand," which are part of the daily parlance in the television industry – will result in having to sift through hundreds of thousands of non-responsive documents.  *See* Shepard Decl., ¶¶ 12-13.  This burden is undue even if the search

---

[11] Aereo also has made a demand for "Ad-Skipping" documents.  Aereo Br. 14.  But such documents are irrelevant as Aereo's technology does not enable "ad-skipping."

were limited to a handful of custodians and is unjustified in light of the voluminous documents

Plaintiffs have already provided to Aereo.

**III.   Plaintiffs Have Already Agreed To Produce All Documents Properly Within The Scope Of Discovery For A Statutory Damages Claim**

Copyright owners may elect statutory damages "precisely because of the difficulties

inherent in proving actual damages and profits" given the number of factors other than a single

infringer's actions that can influence the commercial success of a given work. *Yurman Design,*

*Inc. v. PAJ, Inc.*, 93 F. Supp. 2d 449, 462 (S.D.N.Y. 2000), *aff'd in part, rev'd in part by*, 262

F.3d 101 (2d Cir. 2001); *accord Nat'l Football League v. PrimeTime 24 Joint Venture*, 131 F.

Supp. 2d 458, 472 (S.D.N.Y. 2001).

Plaintiffs have elected statutory damages.  They have, as noted, produced gross

advertising revenue, Nielsen data, retransmission agreements and other documents reflecting the

harm caused or likely to be caused by Aereo and Aereo-like services.  The WNET Plaintiffs have

also agreed to provide quarterly, aggregate revenues from Internet and mobile licensing of the

infringed works for 2011 and 2012.

Aereo – without explaining why the substantial production Plaintiffs have already made

is inadequate to demonstrate the existence of and harm to the relevant markets if Aereo-like

Services become widespread – demands more, including additional documents pertaining to 10

years' worth of highly detailed commercially sensitive revenue, profit and expense information

related to advertising, retransmission consent and licensing on a work-by-work basis. *See, e.g.*,

Aereo Br. 7 n. 11, 12.  Aereo has not explained, and cannot explain, how such information could

be relevant.  That is particularly so because Aereo has *Redacted* subscribers and Plaintiffs are

not asserting that it presently causes measurable, quantifiable harm that would be reflected in

such information.  Moreover, due to "the plethora of other factors impacting profitability" (*e.g.*,

increased production cost, upswings (or downturns) in popularity of a work, seasonal viewership fluctuations), the requested data would not help in the calculation of damages, but it would be incredibly burdensome to collect. *See Capitol Records, Inc. v. MP3Tunes, LLC*, No. 07-cv-9931 WHP-FM (S.D.N.Y. April 12, 2010), ECF No. 168, pp. 2-3 (affirming denial of profit discovery; noting actual damages discovery would be of limited utility where statutory damages had been elected and defendants had failed to articulate "how they would be able to take historical profitability data, screen out the plethora of other factors impacting profitability – including internet piracy by parties other than defendants – and calculate actual damages"); *Arista Records LLC v. Lime Grp. LLC*, 06 CV 5936 KMW, 2011 WL 1486640, at *2-3 (S.D.N.Y. Apr. 11, 2011) ("Had Plaintiffs been pursuing actual damages rather than statutory damages for their post–1972 sound recordings, Defendants likely would have been entitled to greater profits and cost-based discovery."); *see also id.* at *2 n.2 (noting defendants were "denied royalty, profit, and cost information").[12]

Aereo's cases do not support an order requiring Plaintiffs to produce any additional revenue, profit or damage documents under the vague theory that they are relevant to Plaintiffs' claim for statutory damages. *Kleiner v. Burns* is irrelevant because Plaintiffs already agreed to produce any documents evidencing their damages due to Aereo. Fed. R. Serv. 3d 644, 2000 WL 1909470 (D. Kan. Dec. 15, 2000). Discovery of damages due to the defendant is what the *Kleiner* court ordered and is what Plaintiffs agreed to here. *Id.* at *3, n. 2. Nothing in the *UMG* order attached to the Hosp declaration suggests that the information Plaintiffs have already

---

[12] *See, also, Apple, Inc. v. Psystar Corp.*, 673 F. Supp. 2d 926, 929 (N.D. Cal. 2009) ("[n]otably, the [statutory damages] factors include the *profits reaped by defendant and the revenues lost by plaintiff, not the plaintiff's profits.*"); *IO Grp., Inc. v. GLBT Ltd.*, C-10-01282 MMC DMR, 2011 WL 3443773 (N.D. Cal. Aug. 8, 2011) (denying motion to compel concerning the plaintiffs' profits and revenues earned; "[A]s the alleged infringer, it is Defendant's profits related to the alleged infringed works, and not Plaintiffs', that are relevant to the issue of actual damages.")

agreed to provide does not equate with the type of summary information the *UMG* court ordered

produced or to suggest that this outlier decision has any application here.[13]

**IV.    Plaintiffs Have Produced All Documents Properly Within The Scope Of Discovery For Irreparable Harm**

Judge Nathan already has found that Aereo's service would cause irreparable harm absent

an injunction. *See Aereo*, 874 F. Supp. 2d at 397-400.  The Second Circuit affirmed a finding

that ivi –another service that retransmitted Plaintiffs' television programming without

authorization until enjoined – caused Plaintiffs irreparable harm. *ivi*, 691 F.3d at, 285-87.

Likewise, Aereokiller, a copycat unauthorized Internet broadcast retransmission service of

Aereo, was recently preliminarily enjoined after the court found that it caused the broadcast

plaintiffs there (some of whom are Plaintiffs here) irreparable injury. *See Aereokiller,* CV 12-

6921-GW JCX, 2012 WL 6784498 at \*6.  The same evidence that supported Judge Nathan's

finding of irreparable harm can also show that Aereo causes market harm under the fourth fair

use factor. *See Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 550-53 (S.D.N.Y.

2008) (evidence of irreparable harm used to find market harm).

Contrary to Aereo's assertions, Plaintiffs have agreed to produce and have produced the

discovery necessary for Aereo to challenge Plaintiffs' testimony as to the irreparable harm Aereo

causes to various of Plaintiffs' markets including their retransmission agreements, Internet and

mobile licensing agreements, and advertising revenues.[14]

**V.    Conclusion**

Plaintiffs have already provided Aereo with all potentially relevant information and then

---

[13]   Aereo's other cases did not concern motions to compel or the scope of permissible discovery where statutory damages were elected.

[14] Aereo suggests that the ABC Plaintiffs have withheld research conducted by NBCUniversal in connection with how consumers watched the Olympics, but has omitted telling the Court that the ABC Plaintiffs have already produced these reports. *See* DNC0043339-DNC0043439.

some.  They have produced far more than any court has required in similar infringement actions

against other Aereo-like Services.  Aereo has failed to demonstrate why this production is

inadequate, the legal relevance of the documents it seeks, or identified any potential need that

outweighs the substantial burden that its additional demands would impose on Plaintiffs.

Aereo's motion to compel Plaintiffs to produce additional documents should be denied.


Dated:  March 19, 2013


     /s/ Steven B. Fabrizio                                    /s/ Bruce P. Keller
Steven B. Fabrizio (No. SF-8639)               Bruce P. Keller
JENNER & BLOCK LLP                             Michael R. Potenza
1099 New York Avenue, N.W.                     DEBEVOISE & PLIMPTON LLP
Suite 900                                      919 Third Avenue
Washington, DC  20001-4412                     New York, NY 10022
Telephone (202) 639-6000                       Tel:  (212) 909-6200
Facsimile (202) 639-6066                       bpkeller@debevoise.com
sfabrizio@jenner.com                           mpotenza@debevoise.com
swilkens@jenner.com
                                               *Attorneys for Plaintiffs American
Richard L. Stone                               Broadcasting Companies, Inc., Disney*
Kenneth D. Klein                               *Enterprises, Inc., CBS Broadcasting Inc.,*
Julie A. Shepard                               *CBS Studios Inc., NBCUniversal Media,*
JENNER & BLOCK LLP                             *LLC, NBC Studios LLC, Universal Network*
633 West 5th Street                            *Television, LLC, Telemundo Network Group*
Suite 3600                                      *LLC, and WNJU-TV Broadcasting LLC*
Los Angeles, CA 90071-2054
Telephone (213) 239-5100
Facsimile (213) 239-5199

*Attorneys for Plaintiffs WNET, THIRTEEN,*
*Fox Television Stations, Inc., Twentieth*
*Century Fox Film Corporation, WPIX,*
*Inc., Univision Television Group, Inc., The*
*Univision Network Limited Partnership,*
*and Public Broadcasting Service*

# Exhibit A

March 19, 2013

| Request # | ABC Plaintiffs' Production | WNET Plaintiffs' Production |
|---|---|---|
| **Documents relating to Aereo** | | |
| 2-11, 13-19, 23-25, 37-41, 50 69, 71, 85, 86 | Responsive, non-privileged documents which mention or concern Aereo, Bamboom and/or Kanojia. | |
| **Documents relating to antennas** | | |
| 2, 12, 15, 18, 20, 21, 26, 27, 39, 86 | Non-privileged documents relating to Aereo. | a)  Non-privileged documents relating to Aereo;<br><br>b)  Non-privileged product reports regarding the number of people who watched broadcast television via over-the-air antennas in 2011 and 2012. |
| **Documents relating to DVRs and RS-DVRs** | | |
| 29, 30, 33-36, 76 | a)  Non-privileged market research, business forecasts or similar analyses created or commissioned in 2011 or 2012, for the purpose of assisting Plaintiffs' business decisions, based on the impact of RS-DVRs or Slingbox on the economics of Plaintiff's domestic, over-the-air, retransmission, online and mobile markets for their broadcast television programs;<br><br>b) Documents created in 2011 and 2012 sufficient to describe any RS-DVR technology developed and deployed by the ABC Plaintiffs;<br><br>c) Nielsen ratings reports that include live broadcast television viewing and C-3 ratings in 2011 and 2012. | a)  Non-privileged market research, business forecasts or similar analyses conducted or commissioned by Plaintiffs in 2011 or 2012 that i) measure fast-forwarding of advertising embedded in their programming using a DVR, ii) reports on consumer access to infringed works via remote DVR, iii) relates to remote DVRs and time-shifting via remote DVRs or iv) relates to market harm/impact of Slingbox);<br><br>b)  Non-privileged market research, or technology reviews conducted or commissioned by Plaintiffs or business forecasts prepared by Plaintiffs in 2011 or 2012 regarding the use of the infringed works via remote DVR;<br><br>c) Documents sufficient to describe any remote DVR technology developed and deployed by Plaintiffs, including what the cost of those services to consumers would be.<br><br>d) Nielsen reports/data reflecting viewership of broadcast television based on following Nielsen metrics where available in 2011 and 2012: Live, Live-Plus-Same-Day, Live +3, Live +5, Live +7 and C3. |
| **Documents relating to revenue, profits and expenses** | | |
| 20-22, 26-31, 35, 38, 40, 58-60, 62-80 | a) Retransmission consent agreements for the NY DMA that redact highly competitively-sensitive provisions and provisions unrelated to retransmission consent for broadcast television;<br><br>b) License agreements with iTunes, Hulu, Netflix and Amazon effective after the time | a) Retransmission consent agreements for the NY DMA that redact highly competitively-sensitive provisions unrelated to retransmission consent for broadcast television;<br><br>b) License agreements for mobile and internet distribution, including with Microsoft, iTunes, Hulu, Netflix and Amazon effective at and after |

|  |  |  |
|---|---|---|
|  | Aereo launched that redacted highly-competitively sensitive provisions and provisions unrelated to the licensings of broadcast television programs;[1]<br><br>c) Documents sufficient to show high-level gross advertising revenue received in 2011 and 2012. | the time Aereo launched that redacted highly-competitively sensitive provisions and provisions unrelated to the licensings of broadcast television programs;<br><br>c) Aggregate gross licensing revenues on a quarterly basis arising from Internet and mobile distribution licenses from 2011 and 2012;<br><br>d) Gross advertising or underwriting (for the non-profit Plaintiffs) revenues from 2011 and 2012. |
| **Documents relating to damages & commercial impact** | | |
| 38, 40, 41, 44-50, 58-60, 61-77, 79, 80 | a) Retransmission consent agreements for the NY DMA that redact highly competitively-sensitive provisions and provisions unrelated to retransmission consent for broadcast television;<br><br>b) Non-privileged documents from custodians most likely to have relevant documents regarding negotiations of retransmission consent agreements that reference (1) Aereo, (2) Filmon, (3) Filmonx, (4) Alki David, (5) ivi, (6) Aereokiller, (7) BarryDriller, (8) Zediva/Zedeva or (9) Chet Kanojia;<br><br>c) Retransmission consent agreements for the NY DMA that redact highly competitively-sensitive provisions and provisions unrelated to retransmission consent for broadcast television;<br><br>d) License agreements with iTunes, Hulu, Netflix and Amazon effective after the time Aereo launched that redacted highly-competitively sensitive provisions and provisions unrelated to the licensings of broadcast television programs;<br><br>e) Documents sufficient to show high-level gross advertising revenue received in 2011 and 2012;<br><br>f) Documents reflecting the adverse impact of Aereo on the potential market for Dyle;<br><br>g) Documents identified to date that evidence damage caused by Aereo. | a) Retransmission consent agreements for the NY DMA that redact provisions unrelated to retransmission consent for broadcast television;<br><br>b) Non-privileged documents from custodians most likely to have relevant documents regarding negotiations of retransmission consent agreements that reference (1) Aereo, (2) Filmon, (3) Filmonx, (4) Alki David, (5) ivi, (6) Aereokiller, (7) BarryDriller, (8) Zediva/Zedeva or (9) Chet Kanojia;<br><br>c) License agreements for domestic mobile and internet distribution of their works, including with Microsoft, iTunes, Hulu, Netflix and Amazon effective at and after the time Aereo launched that redacted highly-competitively sensitive provisions and provisions unrelated to the licensing of broadcast television programs;<br><br>d) Non-privileged documents from custodians most likely to have relevant documents regarding negotiations of license agreements that reference (1) Aereo, (2) Filmon, (3) Filmonx, (4) Alki David, (5) ivi, (6) Aereokiller, (7) BarryDriller, (8) Zediva/Zedeva or (9) Chet Kanojia;<br><br>e) Aggregate gross licensing revenues on a quarterly basis arising from Internet and mobile distribution licenses from 2011 and 2012;<br><br>f) Gross advertising or underwriting (for the non-profit Plaintiffs) revenues from 2011 and 2012;<br><br>g) Documents reflecting the adverse impact of Aereo on the potential market for Dyle;<br><br>h) Documents identified to date that evidence damage caused by Aereo. |

---

[1] Plaintiffs are **prepared** to produce these license agreements pending the outcome of the dispute between Aereo and third-party licensees.

2

| Documents relating to retransmission agreements | | |
|---|---|---|
| 45-50 | a) Retransmission consent agreements for the NY DMA that redact highly competitively-sensitive provisions and provisions unrelated to retransmission consent for broadcast television;<br><br>b) Non-privileged documents from custodians most likely to have relevant documents regarding negotiations of retransmission consent agreements that reference (1) Aereo, (2) Filmon, (3) Filmonx, (4) Alki David, (5) ivi, (6) Aereokiller, (7) BarryDriller, (8) Zediva/Zedeva or (9) Chet Kanojia. | a) Retransmission consent agreements for the NY DMA that redact provisions unrelated to retransmission consent for broadcast television;<br><br>b) Non-privileged documents from custodians most likely to have relevant documents regarding negotiations of retransmission consent agreements that reference (1) Aereo, (2) Filmon, (3) Filmonx, (4) Alki David, (5) ivi, (6) Aereokiller, (7) BarryDriller, (8) Zediva/Zedeva or (9) Chet Kanojia. |

| Documents relating to license agreements | | |
|---|---|---|
| 34, 44, 58-60, 62, 71 | a) License agreements for domestic mobile and Internet distribution of their works with iTunes, Hulu, Netflix and Amazon effective after the time Aereo launched that redact highly-competitively sensitive provisions and provisions unrelated to the licensing of broadcast television programs;<br><br>b) Non-privileged documents from custodians most likely to have relevant documents regarding negotiations of license agreements that reference (1) Aereo, (2) Filmon, (3) Filmonx, (4) Alki David, (5) ivi, (6) Aereokiller, (7) BarryDriller, (8) Zediva/Zedeva or (9) Chet Kanojia. | a) License agreements for domestic mobile and internet distribution of their works, including with Microsoft, iTunes, Hulu, Netflix and Amazon effective at and after the time Aereo launched that redacted highly-competitively sensitive provisions and provisions unrelated to the licensing of broadcast television programs;<br><br>b) Non-privileged documents from custodians most likely to have relevant documents regarding negotiations of license agreements that reference (1) Aereo, (2) Filmon, (3) Filmonx, (4) Alki David, (5) ivi, (6) Aereokiller, (7) BarryDriller, (8) Zediva/Zedeva or (9) Chet Kanojia;<br><br>c) Aggregate gross licensing revenues on a quarterly basis arising from Internet and mobile distribution licenses from 2011 and 2012. |

| Documents relating to market research | | |
|---|---|---|
| 12, 20-22, 26-31, 35, 63-65, 76, 78-80 | Market research, business forecasts or similar analysis created or commission in 2011 and 2012 for the purpose of making business decisions, based on the impact of RS-DVRs, Slingbox, Aereo and services related to Aereo such as ivi, Aereokiller, Filmon and Zediva, on the economics of the domestic, over the air, retransmission, online and mobile markets for Plaintiffs' broadcast television programs. | a) Non-privileged market research, business forecasts or similar analyses conducted or commissioned in 2011 or 2012 that i) measure fast-forwarding of advertising embedded in their programming using a remote DVR, ii) reports on consumer access to infringed works via remote DVR, iii) relates to remote DVRs and time-shifting via remote DVRs or iv) relates to market harm/impact of Slingbox;<br><br>b) Non-privileged market research, or technology reviews conducted or commissioned by Plaintiffs or business forecasts prepared by Plaintiffs in 2011 or 2012 regarding the use of the infringed works on any mobile device or via remote DVR;<br><br>c) Non-privileged reports regarding the number |

3

2184276.1

| | | of people who watched broadcast televisions via over-the-air antennas in 2011 and 2012; <br><br> d) Reports regarding the number of people who watched broadcast television via OTA antennas in 2011 and 2012. |
|---|---|---|
| **Documents relating to viewership measurement** | | |
| 77-80 | a) Nielsen ratings reports that include live broadcast television viewing and C-3 ratings in 2011 and 2012; <br><br> b) Existing reports sufficient to reflect data received from comScore and/or Google Analytics on the viewers of broadcast channels and/or infringed works in homes, over the Internet or on mobile devices in 2011 and 2012. | a) Nielsen reports/data reflecting viewership of broadcast television based on following Nielsen metrics where available in 2011 and 2012: Live, Live-Plus-Same-Day, Live +3, Live +5, Live +7 and C3; <br><br> b) Existing reports sufficient to reflect data received from comScore and/or Google Analytics on the viewers of broadcast channels and/or infringed works in homes, over the Internet or on mobile devices in 2011 and 2012. |
| **Documents relating to other technologies used to watch television programs** | | |
| 22, 28, 31, 32, 35, 42, 43, 76, 78-80 | a) License agreements for domestic mobile and Internet distribution of their works with iTunes, Hulu, Netflix and Amazon effective after the time Aereo launched that redact highly-competitively sensitive provisions and provisions unrelated to the licensing of broadcast television programs; <br><br> b) Non-privileged documents from custodians most likely to have relevant documents regarding negotiations of license agreements that reference (1) Aereo, (2) Filmon, (3) Filmonx, (4) Alki David, (5) ivi, (6) Aereokiller, (7) BarryDriller, (8) Zediva/Zedeva or (9) Chet Kanojia; <br><br> c) Market research, business forecasts or similar analysis created or commission in 2011 and 2012 for the purpose of making business decisions, based on the impact of RS-DVRs, Slingbox, Aereo and services related to Aereo such as ivi, Aereokiller, Filmon and Zediva, on the economics of the domestic, over the air, retransmission, online and mobile markets for Plaintiffs' broadcast television programs; <br><br> d) Documents created in 2011 and 2012 sufficient to describe any technology to distribute broadcast television programming to mobile devices over the Internet developed and deployed by the ABC Plaintiffs; <br><br> e) Documents reflecting the adverse impact of | a) License agreements for domestic mobile and internet distribution of their works, including with Microsoft, iTunes, Hulu, Netflix and Amazon effective at or after the time Aereo launched that redacted highly-competitively sensitive provisions and provisions unrelated to the licensing of broadcast television programs; <br><br> b) Non-privileged documents from custodians most likely to have relevant documents regarding negotiations of license agreements that reference (1) Aereo, (2) Filmon, (3) Filmonx, (4) Alki David, (5) ivi, (6) Aereokiller, (7) BarryDriller, (8) Zediva/Zedeva or (9) Chet Kanojia; <br><br> c) Aggregate net gross licensing revenues on a quarterly basis arising from Internet and mobile distribution licenses from 2011 and 2012; <br><br> d) Non-privileged market research reports or analyses commissioned or conducted by Plaintiffs in 2011 or 2012 that relate to the market harm/impact from Slingbox; <br><br> e) Non-privileged market research reports or technology reviews commissioned or conducted by Plaintiffs or business forecasts prepared by Plaintiffs in 2011 or 2012 regarding use of the infringed works on any mobile device; <br><br> f) Documents reflecting the adverse impact of Aereo on the potential market for Dyle. |

4

| | | |
|---|---|---|
| | Aereo on the potential market for Dyle. | |
| **Documents relating to Plaintiffs' Boards of Directors** | | |
| 8 | Non-privileged board minutes discussing Aereo or Bamboom (including documents discussing Chet Kanojia or Barry Diller in relation to Aereo). | |
| **Documents relating to lobbying/communications with the government** | | |
| 53, 84, 85 | Communications in 2011 and 2012 with government agencies, representatives of Congress or their staffs regarding Aereo or Bamboom (including Chet Kanojia or Barry Diller). | Lobbying communications that mention Aereo or Bamboom (including Chet Kanojia or Barry Diller). |
| **Documents relating to document retention policies** | | |
| 87 | Document retention policies. | |
| **Documents relating to Plaintiffs' organizational structures** | | |
| 88, 89 | Plaintiffs refer Aereo to the information located at:<br><br>a) http://www.nbcuni.com/corporate;<br><br>b) http://www.cbscorporation.com/ourcompany.php?id=11;<br><br>c) http://thewaltdisneycompany.com/about-disney;<br><br>d) http://www.disneyabctv.com/division/index_executives.shtml. | Current organizational charts to the extent they exist. |
| **Documents relating to ownership of copyrights** | | |
| 51-57, 61 | a) Copyright registration certificates for all works Plaintiff claims Aereo is infringing;<br><br>b) Applications for copyright registrations, to the extent Plaintiffs do not have registrations for the works Aereo is infringing;<br><br>c) Additional documents to the extent Aereo raises a good faith challenge to the ownership of a particular copyright. | |
| **Documents relating to *Cablevision*** | | |
| 82 | No additional documents relating to *Cablevision*. | |

2184276.1

# Exhibit B



# Exhibit C

# *Redacted*

HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    AEREO0214833

**Exhibit D**

# *Redacted*

*Redacted*

# Exhibit E

# *Redacted*

HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER          AEREO0342489

# Exhibit F

# *Redacted*

AEREO0036446

HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

# *Redacted*

AEREO0036469

HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

**Exhibit G**

# *Redacted*

HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

AEREO0489482

# *Redacted*

HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    AEREO0489483

# Exhibit H

# *Redacted*

HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    AEREO0218192

# *Redacted*

HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER     AEREO0218193

# *Redacted*

HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

AEREO0218194

# *Redacted*

HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

AEREO0218195

# *Redacted*

HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    AEREO0218196