UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                                         :
AMERICAN BROADCASTING COMPANIES, INC.,                                   :
DISNEY ENTERPRISES, INC., CBS BROADCASTING                               :
INC., CBS STUDIOS INC., NBCUNIVERSAL MEDIA,                              :
LLC, NBC STUDIOS, LLC, UNIVERSAL NETWORK                                 :
TELEVISION, LLC, TELEMUNDO NETWORK GROUP                                 :
LLC, WNJU-TV BROADCASTING LLC,                                           :
                                                                         :
          Plaintiffs,                                                    :
                                                                         :
                    v.                                                   :   Case No. 12-civ-1540
                                                                         :   [consolidated]
AEREO, INC.,                                                             :
                                                                         :
          Defendant.                                                     :
------------------------------------------------------------------------X
------------------------------------------------------------------------X
                                                                         :
WNET, THIRTEEN, FOX TELEVISION STATIONS, INC.,                           :
TWENTIETH CENTURY FOX FILM CORPORATION,                                  :
WPIX, INC., UNIVISION TELEVISION GROUP, INC.,                            :
THE UNIVISION NETWORK LIMITED PARTNERSHIP,                               :
PUBLIC BROADCATING SERVICE                                               :
                                                                         :
          Plaintiffs,                                                    :
                                                                         :
                    v.                                                   :   Case No. 12-civ-1540
                                                                         :   [consolidated]
AEREO, INC.,                                                             :
                                                                         :
          Defendant.                                                     :
                                                                         :
------------------------------------------------------------------------X

## DECLARATION OF MICHAEL R. POTENZA

I, Michael R. Potenza, hereby declare under penalty of perjury, that the following statement is true and correct, to my personal knowledge.

1.      I am a member of the bar of this Court and counsel at Debevoise & Plimpton LLP, counsel for American Broadcasting Companies, Inc., Disney Enterprises, Inc., CBS Broadcasting, Inc., CBS Studios, Inc., NBCUniversal Media, LLC, NBC Studios, LLC, Universal Network Television, LLC, Telemundo Network Group LLC, and WNJU-TV Broadcasting, LLC in the above-captioned action.  I respectfully submit this declaration in support of Plaintiffs' Response to Aereo, Inc's Objections To Magistrate Judge Pitman's Rulings on Discovery Disputes.

2.      Attached hereto as **Exhibit 1** is a correct and true copy of Magistrate Judge Pitman's March 29, 2013 Order.

3.      Attached hereto as **Exhibit 2** is a correct and true copy of the transcript of the March 21, 2013 Hearing Before Magistrate Judge Pitman.

4.      Attached hereto as **Exhibit 3** is a correct and true copy of the transcript of the February 25, 2013 Hearing Before Magistrate Judge Pitman.

5.      Attached hereto as **Exhibit 4** is a correct and true copy of the Plaintiffs' Memorandum of Law Pursuant to Order of Magistrate Pitman Dated February 26, 2013 Regarding Discovery on Damages, Harm, and Market Impact, as redacted for public filing, dated March 19, 2013.

6.      Attached hereto as **Exhibit 5** is a correct and true copy of Defendant Aereo, Inc.'s Memorandum of Law Pursuant to Order of Magistrate Pitman Dated

2

February 26, 2013 Regarding Discovery on Damages, Harm, and Market Impact, dated March 8, 2013.

7.     Attached hereto as **Exhibit 6** is a correct and true copy of Magistrate Judge Pitman's April 1, 2013 Order.

8.     Attached hereto as **Exhibit 7** is a correct and true copy of correspondence sent by Bruce P. Keller to Michael S. Elkin, dated January 15, 2013.

9.     Attached hereto as **Exhibit 8** is a correct and true copy of Aereo's Response To WNET Plaintiffs' Supplemental Requests For Admission.

10.    Attached hereto as **Exhibit 9** is a correct and true copy of the NBCUniversal Media presentation entitled "The Billion Dollar Research Lab."

11.    Attached hereto as **Exhibit 10** is a correct and true copy of an excerpt from the transcript of the May 30, 2012 Preliminary Injunction Hearing.

I declare under penalty of perjury that the foregoing is true and correct

/s/ Michael R. Potenza

Executed on April 23, 2013.

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
                                   :
AMERICAN BROADCASTING COMPANIES,
INC., et al.                       :

              Plaintiffs,          :

     -against-                     :     12 Civ. 1540 (AJN)(HBP)

AEREO INC.,                        :     ORDER

              Defendant.           :

----------------------------------X
                                   :
WNET, et al.                       :

              Plaintiffs,          :

     -against-                     :     12 Civ. 1543 (AJN)(HBP)

AEREO INC.,                        :     ORDER

              Defendant.           :

----------------------------------X

```
                                    USDC SDNY
                                    DOCUMENT
                                    ELECTRONICALLY FILED
                                    DOC #:
                                    DATE FILED: 3/29/13
```

          PITMAN, United States Magistrate Judge:

          A conference having been held on March 21, 2013, during

which various discovery disputes were discussed, for the reasons

stated on the record in open court, it is hereby ORDERED that:

          1.   To the extent not previously produced,

          plaintiffs are to produce all documents concerning the

          renegotiations of retransmission licenses that occurred

          after May 2011.

2.  Defendant's application to compel the production of documents concerning plaintiffs' total revenue, sources of revenue, expenses and profit and loss on a program-by-program basis is denied.

3.  Defendant's application to compel the production of documents concerning (a) damages caused by and the commercial impact of Aereo's technology in comparison to similar or related technologies, (b) technology similar to Aereo including place-shifting and media-shifting devices and (c) consumer and other research on alternative platforms is denied in part and granted in part.  The application to compel is granted to the extent that the requests seek documents regarding damages caused by or consumer research on (a) in-home DVRs, (b) unlicensed remote DVRs, and (c) unlicensed technologies that provide for the transmission of plaintiffs' copyrighted works over the Internet from January 2010 to present.

4.  Defendant's application to compel further production of documents related to plaintiffs' aggregate revenue and financial data is denied.

2

5.    Defendant's application to compel further production of documents concerning plaintiffs' advertising revenue is denied without prejudice.

6.    Defendant's application to compel the production of documents regarding ad-skipping is granted in part and denied in part. To the extent not previously produced, plaintiffs are directed to produce documents related to the analysis of ad-skipping or fast-forwarding by in-home DVRs from January 2010 to present.

7.    Defendant's application to compel the production of documents concerning consumer use of antennas is denied.

8.    With respect to the application of non-parties Netflix, Inc., Hulu, LLC and Amazon Inc. (collectively, the "Non-Parties") to prohibit the production of certain licensing agreements between the Non-Parties and certain of plaintiffs (the "Agreements"), the following procedures shall apply:

> a.    No later than April 3, 2013, the Non-Parties shall identify by Bates number the specific pages of the Agreements that they believe

are so sensitive that even outside counsel should be denied access (the "Highly Sensitive Pages").

b.  No later than April 10, 2013, defendant shall return the Highly Sensitive Pages and all copies thereof to counsel for the Non-Parties, Bobbie Wilson, Esq. of Perkins Coie LLP.

c.  No later than April 19, 2013, the Non-Parties shall provide the parties with redacted versions of the Highly Sensitive Pages accompanied with a log sufficient to identify the nature and subject-matter of the redacted material.

d.  To the extent that the parties object to the redactions, counsel for the parties and the Non-Parties are directed to meet and confer to reach a reasonable compromise.  In the event that the parties and the Non-Parties cannot reach an

agreement, they may write to the Court to seek

resolution.

Dated:  New York, New York
        March 29, 2013

                              SO ORDERED

                              _____
                              HENRY PITMAN
                              United States Magistrate Judge

Copies transmitted to:

All Counsel

5

# EXHIBIT 2

```
                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK

In re:                              :
                                        Docket #12cv1540
 AMERICAN BROADCASTING COMPANY,     : 1:12-cv-01540-AJN-HBP
 et al.,
                                    :
                    Plaintiffs,
                                    :
   - against -
                                    :
 AEREO INC.,                          New York, New York
                                    : March 21, 2013
                    Defendant.
------------------------------------ :

                     PROCEEDINGS BEFORE
                THE HONORABLE HENRY PITMAN,
          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff WNET:     JENNER & BLOCK
                        BY: STEVEN FABRIZIO, ESQ.
                            JULIE SHEPARD, ESQ.
                        1099 New York Avenue, N.W., Suite 900
                        Washington, D.C.  20001-4412
                        (202) 639-6000


For Plaintiff ABC:      DEBEVOISE & PLIMPTON
                        BY:  BRUCE KELLER, ESQ.
                        919 Third Avenue
                        New York, New York 10022




Transcription Service:  Carole Ludwig, *Transcription Services*
                        141 East Third Street #3E
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Fax:  (212) 420-6007


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

APPEARANCES CONTINUED:


For Defendant:            WINSTON & STRAWN
                          BY:  MICHAEL ELKIN, ESQ.
                               DAVID HOSP, ESQ.
                               MARK PUZELLA, ESQ.
                          200 Park Avenue
                          New York, New York 10166
                          (212) 294-6700

For Third Parties:        PERKINS COIE
                          BY:  DENNIS HOPKINS, ESQ.
                               BOBBIE WILSON, ESQ.
                          30 Rockefeller Plaza, 22nd Floor
                          New York, New York 10112-0015
                          (212) 262-6900

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None | | | | |

4

THE CLERK:   ABC and WNET against Aereo.  Counsel, please state your name for the record.

MR. STEVEN FABRIZIO:   Good afternoon, Your Honor, Steven Fabrizio for the WNET plaintiffs.

MS. JULIE SHEPARD:   Good afternoon, Your Honor, Julie Shepard on behalf of the WNET plaintiffs.

MR. BRUCE KELLER:   Good afternoon, Your Honor, Bruce Keller for the ABC plaintiffs.

MR. MICHAEL ELKIN:   Good afternoon, Your Honor, Michael Elkin, Winston Strawn, counsel for defendant Aereo.

MR. DAVID HOSP:   Good afternoon, Your Honor, David Hosp for Aereo.

MR. MARK PUZELLA:   Good afternoon, Your Honor, Mark Puzella on behalf of Aereo as well.

MR. DENNIS HOPKINS:   Good afternoon, Your Honor, my name is Dennis Hopkins with Perkins Coie.  I'm here on behalf of Hulu Inc., Amazon Inc., and Netflix Inc., which are third parties.  This matter – we had written to the court and the court had said that we could come today to be heard on the issue of third-party documents that we did not want disclosed without being redacted.

With me, Your Honor, is my colleague, my partner, Bobbie Wilson who is not admitted in this court, but she's more familiar with the issues, and I'd like to orally move

```
                                                      5
 1 |
 2 | her admission pro hac vice.  We've put in the pro hac vice
 3 | papers and application and we're waiting on an additional
 4 | certificate of good standing which we haven't received yet,
 5 | but as soon as we do, we'll get everything in order.
 6 |          THE COURT:   Okay.  All right, the application is
 7 | granted for today, pending the signature on the form order.
 8 | I'm sorry, what was your partner's name again?  It's not on
 9 | the appearance sheet.
10 |          MR. HOPKINS:   Bobbie Wilson.
11 |          THE COURT:   Miss Wilson, okay, thank you.
12 |          MS. BOBBIE WILSON:   Thank you, Your Honor.
13 |          THE COURT:   All right.  We're here today to
14 | resolve some open issues concerning the scope of discovery,
15 | and I think it's going to be probably most helpful if I
16 | resolve the issues between the parties before we get to the
17 | third-party subpoena issues.
18 |          Let me start with defendant first.  Having studied
19 | the parties' submissions, I think the defendants are
20 | correct that they're entitled to some discovery concerning
21 | harm, concerning damage with respect to both plaintiffs'
22 | claims for statutory damages and plaintiffs' application
23 | for a preliminary injunction.
24 |          But my question is really, and I think that
25 | plaintiffs to some extent can see that.  They tell me in
```

6

their submission and they tell me in the February letter

that there are a number of documents concerning harm that

they have produced.  And having read the papers and having

looked at the chart that's annexed as exhibit A to Miss

Shepard's declaration, I guess the principal question I

have for defendants is why is what plaintiffs have produced

insufficient?  Why do you need more?

          MR. PUZELLA:  Your Honor, Mark Puzella.

          THE COURT:   Yeah.

          MR. PUZELLA:   Before we address that question, if

the Court could just indulge me for a minute to provide

just a little bit of framework that would inform that

question.

          THE COURT:   Go ahead.

          MR. PUZELLA:   Mr. Lane, who you met at the last

hearing, was actually going to provide us the framework,

but he's not here today.  He had a sudden illness this

morning, so bear with me while I try and step into his

shoes.

          Aereo is a technology company that offers some

very basic technologies, an over-the-air television antenna

and a remotely located DVR from which consumers can play

back their recordings to themselves.

          THE COURT:   I've read Judge Nathan's opinion, so

7

1  
2  I understand – I think I understand the technology, unless  
3  you want to tell me that there's some error in her opinion.  
4      MR. PUZELLA:  There are no errors in her opinion.  
5      THE COURT:  Okay.  
6      MR. PUZELLA:  It's a fantastic opinion.  I didn't  
7  want to get much more into the technology.  I just wanted  
8  to begin with that and say a little bit about the nature of  
9  the claims because they inform the question the Court just  
10  posed.  
11      So plaintiffs brought this case seeking to enjoin  
12  Aereo on two bases — copying claim and a public performance  
13  claim – of two types – direct and indirect.  Now, the  
14  direct claim concerns their allegations that it's Aereo who  
15  is liable for infringing the copying and public performance  
16  rights.  The indirect claim concerns their allegation that  
17  it's the consumers who are liable for their activity using  
18  the Aereo system to make recordings and play them back for  
19  themselves and that Aereo was indirectly liable for  
20  supplying that technology.  A dispute as to whether the ABC  
21  plaintiffs have made out an indirect claim, but we don't  
22  need to discuss that now.  
23      The plaintiffs sought a PI, as you mentioned, they  
24  lost that.  There was an expedited discovery, expert  
25  testimony, and the court found that the technology was on

8

1

2  four corners with the Cablevision Second Circuit decision

3  and that the technology did not infringe.

4           Now, we're here to address plaintiffs' request for

5  harm documents, as you point out.

6           THE COURT:  Well, defendant's request for

7  additional harm documents.

8           MR. PUZELLA:  Yes, correct.

9           THE COURT:  Not plaintiffs' request for harm

10 documents.  Go ahead.

11          MR. PUZELLA:  Yes, Your Honor.  Specifically

12 Aereo seeks an order concerning the production of documents

13 relevant to harm and commercial impact as set forth most

14 specifically in the February 1 letter submitted to Judge

15 Nathan in category 13, page 19 of the letter.  It lays out

16 very specifically what it is that Aereo is seeking here by

17 way of an order.

18          Aereo asks – I'm quoting here – Aereo asks that

19 "the court order plaintiffs to search, collect, produce

20 across all repositories information sufficient to identify

21 what harms and commercial impacts Aereo causes that are

22 distinct from the impacts and effects caused by these other

23 related technologies such as antenna, DVR's, remote DVR's,

24 and place or media-shifting devices" --

25          THE COURT:  Okay, at some point you're going to

9

1  get to the question I started with, are you not?

2       MR. PUZELLA:   I am, Your Honor.

3       THE COURT:   Thank you, go ahead.

4       MR. PUZELLA:   Yes.  "Such as slingbox or dongles

5  as well as for each asserted copy of the program

6  information sufficient to identify the specific and

7  detailed financial impact on the profit for that program

8  resulting specifically and only from the Aereo technology

9  as well as the 12 category which seeks revenue documents

10 related on a per-program basis."

11      THE COURT:   Right, okay.  And we know from

12 plaintiffs' submission at page 12 of plaintiffs'

13 submission, plaintiffs say "because Aereo has only 3,000

14 subscribers and plaintiffs are not asserting that it

15 presently causes measurable, quantifiable harm that will be

16 reflected in financial information, that would be reflected

17 in program specific information."

18      So you don't need to disprove a claim that they're

19 not making.  I come back to the question I started with.

20 Why is not – why are not the documents they have agreed to

21 produce sufficient?

22      MR. PUZELLA:   They're not sufficient, Your Honor,

23 because Aereo is entitled to greater discovery on harm and

24 commercial impact.  All plaintiffs are willing to provide

```
1                                                        10
2  are documents that show that support their claim.  What
3  Aereo --
4              THE COURT:   Well, let's talk about that.  I mean
5  in her opinion Judge Nathan described four or five
6  categories of harm where she had found that plaintiffs had
7  demonstrated that they will suffer irreparable harm.  And I
8  agree with you, you are entitled to discovery to probe
9  their allegations of irreparable harm and to look for
10 documents and other discovery that may disprove their
11 allegations of irreparable harm.  But why should that not –
12 why should that discovery not be limited to the irreparable
13 harm that plaintiffs are claiming?
14             I mean the plaintiffs are not claiming that
15 they've lost revenue for – that Dancing with the Stars is
16 less profitable than it was before Aereo entered the scene.
17 They're not claiming that 60 Minutes is less profitable due
18 to Aereo's activities.  I mean I'm not sure how the per-
19 programming discovery – and that's not something that Judge
20 Nathan found in her opinion either, that a particular
21 program is worth less as a result of Aereo's activities.
22             Why is this per-programming cost and revenue data
23 relevant here?
24             MR. PUZELLA:   Yes, Your Honor.  Judge Nathan
25 didn't address it because the only question at the stage of
```

```
 1                                                    11
 2  the preliminary injunction was irreparable harm.  Damages
 3  weren't really in it, right, so --
 4            THE COURT:   Right, but you need that for a
 5  permanent injunction too.
 6            MR. PUZELLA:   Right, but her omission of
 7  addressing, for example, why these --
 8            THE COURT:   No, but she - hold on a second --
 9            MR. PUZELLA:   -- the traditional discovery's
10  relevant to their use.
11            THE COURT:   -- she omitted it, but they're not
12  claiming it either.  So why is it even an issue?
13            MR. PUZELLA:   Fair use, Your Honor.
14            THE COURT:   Well, they're admitting through - I
15  mean look at page 12 of the submission they made, I don't
16  know if it was Tuesday night or Wednesday morning, they're
17  not claiming that Aereo has a measurable, quantifiable
18  effect on its per-programming revenue.
19            MR. PUZELLA:   Your Honor --
20            MR. HOSP:   Your Honor --
21            THE COURT:   I thought it was Mr. Puzella.
22            MR. HOSP:   It is, Your Honor --
23            THE COURT:   Are you going to take over, Mr. Hosp?
24            MR. HOSP:   No, I just - if I may --
25            THE COURT:   We don't have tag-team arguments.
```

```
 1                                                      12

 2            MR. HOSP:   Thank you, Your Honor.

 3            THE COURT:   Okay?  I mean if you want to take

 4   over and Mr. Puzella sits down, that's fine, but --

 5            MR. HOSP:   Your Honor, if I may.  There were

 6   certain aspects of the argument that different individuals

 7   were going to address.

 8            THE COURT:   Can you answer my question?

 9            MR. HOSP:   Yes, yes, Your Honor.  And Judge

10   Nathan actually addressed this in her order, this basic

11   concept in her order regarding the retransmission

12   agreements.  Because plaintiffs made the identical argument

13   with respect to whether or not retransmission agreements

14   should be produced.  What they said was we're not going to

15   rely on these agreements.  We're actually going to rely on

16   other things, and so, in essence, we shouldn't have to

17   produce these.

18            And Judge Nathan actually considered that, and

19   what she said – and this is on page 4 of the opinion, and

20   this is document 34 in the case.

21            THE COURT:   Is this the July 11 opinion?

22            MR. HOSP:   Judge Nathan's opinion on the

23   retransmission agreement.

24            THE COURT:   Is this the July 11 opinion?

25            MR. HOSP:   This is the – no, this the April 13.
```

13

1

2         THE COURT:   All right, I don't have it, but go

3   ahead, why don't you read the passage you're relying on.

4         MR. HOSP:   Yes, what she says is, and this,

5   again, was in the context of the plaintiffs having said

6   we're not going to rely on the retransmission agreements to

7   prove our harm.  And so they made the same argument that

8   because they weren't going to rely on this, they didn't

9   have to produce it.  And what Judge Nathan said was

10  "plaintiffs contend that allowing defendants access to

11  these documents is tantamount to allowing it to condition

12  how copyright plaintiffs must prove irreparable harm.  The

13  Court disagrees.  Even if plaintiffs do not intend to rely

14  on the specific content of these agreements as part of

15  their affirmative case for irreparable harm, if the

16  agreements contain information relevant to rebutting claims

17  of irreparable harm, as they appear they may, defendants

18  are entitled to this production."

19        THE COURT:   Wouldn't that only be true though if

20  the agreements were renegotiated after Aereo launched?

21        MR. HOSP:   And what we're seeking with respect to

22  the individual --

23        THE COURT:   No, but if a retransmission agreement

24  was in place before Aereo launched, it hasn't been

25  renegotiated after Aereo launched, is it going to show

```
 1                                                      14
 2   anything?
 3            MR. HOSP:   Well, no, but there are agreements --
 4            THE COURT:   So we agree then, so we agree with
 5   retransmission we're limited to agreements, the only
 6   agreements that would be relevant would be agreements that
 7   were renegotiated after Aereo launched, agreed?
 8            MR. HOSP:   Well, any agreements that were
 9   renegotiated after Aereo announced as well as the
10   agreements --
11            THE COURT:   Fair enough.
12            MR. HOSP:   -- as well as the agreements --
13            THE COURT:   But Aereo --
14            MR. HOSP:   -- prior to those.
15            THE COURT:   Aereo had to have some impact on the
16   agreement for the agreement to be relevant.  If there's a
17   preexisting agreement that hasn't been changed since Aereo
18   announced, it has no relevance, agreed?
19            MR. HOSP:   Agreed, to the extent that we're
20   talking about retransmission agreements.  What we're
21   looking at are retransmission agreements that - well, and
22   when I say --
23            THE COURT:   When did Aereo announce?
24            MR. HOSP:   Well, Your Honor, let me --
25            THE COURT:   When did Aereo announce?
```

```
 1                                                15
 2            MR. HOSP:   Aereo announced in March, well, no,
 3   they actually announced --
 4            MR. PUZELLA:   February 14.
 5            MR. HOSP:   -- February of 2011.  May of 2011.
 6            THE COURT:   May of 2011.
 7            MS. SHEPARD:   May of 2012.
 8            MR. HOSP:   No, 2011.  That was when Aereo first
 9   announced what it was going to do, absolutely.  And, Your
10   Honor, for example, some of these agreements are important
11   because, even if they haven't been renegotiated, because
12   some of these agreements are ten years long.  So if they're
13   claiming that they're going to be impacted, and, in fact,
14   the agreements are in place for ten years, we need to know
15   that because, in fact, it's going to be another nine or
16   eight or seven years before those negotiations can even be
17   renegotiated.
18            So I actually - I'm going to take back what I said
19   before, I don't think that we're just limited to those
20   documents, and, in fact, this is an issue that Judge Nathan
21   already ruled on.
22            THE COURT:   Well, if they're not - if they
23   haven't been renegotiated after Aereo announced, then all
24   you need is the term, the term of the agreement, the
25   duration of the agreement.
```

```
 1                                                  16

 2            MR. HOSP:   Well, yes, in the context of the total

 3   number of agreements that they have.  But Judge Nathan has

 4   already ruled on this.  Judge Nathan was represented with

 5   this question and it was briefed, and she already ruled

 6   that, in fact, those documents needed to be produced.  And

 7   the rationale --

 8            THE COURT:   Well, I'm not sure that's the case or

 9   else she wouldn't have referred the dispute to me.  She

10   wouldn't refer to me a dispute she's already ruled on.

11            MR. HOSP:   My understanding is that she referred

12   all of the discovery disputes, but this is a dispute that

13   was actually originally addressed back in the preliminary

14   injunction stage, and she ordered that all of the

15   retransmission agreements be produced.  She ordered that

16   they --

17            THE COURT:   And do you cite this fact to me in,

18   this claim that Judge Nathan has already ruled on it, do

19   you cite this to me in your March 8 submission?  Did I

20   overlook it?

21            MR. HOSP:   I believe --

22            THE COURT:   Or is this a new argument?

23            MR. HOSP:   -- we attached the order.  We attached

24   the order in that submission.

25            THE COURT:   Where is it?
```

1

2        MR. HOSP:   It's exhibit --

3        ATTORNEY:   Exhibit B

4        MR. HOSP:   Exhibit B.

5        THE COURT:   Exhibit B is the July 11 opinion.

6        ATTORNEY:   Oh, no.

7        THE COURT:   This contention that she's already

8   ruled on the retransmission agreements, is this something

9   that you cited to me in your March 8 decision?  March 8

10  submission, excuse me.

11       MR. HOSP:   Your Honor, may I hand up the order?

12       THE COURT:   Can you answer my question first?

13       MS. SHEPARD:  Your Honor --

14       MR. HOSP:   Again, Your Honor, I don't recall – I

15  thought that we had, but I don't want to say that we

16  hadn't, and I want to look at the –

17       MS. SHEPARD:   Just on the purpose of the re –

18  just on the issue of the retransmission consent agreements,

19  Your Honor, we have produced those.  Those are not in

20  dispute, and I know that the Court's time is precious, and

21  so I don't want to, I just want to let you know this.

22       MR. HOSP:   My only point here, Your Honor, is

23  when Judge Nathan considered that and ruled on this issue,

24  what she said was it's not just what plaintiffs are going

25  to rely on that's relevant.  It's actually those things

1
2 that plaintiffs don't rely on that ultimately could

3 disprove the statements that plaintiffs are making --

4            THE COURT:   Well, yes and no.

5            MR. HOSP:   -- defendants are entitled to get.

6            THE COURT:   I mean with the - the documents they

7 don't rely on with respect to this subject matters for

8 which they're claiming harm you may be entitled to, but if

9 they're not claiming that the profit from a particular

10 program has been diminished as a result of Aereo's

11 activity, I don't know how you're entitled to that.  It

12 doesn't seem to me that you're rebutting anything that

13 they're offering.

14            MR. HOSP:   Well, for example, Your Honor, and

15 this was an issue that came up at the preliminary

16 injunction --

17            THE COURT:   And I'm also kind of surprised, you

18 know, now you're standing here, you know, we met at the end

19 of February, I asked for additional submissions on the

20 matter.  You made a submission March 8.  In the March 8

21 submission I don't think you told me that Judge Nathan has

22 ruled on these matters, you know, and I think you had about

23 two weeks to get the March 8 submission in, and now you're

24 telling me that these matters have already been decided.

25            MR. HOSP:   No, Your Honor, as plaintiffs have

19

1  pointed out, the question of whether or not the

2  retransmission agreements is not, should be produced is not

3  an issue that's before Your Honor.  That's not in dispute.

4          THE COURT:   Okay.

5          MR. HOSP:   Which is why we wouldn't – that's not

6  a matter --

7          THE COURT:   It's something you raised in your

8  March 8 submission.  I'm looking at page 13 of your March 8

9  submission, and you tell me retransmission agreements are

10  in play.

11         MR. HOSP:   Well, there is a question with respect

12  to license agreements as opposed to -

13         THE COURT:   No, it says, no, your March 8

14  submission says "plaintiffs' retransmission and licensing

15  agreements."

16         MR. HOSP:   Right.

17         THE COURT:   Page 13.

18         MR. HOSP:   And we don't know whether or not they

19  have all been produced.  If the representation is that all

20  retransmission agreements have been produced, then there is

21  no issue.

22         THE COURT:   If the issue is completeness, why

23  didn't you pick up the phone and call your adversary and

24  say do we have all of them?

                                                                  20

1

2          MR. HOSP:   Because the real dispute with respect

3    to this category are the documents related to the

4    negotiations of those agreements.

5          THE COURT:   Well, let me ask plaintiffs a

6    question.  Have any retransmission agreements been

7    renegotiated since May 2011?

8          MR. KELLER:   Your Honor, if they have, we are not

9    claiming at this point that any of those renegotiated

10   agreements have been renegotiated for any reason other than

11   they were renegotiated in the normal course.  I know what

12   Mr. Hosp wants --

13         THE COURT:   Well, no, hold on a second, hold on a

14   second.  I'm looking at Judge Nathan's July opinion here,

15   and she's talking about how plaintiffs have demonstrated

16   irreparable harm.  And this is paragraph 5(a) or Section

17   5(a) of her decision.  And she wrote, "Similarly, the

18   evidence shows that by poaching viewers from cable and

19   other companies that license plaintiffs' content, Aereo's

20   activities will damage plaintiffs' ability to negotiate

21   retransmission agreements as these companies will demand

22   concessions from plaintiffs to make up for this decrease in

23   viewership."  So that is apparently a theory of harm that

24   you proffered in connection with the irreparable --

25         MS. KELLER:   And, Your Honor --

21

1

2          THE COURT:    -- in connection with the preliminary

3    injunction on which you prevailed.

4          MR. KELLER:    We produced those.  Those have been

5    produced.

6          THE COURT:    Okay, and have any been – well, if

7    any have been renegotiated since May 2011, and Aereo hasn't

8    been a factor in the renegotiations, isn't that relevant to

9    this claim of irreparable harm?

10         MS. KELLER:    Your Honor, they have them, they're

11   entitled to take further discovery by way of asking the

12   people who negotiated them in depositions what the

13   renegotiation was all about.  This is a document discovery

14   dispute --

15         THE COURT:    No, I understand that.  Are there --

16         MS. KELLER:    We gave them the documents.

17         THE COURT:    And if there's been a renegotiation,

18   has the document, have the documents concerning the

19   renegotiation been produced?

20         MS. SHEPARD:    We have agreed, Your Honor, to

21   produce negotiation documents of retransmission consent

22   agreements that reference Aereo, FilmOn which is another

23   unauthorized retransmission service, FilmOn X, AereoKiller,

24   IUV, all of which are unauthorized retransmission service,

25   broadcast retransmission services over the internet.  Those

                                                                    22

1

2   have already been agreed to produce, be produced, and are

3   either produced or in the process.

4          THE COURT:   Okay, well, let me ask you this, I

5   mean if there was a renegotiation after Aereo announced and

6   Aereo was not mentioned as a factor, isn't that also

7   relevant the fact that XYZ cable company was not con – did

8   voice any concern about Aereo's siphoning customers from

9   XYZ cable?

10         MS. SHEPARD:   Well, Your Honor, they would know

11  that by the abstract, or they aren't going to have a

12  negotiation document that says, say negotiation was done

13  with Acme Company.  They have all the retransmission

14  consent agreements.  They know the parties who have

15  retransmission consent with us, like CableVision, DirecTV,

16  Dish, etc. --

17         THE COURT:   No, I'm talking about negotiations

18  after Aereo announced.

19         MS. SHEPARD:   I understand, Your Honor.

20  Negotiation documents that do not mention Aereo won't –

21  they won't – they can make the argument this is without

22  having the negotiation documents which are highly sensitive

23  negotiation – they're highly negotiated agreements and are

24  extremely sensitive negotiation processes.

25         They will have those identifying where Aereo was

1   mentioned.  They can make the argument in the negative,

2   well, you didn't produce anything where Acme Company

3   mentioned Aereo, yet you've renegotiated the agreement.

4   They don't need the negotiation documents because the court

5   is not going to take into consideration thousands of pages

6   where they put into evidence and say, well, none of these

7   mention Aereo.

8        THE COURT:  Well, let me come at it another way.

9   How many retransmission agreements were either negotiated

10  to renegotiated after Aereo announced.

11       MS. SHEPARD:  Honestly, Your Honor, I don't have

12  that number in mind that I can tell you how many.  I know

13  that they have been and that they are --

14       THE COURT:  I mean are you willing to stipulate

15  that - well, are you willing to identify the retransmission

16  agreements that were renegotiated after Aereo announced and

17  identify and stipulate that Aereo was not mentioned as an

18  issue with respect to renegotiations one, two, three, four,

19  and five, or whatever number there are?

20       MS. SHEPARD:  Whether or not it was raised in the

21  documents or whether or not it was raised in discussions?

22  Because - and also the other issue with respect to --

23       THE COURT:  No, look, if you're going to say they

24  can argue in the negative without the documents, I think

24

1

2   they're either entitled to the documents or they're

3   entitled to some stipulation.  I mean you can't have it

4   both ways.

5        MR. HOSP:   Your Honor, may I be heard just on a

6   brief issue, this issue as to why the correspondence, aside

7   from the negotiating documents, aside from these

8   retransmission agreements are important?  I deposed their

9   person most knowledgeable during the preliminary injunction

10  phase, Mr. Franks.  He testified, and we have the page and

11  line references, if useful to the Court, he testified that,

12  yes, when I had discussions and negotiations with DirecTV,

13  and when I had discussions and negotiations with Dish, the

14  subject of Aereo or a service that Aereo is actually

15  performing, or a technology that is being provided by Aereo

16  is affecting these negotiations, I specifically asked about

17  it, and when I pressed him further as to whether it was

18  Aereo or not Aereo, he couldn't specifically say it was

19  Aereo, but in his mind it was the only company that was

20  involved in providing that.

21        There is no way, Your Honor, respectfully, that we

22  could possibly get to the bottom of this which has, in our

23  view, broad commercial impact on their claims without

24  getting this kind of correspondence.  I don't think that

25  Judge Nathan, when she ultimately decides this case, should

25

1  decide it without having access to that evidence.

2         MS. KELLER:   But, Your Honor, I guess he didn't

3  hear Miss Shepard say we've given them all the negotiation

4  documents that mention Aereo; they have it.  And they have

5  the ultimate agreement that was the result of the

6  negotiations, and they have all the other retransmission

7  agreements and all they have to do is take a deposition on

8  the subject and ask those questions because they have the

9  underlying documents.

10        THE COURT:   All right, so what we're talking

11 about now is retransmission agreements that were

12 renegotiated after Aereo announced in which Aereo -- that

13 don't mention Aereo.  Right?  That's the universe we're

14 talking about.

15        MS. KELLER:   Right, because they've got the ones

16 that do.

17        THE COURT:   Okay.

18        MR. PUZELLA:   Let me just say --

19        THE COURT:   Hold on, hold on.  How many did not

20 mention – how many retransmissions – maybe you know – how

21 many retransmission agreements were renegotiated after

22 Aereo announced that didn't mention Aereo?

23        MS. KELLER:   I think that without knowing the

24 exact number, I think it's fair to say, and I'm looking at

1                                                           26

2   my colleagues, that the majority of the renegotiated

3   agreements were not accompanied by specific references to

4   Aereo or AereoKiller or any of the other things that we

5   voluntarily gave them.

6           MR. PUZELLA:   So, Your Honor, just with respect

7   to Mr. Keller's statement that they would give us documents

8   that specifically reference Aereo, why Aereo is relevant,

9   this is Mr. Franks, at page 89 of the transcript --

10          THE COURT:   No, I understand your point, but it's

11  not, I mean we are talking about a document dispute, not

12  deposition questions.   And if it's not in the documents,

13  it's not in the documents.   That doesn't mean it wasn't

14  discussed; it just means it was not reduced to writing

15  somewhere.

16          MR. PUZELLA:   Exactly.   And here's the rub, if I

17  may, here's the rub.   If they are delimiting the documents

18  that specifically just reference Aereo but yet those

19  documents do have an effect on the very claims and defenses

20  that have to be decided here, how could we possibly be

21  deprived of that?

22          MS. KELLER:   Your Honor, we've given them all the

23  retrans agreements, that's the point.   They've got the

24  universe of retrans agreements, they've got the universe of

25  renegotiated retrans agreements, and they've got the

1

2 universe of correspondence that says Aereo in connection

3 with those negotiations, and we gave them more because we

4 didn't stop at Aereo.  We took the AereoKiller copycat.

5 So they've got everything they need.  If they want

6 to do the work, and they have to, read the documents, read

7 the correspondence, take your deposition, and then you'll

8 have your answer.  That's the way it's normally done.  That

9 is the proper way to resolve this dispute, because,

10 frankly, we gave up the documents that they asked for.

11 THE COURT:  Let me come back to the question I

12 asked a few moments ago, are you willing to identify the

13 retransmission agreements that were renegotiated after

14 Aereo announced in which Aereo is not mentioned in the

15 documents and stipulate that Aereo is not – Aereo and the

16 Aereo equivalents are not mentioned in the documents

17 concerning those renegotiations?

18 MS. SHEPARD:  Your Honor, we could stipulate that

19 we have produced all documents in the renegotiation that

20 mention Aereo --

21 THE COURT:  That's not my question.  Answer my

22 question.

23 MS. SHEPARD:  If I can stipulate --

24 MR. FABRIZIO:  Excuse me, Your Honor, I'm Steve

25 Fabrizio.  I think the answer is we certainly can't here,

28

1   and we don't necessarily think it's appropriate for us to

2   stipulate to what might have happened in oral discussions I

3   what may be many negotiations --

4              THE COURT:   I'm not asking you to stipulate to

5   oral discussions.  I'm asking you to stipulate that - look,

6   I mean they want to argue that when you renegotiated with

7   cable companies A, B, and C, Aereo was not even an issue;

8   therefore, Aereo did not affect the renegotiated price.

9   And they can do that a couple of ways.  I mean they can

10  look at the documents concerning the renegotiation and say

11  that there's no mention of Aereo or the Aereo equivalents,

12  or it can be done by stipulation.

13             MR. FABRIZIO:   And I think as Mr. --

14             THE COURT:   You know, to put them in the position

15  of saying, well, geez, we know 1 through 7, retransmission

16  agreements 1 through 10 were renegotiated, we have

17  documents with respect to three of those, ergo Aereo could

18  not have been mentioned in the other seven.  I mean that

19  sort of puts them in an awkward position, and I'm not sure

20  that would necessarily have the same impact on the fact-

21  finder that the documents would.

22             MR. FABRIZIO:   And I say, you know, it not

23  necessarily puts them in that position.  As Mr. Keller has

24  pointed out, they have the documents, so they know when

29

these agreements are coming up for renegotiation, and they

are going, undoubtedly, to take the deposition of the

people who have responsibility for either conducting or

overseeing the negotiations.  And the appropriate way for

them to determine what happened in the course of

negotiations is to ask the people that are percipient

witness --

THE COURT:  Also, to look at the documents

accompanying the transaction.

MR. FABRIZIO:  And the documents that do

reference Aereo or any of their likely competitors have

been produced, and we certainly will stipulate that we have

produced all such documents and that the absence of a

production means it doesn't exist as far as we are aware.

MR. PUZELLA:  See, that's the problem, Your

Honor, with not only this particular issue --

THE COURT:  All right, all right, I've heard

enough on this issue.  With respect to the retransmission

and renegotiation documents, I'm going to direct that

plaintiffs produce documents concerning the renegotiation –

let me rephrase that – documents concerning all

renegotiations of retransmission agreements that occurred

after May 2011.

All right, I know you've produced some of those

                                                                    30

1

2   already, so this is only to the extent you already have –

3   you haven't already done so.

4          MR. FABRIZIO:   Your Honor, clarifying comment.

5          THE COURT:   Go ahead.

6          MR. FABRIZIO:   As I said, we've produced that in

7   any way mention Aereo or their competitors.  Is your order

8   broader than that?

9          THE COURT:   Yes.

10          MR. FABRIZIO:   All right, and we would request

11  that -- these documents tend to be negotiated by television

12  markets, so there'd be a New York metropolitan market, you

13  know, a Wyoming market or --

14          THE COURT:   All right, you want to limit it to

15  the area that – to retransmission agreements that cover the

16  area that Aereo is active in or announced in?

17          MR. FABRIZIO:   Which is only one.  Aereo set up

18  its business purposefully and didn't allow any

19  transmissions outside of the New York market.

20          THE COURT:   Okay, one question.

21          (interposing)

22          THE COURT:   Look, my question is to defendants.

23  When Aereo announced what geographic area, if any, did the

24  announcement relate to.

25          MR. PUZELLA:   the initial announcement was

31

1

2 related to New York, but plaintiffs have never --

3          THE COURT:   Have you ever announced that, has

4 Aereo ever announced --

5          MR. PUZELLA:   Yes.

6          THE COURT:   -- a broader geographic area?

7          MR. PUZELLA:   Yes.

8          THE COURT:   When?

9          MR. PUZELLA:   Within - well, the official

10 announcement was within the last three months, but

11 plaintiffs have always asserted that their claims go beyond

12 the New York area.  They have demanded documents that go

13 beyond the New York area.  They're seeking an injunction

14 that goes beyond the New York area.  Their claims are that

15 Aereo's existence --

16          THE COURT:   All right, I'm not gonna impose a

17 geographic limitation.  Okay?  And, look, I appreciate

18 they're sensitive documents.  If you want to designate them

19 eyes of counsel only, subject to any fight you have about

20 that, you an do that.  All right.

21          Well, I'm still not sure I got an answer to the

22 question I started with.  Why are not the - why is not the

23 production plaintiffs are making sufficient?

24          MR. HOSP:   May I address that, Your Honor?

25          THE COURT:   I wish you would.

1

2          MR. HOSP:   We believe, and I could understand the

3  hesitancy, I do, that we are entitled to have fairly broad

4  discovery on this point.  The lawyers before you, a number

5  of us have been litigating copyright cases and have tried

6  copyright cases for many, many years.  Cases have been

7  submitted to yo, and I would submit, Your Honor, that if,

8  in fact, there is liability, and our side, of course, will

9  argue vociferously to avoid that to the extent that we can,

10 but if there is liability, Judge Nathan at some point is

11 going to have to decide where on the continuum from $750 --

12          THE COURT:   No, I understand that, and you're

13 entitled  --

14          MR. HOSP:   -- to 150,000 --

15          THE COURT:   No, look, let me shortcut this

16 because I think we can jump ahead. I'm not trying – I'm

17 going to hear from you further.  I'm not trying to cut you

18 off.  I accept the proposition that you're entitled to some

19 discovery with respect to actual damages to inform the

20 decision with respect to statutory damages.

21          Your submission convinced me that you're entitled

22 to that --

23          MR. HOSP:   Thank you, Your Honor.

24          THE COURT:   -- but I also think that you're not

25 entitled to the full panoply of damages discovery that you

33

1

2    would be entitled to if they were seeing actual damages.

3    This is something I think that's addressed in the decisions

4    by Judge Maas and Judge Pauley.  There was a music case

5    that they had --

6              MR. HOSP:    The MP3 tunes case.

7              THE COURT:    Yeah.  So it's sort of damages

8    discovery lite, if you want to paraphrase it, is what seems

9    to me the standard should be, but I'm happy to hear you on

10   it further.

11             MR. HOSP:    I appreciate that, but I was going to

12   make this point earlier, and I'm going to make it now, if I

13   can.  There is an undercurrent in the submissions and

14   positions from the plaintiffs on this particular issue.  We

15   will produce the documents that we believe are relevant,

16   documents that will support our claims of damages.  It's

17   right in the first and second pages of their submissions.

18              That's not the way it works, as Your Honor knows.

19   They have to produce documents that are necessary to the

20   defense and presentation of the defense and the claims.

21   And by their simple, simple identifying of documents that

22   are going to help, that's part of it, and we're not seeking

23   to have everything, every single piece of paper.  I've

24   offered up in meets and confers with the other side on this

25   particular issue, but there's a theme.

1                                                                          34

2            We're going to produce what we think is relevant.

3  But we think that we have the ability, if we have to get

4  before Judge Nathan at trial, to be able to say, yes, they

5  have produced these documents with respect to loss.  But we

6  think that we're entitled to make counterarguments that

7  these licensing arrangements in these particular markets

8  have an effect, and our expert can testify, no, the damage

9  calculated here is not really in the hundreds of millions

10 or maybe the tens of millions.  Maybe it's in the hundreds

11 of thousands.  Who knows?  But without a broad information

12 that we seek, I don't think that we can get there.

13           And the last thing I would say, and I appreciate

14 Judge Pauley's decision, but there are a lot of other

15 decisions that we've cited to you, not only in the Southern

16 District but in the Second Circuit as well.  We're not

17 asking for --

18           THE COURT:  Right, and they all affirm the

19 proposition that the statutory damages has to be bear

20 something relationship to the actual damages, but I don't

21 think that there's any decision that says – if there is,

22 I'm happy to have you call it to my attention – I don't

23 think there's a decision that says that where a plaintiff

24 is seeking statutory damages, the defendant gets the full

25 panoply of damages discovery that it would get in a

35

statement where the plaintiff is seeking actuals.

        MR. PUZELLA:   Your Honor, what you have here is
not only a situation – and I'm sure there's no decision
which specifically says that --

        THE COURT:  Or suggests --

        MR. PUZELLA:   -- but what you have here, first of
all, is scores and scores of works.  These are plaintiffs
that banded together, it was your prerogative, they've
asserted, I don't whether the hundreds or thousands of
works where the copyright damages under the scheme, as Your
Honor well knows, could have exponential liability.

        And in a case like this, you have something else,
something else that wasn't necessary in those other cases.
You have fair use, that fourth factor that Your Honor knows
very much about the potential impact on the market by this
claimed misuse.  That's what they have to show.  And here,
if we are unable to educate and present evidence to Judge
Nathan, then their claims of indirect liability prevent the
Court, in our view, to be able to make a proper assessment
on the potential impact.  It permeates their entire
businesses.

        And what they say in response, and I think what
Your Honor may be struggling with, is that we are too big,
not too big to fail, but we're too big to produce.  We have

1                                                             36

2  all of these parties, we're really, really big companies,

3  but they're the ones --

4           THE COURT:   Nobody's too big to produce in this

5  building.

6           MR. PUZELLA:   Thank you, Your Honor.  And, you

7  know what, there's a part of me in this day and age that's

8  slightly sympathetic to that, but they're the ones, Your

9  Honor, that have brought these claims.  They're the ones

10 that are seeking statutory damages for willful

11 infringement, 150,000 per work.  We're asking, Your Honor,

12 please to give us the opportunity to challenge that,

13 challenge it in a way that not only says we'll accept the

14 documents you'll give us but documents that we feel we need

15 in order to properly defend this case.

16          THE COURT:   But what about the concession they

17 make on page 12?

18          MS. KELLER:   Your Honor, that's exactly right.

19          THE COURT:   Hold on, let me finish with defense

20 counsel here.  The last full sentence on page 12, let me

21 read it in context.  The plaintiffs say, "Aereo, without

22 explaining why the substantial production plaintiffs have

23 already made is inadequate to demonstrate the existence of

24 and harm to the relevant markets if Aereo-like services

25 become widespread, demands more, including additional

37

1
2    documents pertaining to ten years' worth of highly
3    detailed, commercially sensitive material, profit and
4    expense information related to advertising, retransmission
5    consent, and licensing on a work-by-work basis.  Aereo has
6    not explained and cannot explained how such information
7    could be relevant.  This is particularly so because Aereo
8    has only 3,000 subscribers and plaintiffs are not asserting
9    that it presently causes measurable, quantifiable harm that
10   will be reflected in such information."
11           MR. ELKIN:   Yes, Your Honor, if you look at the
12   last --
13           THE COURT:   Let me – who was I – you're going to
14   need name tags here.
15           MR. ELKIN:   I'm Michael Elkin, Winston & Strawn.
16   Sorry.  Sorry.
17           THE COURT:   Yeah, let me -- it was Michael what?
18           MR. ELKIN:   Elkin.
19           THE COURT:   Mr. Elkin, why don't you – can you
20   answer that question for me?
21           MR. PUZELLA:   First of all, Your Honor, this is,
22   with all respect, I think misleading.  They have maintained
23   throughout these proceedings that the harm is expansive.
24   When they sit and negotiate with let's say a DirecTV or a
25   Dish, these are arrangements that cut across a broad swath

38

of markets, and as Mr. Hosp represented to the Court just a

short while ago, nowhere had they ever sought to delimit

the harm specifically to the New York market.  In fact, I

offered up a concession in the meet and confers that we

had, that --

THE COURT:  You prevailed on the negotiation.

You got it without geographic limitation.

MR. PUZELLA:  No, I appreciate that, but I just

wanted to --

THE COURT:  So don't come back to something you

already won on.

MR. PUZELLA:  I'm not going back to that, you're

right, you're right.  I apologize.  In fact, appreciate the

extra help here.  But what I want to say is this, is that

they have the ability to argue and whatever arrangements

they have --

THE COURT:  Not if they're cut off - not if

they've prevailed on an application to preclude discovery,

they can't come back - they can't come back, they can't say

it's irrelevant before me and then later on try to assert

that evidence as relevant.

MR. PUZELLA:  We offered them up the possibility

of stipulating that there was no harm, and they --

THE COURT:  Well --

1

2          (laughter)

3          MR. PUZELLA:   And we don't have to --

4          THE COURT:   Was this paragraph 2, paragraph 1,

5    the offer of stipulation, there's no infringement?

6          MR. PUZELLA:   No, not no infringement.   There's

7    no harm.   But this is a serious issue, Your Honor.   There

8    are three issues that we have to prove in any copyright

9    case, right - ownership, the actual reproduction or public

10   performance in this case, and the issue of damages.   What

11   we're seeking here cuts both with respect to liability on

12   the fourth use, on the fourth factor, as well as damages.

13   And these arrangements that they negotiate, we've seen

14   enough of them to know and all of us --

15          THE COURT:   You've got that.   You've got the

16   retransmission documents.

17          MR. PUZELLA:   Okay.   But it's not just the

18   retransmission that we're talking about.   We're talking

19   about licensing arrangements that have nothing to do with

20   retransmission.   It has to do with arrangements that they

21   enter into, whether it's with the Hulus of the world or

22   other third parties, other licensing arrangements.   That's

23   how they make their money, they make their money, of

24   course, through advertising, they make their money through

25   subscription, they make their money through - close your

```
                                                        40
 1

 2   ears – retransmission fees.  And --

 3          THE COURT:   Website traffic.

 4          MR. PUZELLA:   -- and these are the areas of

 5   revenue.  I don't want to cut Mr. Hosp off because I know

 6   he wanted to add something.

 7          MR. HOSP:   No, and, Your Honor, if I may just

 8   take two seconds, because I think the key to this is the

 9   way in which they've phrased what they're saying that

10   they're not asserting.  They say plaintiffs are not

11   asserting that it presently causes measurable quantifiable

12   harm that would be reflected in such information.  That's a

13   very carefully constructed limitation.

14          Because I'll tell you what they're gonna do.  When

15   it comes to the question of fourth factor fair use, they're

16   gonna sit up there on the stand and their witness is going

17   to say, well, I can't quantify it, but it exists.  It

18   exists today.  I can't quantify it, but it exists today.

19   And we're gonna be in a position where we're gonna be in a

20   position where we have to cross-examine that witness, and

21   we're gonna have to say with respect to the fourth fair

22   factor, you say that it exists but we cannot quantify it.

23   Okay, well, let's go through what we do have, and we're

24   gonna need the information, the quantified information to

25   be able to do that.  We know --
```

41

1

2          THE COURT:   And what – if they say it can't be

3    quantified, in rebuttal, exactly what proposition are you

4    trying to prove, that it can be quantified?

5          MR. HOSP:   It likely can be quantified and it

6    likely is additive, and, in fact, we have documents.  The

7    few documents that we do have from them suggests that what

8    it is, the functionality that Aereo provides that --

9          THE COURT:   So you want to rebut it by showing

10   that there is damage that can be quantified?

11         MR. HOSP:   No, we want to show it by – we want to

12   disprove it by showing that, in fact, the functionality

13   that Aereo provides and allows consumers to do actually

14   increases their revenue.  This is an issue that was at the

15   preliminary injunction, this is what Mr. Kanojia testified

16   to, that he believes that it's going to increase their

17   revenue.  And, in fact, Your Honor, we have documents, the

18   few documents that have been produced on this, for example,

19   the billion dollar research lab, this is the only document

20   with respect to all of the research that NBC has done that

21   they call the billion dollar research lab that they say

22   this is how people access television programming across

23   platforms, the tablets, computers, those very things that,

24   in fact, Aereo's technology allows consumers to do.  And

25   one of the conclusions that they come to is that more

42

screens equals more use.  It's additive.  It's no
cannibalization.  That's actually what it says.

Now, you know what?  What they're trying to say is
they're trying to say, well, you know what, we shouldn't
have to turn over any economic information because we're
not saying that the economic information is going to
support us.  But you know what?  We think --

THE COURT:  I'm not sure you're addressing though
the relevant question here.  I mean in their – in exhibit A
to Miss Shepard's affidavit, I believe she told me that
they are producing --

MS. SHEPARD:  We're producing licensing revenues,
Your Honor, advertising revenues, and they also had the
financial terms from all the retransmission consent
agreements.  Is that what you're thinking of?

THE COURT:  I'm looking at page 3, documents
regarding licensing agreements and retransmission
agreements.

MR. HOSP:  I'm sorry, where are we looking?

THE COURT:  Page 3 of exhibit A to Miss Shepard's
declaration.  I guess my question though is what else do
you want?  I mean they're not – I'm trying to understand
why what they've produced is insufficient, and maybe you
can tell me with some specifics --

43

1

2          MR. HOSP:   Sure.

3          THE COURT:   -- what it is you want that they

4    haven't produced.

5          MR. HOSP:   Yes, yes, Your Honor.  I can give you,

6    and, again, I want to be clear, these are only examples.

7    One of the reasons that we're here --

8          THE COURT:   Well, start with one and we'll see

9    what we can get through.

10         MR. HOSP:   Okay, Your Honor, NBC has engaged in

11   an extensive seven-year, at least seven-year project to

12   determine how people interact with their programming when

13   they're using different types of media, exactly the kind of

14   functionality that Aereo provides.  And the only thing that

15   they have produced from this is a single document.  They

16   have produced none of the research.  The only single

17   document that they have produced is a very summary

18   document, doesn't give any of the specific, doesn't give

19   any of the data, doesn't give it any of the actual research

20   that was done.  It doesn't give the emails about it, it

21   doesn't give how it was set up, it doesn't give the --

22         THE COURT:   Can I see this document?  I'm not

23   sure this was submitted with your --

24         MR. HOSP:   No, Your Honor, this was --

25         THE COURT:   --March 8 submission either.

44

1

2          MR. HOSP:   This was produced three days before

3    our submission was due along with about 25,000 pages of

4    other documents.  So we had not had the opportunity to

5    actually see this document before.  And prior to the

6    briefing that was done by plaintiffs, this was – our

7    understanding was they were refusing to produce any

8    information on this topic.  That was what they had said,

9    that was our understanding --

10         THE COURT:   Do you have a copy of --

11         MR. HOSP:   And we --

12         MR. FABRIZIO:   Yes, Your Honor, I do, and I can

13   explain why Mr. Hosp is wrong when he stops.

14         THE COURT:   Go ahead, Mr. Hosp.

15         MR. HOSP:   And so this is a document that shows

16   that they are doing research that is directly related, they

17   have been doing research that is directly related, and, in

18   fact, if you look --

19         THE COURT:   That's directly related to what?

20         MR. HOSP:   That is directly related to how

21   consumers interact.  Let me step back for a second.  It's

22   directly related to commercial impact.  The argument that

23   plaintiffs have made, the arguments that they made at the

24   preliminary injunction argument was ultimately that what

25   happens if Aereo is allowed to proceed, it will allow

                                                                45

consumers to access the over-the-air signals and watch that

on internet devices.

          THE COURT:   One of the points they make though

here with respect to the fourth fair use factor is that

it's limited to the conduct engaged in by defendant.

          MR. HOSP:   No --

          THE COURT:   And I'm looking at Justice Souter's

opinion writing for the court in Campbell against Acuff and

Judge Souter wrote as follows:  The fourth fair use factor

is "the effect of the use upon the potential market for or

value of the copyrighted work.  It requires courts to

consider not only the extent of market harm caused by the

particular actions of the alleged infringer but also

whether unrestricted and widespread conduct of the sort

engaged in by the defendant would result in a substantially

adverse impact on the potential market for the original."

But --

          MR. HOSP:   And that's exactly what the document

in front of you illustrates.  Ultimately --

          THE COURT:   Was someone else doing what Aereo was

doing --

          MS. KELLER:   No, Your Honor --

          (interposing)

          MR. HOSP:   No, no, ultimately, Your Honor --

46

1

2          THE COURT:   -- before Aereo?

3          MR. HOSP:   -- what they are about to say, they're

4   about to try to bring this back to  this is about what

5   Aereo does, but what we're talking about -- Aereo does, but

6   what we're talking about --

7          THE COURT:   Well, that's what Justice Souter

8   says.

9          MR. HOSP:   No, because that case was not an

10  indirect infringement claim.  What we're dealing with here

11  is an indirect infringement claim.  By definition they

12  claim – the Fox plaintiffs have certainly alleged an

13  indirect infringement claim.  The ABC plaintiffs claim to.

14  We don't need to get into that.  But ultimately they have

15  alleged an indirect infringement claim.  The premise of the

16  indirect infringement claim says this, even if it is not

17  Aereo that is doing the activity, if it not Aereo doing the

18  activity and even if it is the consumer doing the activity,

19  then, in fact, it doesn't matter because what the consumer

20  is doing is an infringement, and, therefore, Aereo is a

21  contributory infringement.

22          When we talk about the fourth factor, the primary

23  issues that this goes to are the indirect infringement

24  claims.  They actually tried to turn this around and

25  suggest that this is primarily about the direct

1    infringement claims.  It's simply not.  That's a

2    misrepresentation.  That's truly to mislead you.

3

4         The reality is that this is about the indirect

5    infringement claim, and this is about what the consumer

6    does.  The notion that this is about what Aereo does is

7    simply not true when it comes to the indirect infringement

8    claim.  In order for them to establish indirect

9    infringement against Aereo, they first have to identify an

10   infringement that's conducted by the consumer.

11        So it is simply incorrect and misleading to

12   suggest to you that when it comes to the indirect

13   infringement claim, the activity in question is Aereo's

14   activity.  The activity in question is the consumer's

15   activity.  And what this document shows is that they're

16   doing research on what it is that the consumer does and

17   what impact that has on their programming.  And we've got –

18   I've got a number of other documents that I can show you

19   that shows that other people, other plaintiffs are doing

20   the exact same thing.  And they're refusing to turn over

21   those documents, and the reason they're refusing to turn

22   over those documents is because those documents –

23             THE COURT:  Are there other --

24             MR. HOSP:   -- support Aereo's case.

25             THE COURT:  Please don't speak over mel.  When I

```
1                                                     48
2    have a question because --
3              MR. HOSP:   I apologize.
4              THE COURT:   -- I'm trying to get some information
5    that's important to me --
6              MR. HOSP:   I apologize, Your Honor.
7              THE COURT:   Are there other providers other than
8    Aereo who provide the remote DVR recording facility?
9              MR. HOSP:   Remote DVR --
10             THE COURT:   I mean that's what Aereo does.  I
11   mean in addition to transmitting the program
12   contemporaneously with the plaintiffs' broadcast, you also
13   offer a remote DVR feature, do you not?
14             MR. HOSP:   Yes, with respect --
15             THE COURT:   Yes.
16             MR. HOSP:   -- we offer a remote DVR --
17             THE COURT:   Right.  And I'm --
18             MR. HOSP:   -- system that the consumer --
19             THE COURT:   -- trying, I'm trying to pick up on
20   your argument that you look at whether or not someone else
21   is engaging in infringement, someone else with the same
22   kind of system.  Does someone else offer remote DVR
23   facility?
24             MR. HOSP:   The consumer uses the remote DVR
25   service, and that's – there is a server.  That's what's at
```

```
 1                                               49
 2   issue in the indirect claim.
 3              THE COURT:   Are there other companies that offer
 4   the remote DVR facility?
 5              MS. SHEPARD:   AereoKiller, Your Honor, offers a
 6   remote DVR facility.
 7              MR. HOSP:   Well, Cable --
 8              MS. SHEPARD:   They've been enjoined in the Ninth
 9   Circuit --
10              MR. HOSP:   -- vision does, we believe that there
11   are other – yes --
12              MR. PUZELLA:   Cablevision --
13              (interposing)
14              MR. HOSP:   Excuse me, that's not correct.
15   Cablevision does not --
16              THE COURT:   Cablevision does it under a license?
17              MR. PUZELLA:   Cablevision does not.  That was a
18   proposed service that was then litigated through the Second
19   Circuit, but as we understand it, it's a service that
20   actually never was launched.
21              MR. HOSP:   No, actually it was launched, and, in
22   fact, they call it --
23              THE COURT:   But it does it under a license?
24              MR. HOSP:   They call it --
25              MR. PUZELLA:   No.
```

1

2          MR. HOSP:   No, it does not.   It's called DVR Plus

3  I believe is what they advertise it as.

4          THE COURT:   All right, go ahead.

5          MR. HOSP:   So, Your Honor, again, in order to

6  prove an indirect infringement claim, they have to prove

7  that the consumer is infringing first.   And what that means

8  is that it is the consumer's behavior that is directly at

9  issue.   They cannot prove an indirect infringement claim

10 against Aereo without first proving that there is a direct

11 infringement that is conducted by the consumer.

12          And so Aereo's defense to the indirect claim is

13 this:  when the consumer uses Aereo's technology to make a

14 copy, that consumer is engaging in a fair use.   That's

15 Aereo's defense to it.   We cannot be indirectly liable

16 because the consumer is not directly liable, and the reason

17 the consumer is not directly liable is because there is a

18 fair use going on here.   That's what Sony said.   And so the

19 behavior at issue in dealing with the fair use on the

20 indirect infringement claim is the consumer's behavior.

21 And so --

22          THE COURT:   Right, but the conduct that would be

23 an issue would be the consumer's behavior in utilizing a

24 remote DVR service, would it not?

25          MR. HOSP:   Well, relevant to that is the

51

```
 1                                                        51
 2   consumers – what they have learned about consumer's
 3   behavior using a regular DVR service, for example.
 4              THE COURT:   How is a regular DVR the same as a
 5   remote DVR?
 6              MR. HOSP:   Because --
 7              THE COURT:   If it's the same as a remote DVR,
 8   then what are you offering that has value?
 9              MR. HOSP:   What we're – no, no, this is
10   Cablevision --
11              THE COURT:   I mean presumably you're offering
12   something, you know, there's some plus factor to what
13   you're offering.
14              MR. HOSP:   No, no, Judge Nathan in her decision
15   recognized that what Aereo is similar to is both a DVR and
16   a remote DVR.  The functionality that a remote DVR provides
17   is the same as the functionality that a DVR provides.
18   There's no difference.  In fact, the entire purpose, if you
19   go back to the Cablevision case, the entire purpose of the
20   remote DVR system was to provide the identical
21   functionality and just house it someplace else.
22              So from a commercial impact standpoint, the
23   commercial impact of a remote DVR is going to be no
24   different than the commercial impact of a regular DVR.
25   It's going to be the same commercial impact.  And that's
```

52

going to be the same as the commercial impact of Aereo.

And so when you're talking about relevance here, when you're talking about Aereo being able to say, hey, we know that, in fact, you've learned, plaintiffs have learned that DVR's don't harm them.  We actually have documents here that say that.  We don't have the research behind it. What we want is the research behind it.  What we want is the data.  The only way that we've gotten these is because some of these documents actually do mention Aereo, and so we get them in that.

And so we get this tiny little sliver of what's actually out there, this tiny little sliver that actually says, ooo, look, this stuff doesn't actually hurt the plaintiffs.

THE COURT:  By the way --

MR. HOSP:  But they're not giving us the underlying information behind it.

THE COURT:  Okay.  Okay, let me hear from plaintiffs on this.

MS. KELLER:  Briefly, Your Honor, either a misunderstanding or a mischaracterization of a lot of what plaintiffs argument in this case, to even suggest that the in-home DVR where you're sitting in your living room on your couch watching a television show that was broadcast

53

originally to your home television is the same as a virtual
or a remote DVR where you are retransmitting that content,
which was originally in a broadcast medium, you are
retransmitting it over the internet which is a separate
distribution channel, it is a separate commercial market,
and it is a market that our clients are commercially
exploiting in multiple ways.

Whether or not the in-home DVR has impacted our
business for the better, for the worse, or not at all.  It
simply does not bear on and no probative value at all as to
whether the Aereo system, which only allows, only allows
retransmission over the interest, harms us.  Our harm, the
market harm that we have been discussing is the harm
related to that retransmission over the internet.

THE COURT:  Well --

MR. HOSP:  Your Honor --

THE COURT:  Hold on a second.  I mean in
Cablevision didn't Judge Walker, writing for the circuit,
come pretty close to saying that there's no difference
between a remote recording device and an in-hour recording
device?

MS. KELLER:  That's why, Your Honor, I
distinguish, I use the word virtual DVR.  There is a very
significant technological difference.  In Cablevision, the

54

service that was at issue, that went up to the Second

Circuit, was a service that moved the DVR from your in-home

television station to their server, but it only allowed

playback to the original set-top box in your home that was

authorized to receive the signal in the first place.  It is

on that basis that the court said it was very similar to

the home DVR with the box moved to a different location.

Aereo is very different.  Aereo not only has the

box at a different location which is, frankly, not of the

consequence here; it retransmits the information over the

internet.  And the difference between the in-home market

and the portable, mobile, or internet markets is what this

case has been about on this market harms.

MR. FABRIZIO:  Your Honor, may we be heard very

briefly?  Just --

THE COURT:  Do you want to come back and respond

to the broader point that Mr. Hosp made?  I'll hear from

you in a minute, but let me get --

MR. FABRIZIO:  Thank you, Your Honor.

THE COURT:  Mr. Hosp said a lot of things; I'd

like to get plaintiffs' response to it.

MR. FABRIZIO:  Mr. Hosp said a lot of things, and

I do want to respond.  Let me start with a micro point that

needs to be rebutted because he handed put to you a

55

document that we voluntarily produced, even though we don't

think it's relevant, we don't think it was called for, and

it is that NBC document that reflects market research, Your

Honor, conducted during the Olympics by NBC about the ways

that NBC itself transmitted the Olympics through authorized

distribution channels to consumers.  And that is why it is

completely irrelevant to the question you've been asking

and you haven't gotten an answer yet, and I want to move to

that answer in one second.

          This document is about authorized distribution

channels.  ABC distribute the Olympics over the air and

over the internet and in lots of ways, and what this does

is it measures the authorized distribution and how

effective it's been and is it a good thing to use

alternative distribution channels or not.  Full stop.  It

has nothing to do with Aereo.

          And why does it have nothing to do with Aereo?

Because Aereo is not accurate when it says that the only

analysis here is whether or not an end-user is making a

fair use, and that these documents that they claim they

need so desperately go to the fourth fair use factor in

terms of what consumers do.  It is wrong for at least the

following reasons:

          First, what they're really asking you to order is

56

1  essentially an accounting.  They want an accounting on a

2  program-by-program basis of revenues, profits, losses,

3  expenses.  We're not making any claim that has anything to

4  do with revenues, profits, losses on a program-by-program

5  basis.  And we're certainly not doing it with a internet

6  startup that they represented to you has about 3,000

7  subscribers and wouldn't tell you whether that number's

8  changed.  Remember last time you asked that question?  You

9  didn't get an answer as to how many subscribers they have.

10 I think the answer is because they have virtually none,

11 which is why it has no measurable impact in the

12 marketplace.

13         And that is important because even we can't prove

14 a negative, and we're not trying to do it on a program-by-

15 program basis.  There are two defenses — there are two

16 rationales they've offered up as to why they need these

17 detailed accounting documents.  The first is it's relevant

18 to the statutory damages analysis; you pretty well covered

19 that.  We know that they get some information on that, but

20 not a lot.  It's discovery damages, discovery lite, as you

21 said.  We agree, and we actually think that the documents

22 we've offered up give them exactly that, and you've asked

23 them repeatedly now why that's not true, and you've yet to

24 get an answer.

57

2          But on the long dissertation you just heard from

3   Mr. Hosp about the fourth fair use factor and market harm.

4   What matters is what the market is, and the market that

5   we're worried about is the unauthorized interloping that

6   Aereo conducts when it comes into our authorized

7   distribution channel for all of our programs, which is why

8   it doesn't really matter with respect to any particular

9   program in the isolated extreme or in the aggregate as to

10  what the actual revenue loss is per program because the

11  harm that they cause is a much more global harm.

12          They are trying to enter into markets that we as

13  the copyright owners have the right to authorize.  And when

14  they come in, they're either having an effect or not, and I

15  was going to quote Campbell to you for the very passes that

16  you've already cited.  Only what Aereo does in that regard

17  matters.  That's what the Supreme Court complaint has said.

18  And we know that they're the markets, right, I mean, Judge,

19  you've got proof right here in the courtroom, here's the --

20          THE COURT:  Well, in fairness, what Justice

21  Souter said is whether unrestricted and widespread conduct

22  of a sort engaged in by the defendants.

23          MR. FABRIZIO:  Exactly right, Your Honor.  But

24  that's the point.  It's not widespread yet, it's not

25  unrestricted yet.  It's really very restricted

58

geographically, and hardly anyone else has tried.  The only

other one who did got enjoined in California.  That was

AereoKiller.

          So there is really nobody else out there to look

at, and it's certainly not the case, Your Honor, and this

goes to the heart of their remote DVR argument and their

DVR argument and their slingbox argument and their dongle

argument.  The fourth fair use factor is not a relative

analysis.  It is simply not the law that if they don't

cause any much more harm than somebody else does, they're

okay.  It's an absolute analysis.  Does Aereo hurt the

markets that we are trying to exploit for ourselves?

You've got third-party licensees here today before you,

it's proof that the market exists.  They care enough to

come all the way into court, even though they're located in

California and Washington and other places, to say don't

give up our documents without additional restrictions at a

minimum.

          The proof of the market is not so difficult here.

I think even Aereo wouldn't deny that the market exists.

They deny that they are precluded from coming into that

market without authorization and suffering any

consequences.  And the reason they deny it is they say,

well, you know what, it doesn't hurt you that much more.

59

1

2   But that's not the right test.  The test is does it hurt us

3   at all in any way, shape, or form.  That's what Campbell

4   stands for.

5          So it's just this notion that somehow, and, Judge,

6   Mr. Elkin -- I am second to none in my admiration for his

7   copyright litigation expertise -- he did not cite you a

8   single case that's ordered discovery on the scale that they

9   are asking for.  You know that if such a case existed, it

10  would have been brought to your attention.

11         For all of these reasons, and I'm truncating this

12  because we ate up a lot of time listening to this

13  impassioned argument about fair use, the discovery they

14  seek is overboard and completely inconsistent with settled

15  copyright law principles as the fourth fair use factor

16  plays out right from the passage you read in Campbell.

17  They want too much.  They're not entitled to that much.

18  It's intrusive, it's backbreaking, and it's irrelevant

19  under well-established copyright law.

20         This is a question – are they entering into

21  distribution channels that we otherwise have the right to

22  exploit for ourselves.  What are the documents that are

23  relevant to that?  They're the retrans agreements, they're

24  the license agreements, they're other agreements with

25  commercial providers that maybe aren't subscription

60

1 agreements but one-off agreements. They're DVD, you know,

2 entire season sales. There's lots of markets that we use

3 that we occupy, distribution channels that we employ to

4 distribute our copyright programming. Aereo has the

5 potential to affect all of them.

6 And I just want to conclude on this. I really

7 don't like being accused of misleading the Court. We're

8 not misleading the Court. We have a position, it's a

9 position that's actually supported by the case law, we gave

10 you the cases. They don't like those cases, but we're not

11 misleading you when we direct you to them. You can read

12 them for yourself. They seek unprecedented discovery on a

13 work-by-work basis when we're not arguing that work-by-work

14 we're suffering any measurable impact right now given their

15 limited existence. Those are all the reasons why they

16 haven't answered your question. They can't give you an

17 answer as to why it's not enough because it is enough under

18 the existing case law.

19 THE COURT: Mr. Elkin.

20 MR. ELKIN: Thank you, Your Honor. Just a few

21 points. Mr. Fabrizio, when he addressed the Court, kept on

22 making references to Aereo as a retransmitter, it's

23 something that we've heard over and over again. That was

24 not found by Judge Nathan. Actually, to the contrary.

                                                                61

          What is happening is that the consumers are

accessing, which is their right, over-the-air signals, and

they are making a copy and they are viewing that copy.

Judge Nathan found, she found that the functionality of

Aereo - and she studied it, by the way.  There was 11 weeks

of discovery.  There were six experts.  This was a two-day

evidentiary trial.  She shifted through all of that, and

she found as a matter of law, it's in the opinion, that the

functionality of Aereo was no different than the remote,

you know, DVR in Cablevision.  Cablevision had, they claim,

a license.  The truth is, when that case was litigated,

they said it was unlicensed.  And here you have over the

years --

          THE COURT:  I think I asked whether it was

pursuant to a license.  They didn't say it was subject to a

license.  I think it was my question.

          MR. ELKIN:  And I appreciate that.  But what's

interesting is that what was relevant at the preliminary

injunction stage, and this I think should inform the Court,

my view, is that they testified that, in fact, there wasn't

any harm, that there was harm to the market through Aereo,

and that's the primary basis upon which they sought to have

the technology enjoined.  But now we find, just a week or

two ago, documents that, frankly, they should have produced

62

earlier because it was definitely responsive to the then

pending discovery request, which completely contradict,

which completely contradict the positions that they took in

open court.

THE COURT:   Well, does this document talk about

services that provide remote DVR facilities?

MS. SHEPARD:   No.

MR. ELKIN:   Your Honor, we submit that they are

defining – and it is their right --

THE COURT:   Answer my question first, then I'll

hear whatever you want to say.

MR. ELKIN:   Okay.

THE COURT:   Does this document talk about

facilities that provide remote DVR capability?

MR. HOSP:   I don't believe that document does --

MR. FABRIZIO:   -- No, Your Honor.

MR. HOSP:   We do have other documents that do,

Your Honor.

THE COURT:   Okay.  Go ahead, what did you want to

say?

MR. ELKIN:   Thank you, I'll be brief, Your Honor.

You heard it from Mr. --

THE COURT:   I mean if this doesn't talk about

remote DVR providers, how do you get to the fourth factor?

63

1

2          MR. ELKIN:   It's exactly what I was going to

3    address, Your Honor.

4          THE COURT:   Go ahead.

5          MR. ELKIN:   They keep addressing their view,

6    which they're entitled to - Mr. Keller's very eloquent in

7    talking about their definition as to the harm to the

8    marketplace.  We don't agree with that.  And two points

9    with respect to this.

10          Number one, number one, he hasn't really addressed

11    the very important argument that Mr. Hosp raised that at

12    the end of the day it has to do with the indirect claim.

13    Nothing that he said countermanded that particular point.

14    And the issue, again, is that they want to produce

15    documents which in their view affects what Aereo is

16    actually doing.

17          We believe that we're entitled, even under any

18    reading, liberal reading of Acuff-Rose, that whatever

19    effect on the potential market there is, we've given Judge

20    Nathan's opinions and the rulings in Cablevision, we

21    believe that there is probative evidence in the marketplace

22    that if there is technology or services or utilizations

23    that somehow permit consumers to access remotely over-the-

24    air signals, that is important.  That is an important

25    information that we need to present to the judge when she

                                                              64

 1
 2    has to adjudicate the issue of the fourth factor.  And
 3    whether or not Aereo itself --
 4              THE COURT:   I'm sorry, just a question of
 5    terminology.  When you say access remotely over-the-air
 6    signals, I'm not sure what you mean by that.
 7              MR. ELKIN:   Well, what you have here, Your Honor,
 8    you have --
 9              THE COURT:   If I'm sitting in my --
10              MR. ELKIN:   -- you have to have --
11              THE COURT:   -- house on Long Island and I turn on
12    an antenna TV, am I not remotely accessing a signal that's
13    coming from a broadcasting tower somewhere?
14              MR. ELKIN:   That's a great point.  What you're
15    doing is you have - I assume you get that through rabbit
16    ears on your TV or some antenna on your rooftop --
17              THE COURT:   Let's assume I have an old-fashioned
18    aerial.
19              MR. ELKIN:   Right.  And I hope it works well.
20    And you have that, and if you were to then basically --
21              THE COURT:   I don't want to get off on a detour -
22    -
23              MR. ELKIN:   -- make a copy --
24              THE COURT:   I'm just trying to understand when
25    you said remotely accessing, I'm not sure what you mean by

1

2  that.

3         MR. ELKIN:   What I mean by that is if you were to

4  have the – instead of the television over-the-air linear

5  signals coming to you in your home, if you're able to

6  through some antenna or some rabbit ears or something like

7  that, if you were to basically have the signals be

8  delivered to you through an antenna that was not in your

9  home, and you're able to capture those signals, if you were

10 a person, you know, any member of the public --

11        THE COURT:   No, but I mean – I don't want to get

12 off on a detour.  I mean remotely accessing the signal

13 seems to me to sort of be self-evident.  Anybody who

14 watches TV, unless they're in the studio, they're remotely

15 accessing the signal, aren't they?

16        MR. ELKIN:   What you have right here, Your Honor,

17 you have three things in the Aereo technology.  You have

18 the remote antenna, you've got the remote DVR, and you've

19 got basically, effectively a slingbox slinging that to your

20 tablet or telephone or some mobile device.

21        What you have is Judge Nathan stating that there

22 is nothing about this, A, that doesn't violate the right of

23 public performance.  Then you have her further stating that

24 this functionality, and if it's ultimately found that

25 there's liability, they are basically taking the position

66

1

2  that if the consumer doesn't have the right to make a copy

3  in this particular instance, then we have contributed to

4  that by providing this technology or making it accessible

5  to the consumer.

6        We are taking the position that the market --

7        THE COURT:   I think - can you bring us back to

8  the discovery issue?

9        MR. ELKIN:   Sure.  The discovery issue basically

10 is we are seeking information based on the market harm.

11 Mr. Hosp had pulled out a document that was recently

12 produced, one of the few that we believe exists, that have

13 not - one of the few that exists that have --

14        THE COURT:   And it's your view that the document

15 --

16        MR. ELKIN:   -- of a larger seg --

17        THE COURT:   It's your view that any document that

18 addresses the harm or lack of harm caused by internet

19 accessible viewing technologies is relevant to the fourth

20 factor?

21        MR. ELKIN:   It's not simply internet enabled.

22 That's what they've claimed.  The position basically is

23 that they are - what they have said, they've taken a

24 position that --

25        THE COURT:   Well, no, I mean the fourth factor,

```
 1                                                           67

 2   it talks about conduct of the sort engaged in by the

 3   defendant.

 4          MR. ELKIN:   Right --

 5          THE COURT:   And I'm trying – you used the

 6   internet I guess which is what distinguishes you from cable

 7   companies.  I mean what would you say is within the ambit

 8   of conduct of the sort engaged in by you?

 9          MS. KELLER:   Your Honor, before Mr. Hosp

10   continues, I think he's gotten in his hand a highly

11   confidential document.  To the extent he wants to use it

12   with you now --

13          THE COURT:   Let me finish with Mr. Elkins who

14   doesn't have anything in his hand.

15          MS. KELLER:   Well, only because Mr. Hosp popped

16   up, I wanted to make sure we didn't violate the protective

17   order, that's all.

18          THE COURT:   All right.  Okay.

19          MR. ELKIN:   Okay, sorry, I thought there's a

20   point – I wanted to make sure I captured that, Your Honor.

21   What is the precise question that you were asking?

22          THE COURT:   Well, in Campbell the Supreme Court

23   tells us that "the fourth factor requires an inquiry into

24   whether unrestricted and widespread conduct of the sort

25   engaged in by the defendant would result in a substantially
```

68

adverse impact on the potential market for the original."

MR. ELKIN:   Okay, so --

THE COURT:   And my question – the precise question I had is what would you include within the ambit of "conduct of the sort engaged in by the defendant?"

MR. ELKIN:   So it's anything that would relate to the things that comprise the technology at issue that is offered by Aereo.

THE COURT:   Does it make a difference whether it's licensed or unlicensed?

MR. ELKIN:   Not for this purpose it doesn't because --

THE COURT:   If it's income gen – you're saying that it should be considered even if other activities should be considered even if it's income-generating to plaintiff, although defendant's activity is not?

MR. ELKIN:   Can I tell you why?

THE COURT:   Yeah.

MR. ELKIN:   What you have here, okay, there's – and I apologize if this comes off like a bit of industry gossip, but I think it's relevant.  You have here a marketplace, an industry that is attempting to perpetuate a business model.  They get billions of dollars a year through these retransmission agreements with these cable

69

systems and these satellite providers.  They get a lot of
money through advertisers relative to programming that is
measured by Nielsen, and they are concerned – so we thought
– that if something isn't measured, for example, by
Nielsen, which is what you'd have if something were remote,
a DVR that's not measured three days out from the original
broadcast or something that you were able to --

THE COURT:  You're not answering the question.

MR. ELKIN:  The system – what's happening here,
Your Honor --

THE COURT:  I mean are you saying that – you
know, take Netflix, for example, I presume that Netflix is
paying a royalty or paying some kind of fee to NBC for the
right to rebroadcast the Office over Netflix.

MR. ELKIN:  Respectfully, Your Honor, that's
comparing apples to pears.

THE COURT:  Well, no --

MR. ELKIN:  I'll tell you why.

THE COURT:  -- maybe it is, and maybe you've just
answered the question.  My question is would you say
Netflix is engaged in conduct of the sort engaged in by the
defendant?

MR. ELKIN:  That's completely different.

THE COURT:  So it's not?

70

1

2          MR. ELKIN:  Well, what's – first of all, Netflix,

3  and I'll tell you why, Netflix is not being – they're not

4  basically using programming that is being contemporaneously

5  broadcast.

6          THE COURT:  So something like Netflix would not

7  be something that should be considered under the fourth

8  fair use factor?

9          MR. ELKIN:  I don't – if you're asking me with

10  respect to that particular point, I think that the value of

11  the licensing arrangements --

12          THE COURT:  It's a yes or a no.

13          MR. ELKIN:  I can't --

14          THE COURT:  It's a yes or no or you can't answer

15  it yes or no.

16          MR. ELKIN:  I think it is relevant with respect

17  to other aspects of the case.  That's why I think the

18  question is a little confusing, with all due respect.

19          THE COURT:  No, I'm just asking about the fourth

20  fair use factor.  I mean would you say Netflix falls within

21  the ambit of conduct of the sort engaged in by the

22  defendant?

23          MR. HOSP:  Your Honor, if I may --

24          THE COURT:  Go ahead.

25          MR. HOSP:  The answer is no, but I think I have

71

1

2    to back up because I think the question from our

3    perspective is not the right question.

4          THE COURT:   I'm trying to understand how broad

5    the ambit of conduct of the sort engaged in by the

6    defendant is from your point of view because that's the

7    theory of relevance here.

8          MR. HOSP:   And what I'm saying is when you're

9    reading that language, you're reading that language from a

10   case that involves a direct infringement claim.  The real

11   inquiry is the behavior of the alleged infringer, not the

12   defendant.  And in the scope of an indirect claim, the

13   alleged --

14         THE COURT:   This is the argument you made about

15   half an hour ago.

16         MR. HOSP:   Right, the alleged infringer --

17         THE COURT:   Okay, I listened to it then, okay.

18         MR. HOSP:   And so with respect to that, what is

19   relevant is any similar behavior that that individual, that

20   consumer, that alleged infringer already engages in because

21   we can see how that's going to happen.

22         Now, what Judge Nathan said was the functionality

23   that Aereo provides to the consumer is it allows the

24   consumer to access the over-the-air airwaves through an

25   antenna, it allows them to record with a DVR, and it allows

72

1
2   them to watch over the internet.  Now, the document that
3   you have in front of you addresses that third issue, that
4   question of consumers in certain instances have already
5   been given the ability to watch over the internet.

6               THE COURT:   From a licensed source.

7               MR. HOSP:   Yes, but it doesn't matter because the
8   ultimate question is what behavior does that beget.
9   Whether it's licensed or not licensed, the question is what
10  behavior in the consumer --

11              THE COURT:   No, this document relates to
12  transmission over the internet through a licensed source.

13              MR. HOSP:   Yes, but it doesn't matter because
14  ultimately what that document and the research shows is how
15  a consumer behaves if he has that functionality.  There's
16  no reason to suggest because that's licensed that a
17  consumer is going to behave different when he has that
18  functionality than when he behaves, than how he behaves if
19  he has Aereo which provides the identical functionality.

20              The behavior that they're going to engage in is
21  going to be the same.  So that's relevant because it's
22  going to give us some insight into how the consumer
23  behaves, and that's on the issue of over-the-air – that's
24  on the issue --

25              THE COURT:   Yeah, I'm not sure the issue though

73

1   is how the consumer's gonna behave.  The issue is the

2   impact on the potential market for the original.

3   

4         MR. HOSP:   Right, but in this instance what

5   you're talking about is the over-the-air broadcast as

6   licensed to the consumer.  The consumer has the right to

7   access the over-the-air programming.  And so there is no

8   difference.  This was, again, an argument that was argued

9   before Judge Nathan and rejected.  The notion that there is

10  a difference because it was licensed, it's not licensed.

11        THE COURT:   Well, you know, I'm really – you

12  know, you said this before.  I'm really a little bit

13  confused here because you're telling me all the discovery,

14  or a number of the discovery disputes that are cited in

15  your March 8 letter have already been decided by Judge

16  Nathan, although nowhere in your March 8 letter do you tell

17  me that.

18        MR. HOSP:   No, this is – I'm not saying that

19  Judge Nathan decided a discovery --

20        THE COURT:   So, you know, I'm sort of surprised

21  that attorneys of your caliber would overlook a res

22  judicata argument.

23        MR. HOSP:   Your Honor, I'm not suggesting that

24  she decided this in the context of a discovery dispute.

25  What I'm saying is in a context of the preliminary

74

1

2  injunction, the plaintiffs argued that Aereo was somehow

3  different because it was unlicensed.  And that argument on

4  the merits on the preliminary injunction was rejected by

5  Judge Nathan.

6          Now, that has an impact on the discovery dispute

7  that's before Your Honor because what's relevant here is

8  how consumers behave when they have similar functionality

9  that they would have if using Aereo.  Now, the document

10 that – in the research that's described in that document

11 deals with how consumers behave if they have the ability to

12 access the programming using tablets, using their computer,

13 using the internet.  That's what that – and so a consumer

14 who uses Aereo isn't going to behave any differently than a

15 consumer who's actually a subject of that test.  That gives

16 us the idea of how they're going to react, and because we

17 have an idea of how they're going to react, that's going to

18 give us an idea of what impact it's going to have on the

19 market.

20         Now, you asked previously about DVR's and RS-DVR's

21 and was there a difference between RS-DVR's and DVR's, and

22 the answer is, and I'm not – I can hand it up, it is a

23 confidential document, but – highly confidential document –

24 but we have a document where there is an analysis that is

25 done by one of the plaintiffs regarding the potential of an

```
 1                                                          75
 2    RS-DVR service.  And what do they compare the market
 3    impacts to?  A DVR --
 4              MS. KELLER:   Your Honor, there's a reason there's
 5    a protective order in place --
 6              THE COURT:   All right.
 7              MS. KELLER:   -- and it requires consultation
 8    before these documents are used in court.  If Mr. Hosp
 9    wants to continue in this vein, although I don't know why --
10    we really do need to figure out another way to address the
11    document.
12              MR. HOSP:   And I am not --
13              THE COURT:   Don't say anything else about the
14    document.  Okay?
15              MR. HOSP:   But there is no difference in the
16    functionality between an RS-DVR and a DVR.  So when you're
17    talking about market harm, when you're talking about the
18    question of how the market is going to be impacted – if an
19    RS-DVR impacts the market, then a DVR impacts the market
20    because the entire point of the Cablevision decision was
21    when a consumer sits in his home and uses the RS-DVR, to
22    him or to her it function identically to the regular DVR.
23    So if RS-DVR is actually relevant, and everybody has
24    conceded that it is, then DVR is relevant because when it
25    comes to the fourth fact in the market impact, the market
```

76

1  impact is what's gonna happen if lots of consumers, who are

2  the alleged infringers in an indirect claim, all have the

3  ability to use this technology?  Well, you know what, we

4  already know because they've had the ability to use this

5  technology, and that's what Judge Nathan found.

6           MR. FABRIZIO:  Your Honor, first of all, not

7  everybody agrees that an in-home DVR and an RS-DVR that

8  plays back to the home is anything like Aereo because it's

9  not.  Again, Your Honor, we have – Mr. Keller said it, you

10 need to understand the markets that are being harmed.  The

11 market to watch television at home is a very distinct

12 market, and it's separate from the market to watch

13 broadcast television through internet-enabled devices such

14 as laptop computers, such as iPads or cell phones, portable

15 internet-enabled devices.

16          So when Mr. Hosp talks of RS-DVR's or remote

17 DVR's, again, Your Honor, the question you have to ask is

18 where is the playback to, and in the Cablevision case the

19 playback is only in the home.

20          The answer, if I may, to your question of what is

21 the conduct of the sort engaged in by defendants, because

22 there is a very simple answer to it, it is the unauthorized

23 reproduction of broadcast television for further

24 transmission over the internet.  That's the service that

77

1   they're engaged in.

3          Now, Mr. Hosp jumps up and speaks very

4   passionately about who's doing this copying and who's doing

5   this transmission, but for the fair use analysis it's

6   completely irrelevant.  The statutes --

7          THE COURT:   Does that include cable companies

8   with remote DVR capabilities?

9          MR. FABRIZIO:   Your Honor, there is no – well, I

10  don't know whether Dish is – with one potential exception I

11  have to check with my colleague about, this service does

12  not exist.  The service of reproducing broadcast television

13  to transmit it into a different commercial market, the

14  internet and the portable devices, is not something that is

15  currently being offered by anyone other than Aereo and it's

16  like competitors, most of which have been enjoined.

17         THE COURT:   It's your understanding there's no

18  cable company that, or at least no cable company that's

19  licensed by a plaintiff that has remote DVR capability?

20         MR. FABRIZIO:   Dish, a satellite company Dish has

21  apparently recently – has just recently come out with a

22  product that allows the reproduction onto a DVR and then a

23  retransmission to the internet, and they are being sued in

24  the Central District of California for that service.

25         So if you will exclude, Your Honor, the companies

78

that have been enjoined and companies that are being sued

to be enjoined, then the answer is you have Aereo and

what's left of AereoKiller.

THE COURT:   Well, let me ask the $64 question,

what is the difference between a tabletop DVR and a remote

DVR besides the location of the device?

MR. FABRIZIO:   Well, Your Honor, let me suggest

that it's not an either/or; there are three.  There is a

device in your home, there is a device located remotely

that plays back only into your home, and then there are

devices located remotely that play back into, play back

over the internet to a portable market.  The distinction

here is Aereo's service, what people pay them for is to be

able to get this programming through internet-enabled

devices not on their home television.

So the RS or remote DVR analogy gets confusing

because you can locate a box remotely, as was the case in

the Cablevision case, but the playback from that box is

only into the same home market that was authorized to

receive the signal in the first place, in contrast to

Cablevision which transmitted, where the content is

transmitted into a completely different market, the

internet.

Aereo's advertising, Aereo's entire – you know,

79

it's starting an advertising campaign, and its advertising

is live TV online, no cable required, finally.  They're not

talking about the home market.  They're talking about the

portable and internet-enabled market.  That's the market

that is most relevant here.

THE COURT:   All right.

MS. SHEPARD:   It's exhibit B.

ATTORNEY:  Your Honor --

THE COURT:   Well, let me – we need to move this

along a little bit.  We're talking, look, I guess we've

been talking about two types, two species of discovery

here.  To the extent that defendants are seeking program by

program discovery concerning costs and revenue, defendants'

objections – I'm sorry, plaintiffs' objections are

sustained, particularly in light of the concession that's

set forth at page 12 of their submission.  They're not

seeking damages on a program-by-program basis, and my

understanding is they're not going to be offering evidence

of damages on a program-by-program basis.

This document that you handed up, Mr. Hosp, the

billion dollar research lab, you offer this in connection

with the last item on page 14 of your submission?  Which

item or items are you offering this in connection with?

MR. HOSP:   Your Honor, it is in connection with

```
 1                                                  80
 2   request number 13 from our --
 3             THE COURT:   Can you relate it to the March 8
 4   submission please?
 5             MR. HOSP:   Yes.  Yes, Your Honor.  If I may have
 6   just a moment.  Yes, Your Honor, it's on page 14, the
 7   second bullet point on the page --
 8             THE COURT:   Okay.
 9             MR. HOSP:   -- documents concerning other --
10             THE COURT:   All right.
11             MR. HOSP:   -- similar technology.
12             THE COURT:   Okay, I see it.
13             MR. HOSP:   Your Honor, it's also the first bullet
14   point on the top of page 12 for the record.
15             (pause in proceeding)
16             MR. HOSP:   And, Your Honor, I apologize, some of
17   the categories overlap.  It is also the last bullet on page
18   15.
19             (pause in proceeding)
20             THE COURT:   All right, with respect to the first
21   bullet point on page 12, the second bullet point on page
22   14, and the bullet point on page 15, I'm going to grant the
23   application in part and deny the application in part.  I'm
24   going to grant the application to the extent - grant the
25   application to compel to the extent it seeks documents
```

81

regarding damage or consumer research concerning home DVR's

and, concerning home DVR's and unlicensed remote DVR's and

unlicensed internet, and unlicensed technologies that

provide for the transmission of plaintiffs' programming, or

plaintiffs' copyrighted works over the internet.

I think that is arguably the broadest that the

fourth factor of fair use can be read.  I mean if you read

it to include licensed authorizations, I think you're

stretching subdivision 4 of Section 107 to the breaking

point.

The issue under fair use is whether an

unauthorized, unlicensed use or a use that's not permitted

by the copyright holder constitutes fair use.  If you

include that, if you include licensed or permitted uses

within that, you're necessarily talking about something

that's not of the sort, not conduct of the sort engaged in

by the defendant.  If it were conduct of the sort engaged

in by the defendant, you wouldn't even get to the question

of fair use because the conduct would be licensed.  So I'm

limiting those three categories to unlicensed remote DVR's

and unlicensed technologies that provide for the

transmission of plaintiffs' copyrighted works over the

internet.  All right?

We've spent a lot of time on this, and we've

82

1
2   reached a decision point, so I'm not – if there's something

3   else you want to say, go ahead, but we're not going to

4   reargue it.

5           MR. ELKIN:   I accept that, Your Honor, but I do

6   want to just, for the record, ask for you to reconsider

7   only because I think the point that Your Honor is making --

8           THE COURT:   No, we're not going to reconsider it.

9   Really, we've spent about an hour on this, and I appreciate

10  you have differing views, and after hearing your ventilate

11  – after hearing the issue ventilated and having read the

12  submissions, that's my determination as to where the line

13  should be drawn.   I know you're unhappy with it, but the

14  only thing I do where both sides leave happy are marriages.

15  Okay?

16          MS. KELLER:   Two further points that are not

17  seeking consideration.   One, can we have a reasonable time

18  restriction on this.

19          THE COURT:   Fair enough, fair enough.

20          MS. KELLER:   Aereo's been in business or was

21  announced only in 2011.

22          THE COURT:   All right.   From January 2010 to the

23  present.

24          MR. ELKIN:   Your Honor, just for point of

25  clarification, does that mean that the research done by NBC

83

regarding the Olympics is not included?

        THE COURT:   If it relates --

        MS. KELLER:   We voluntary reduced it, Your Honor, we're not going to try and take it back.  They can have it.

        MR. ELKIN:   No, I mean the underlying research that was done that resulted in that --

        THE COURT:   Well, it was just handed up to me about 20 minutes ago, and I haven't read it.  If it relates to home DVR's, unlicensed remote DVR's, and unlicensed technologies that provide for the transmission of plaintiffs' copyrighted works over the internet, yes.  If it doesn't relate to those three categories, no.

        MS. KELLER:   Your Honor, secondly, I understood Your Honor to be ordering the production of documents that are analyses, studies, surveys, but not simply any email that mentions a DVR.  We weren't talking about media companies.  We could be talking about millions of emails that simply have straight mention of DVR.

        THE COURT:   Well, with respect to the problems – with respect to ESI problems, I think what the Sedona principles contemplate, at any rate, is that the parties have a meet and confer specifically addressing the ESI problem, ESI issues.  And I appreciate the issue you're raising, and it's a real issue, but I think before we can

84

even start talking about ESI, counsel need to refine that

issue by a meet and confer specifically addressing the ESI

issues.

MR. ELKIN:   Your Honor, related to that issue,

with respect to the information that was produced by

plaintiffs regarding repositories, they did not produce any

information --

THE COURT:   Let's go through the letter first,

okay?  I want to go through the issues that we have teed up

for today and try to get those resolved, okay, and then

we'll talk about other issues.  Okay?

MS. KELLER:   All right, and I'm sorry, I wasn't

quite finished.

THE COURT:   Go ahead.

MS. KELLER:   It may very well, Your Honor, be

that there are ESI issues here, but wouldn't it be the case

that you just ordered the documents that are going to be of

any consequence to them are going to fall into the category

of something that analyzes the harm or damages, and that

might be – Your Honor, e-discovery is there for when it

actually provides for a more expedient means of searching

large documents.  If we have research documents and we can

go look for these documents, the studies, the surveys, the

analyses, we may be able to get our hands around it much

                                                                    85

 1  quicker, but, again, to have to try and go through emails

 2  where people might just be mentioning the word DVR, it

 3  could be difficult.  So all I'm really seeking is

 4  clarification as to whether the documents that you've

 5  ordered produced are limited --

 6  

 7          THE COURT:  Well, I can't, a priori --

 8          MS. KELLER:   -- to these types of surveys.

 9          THE COURT:   I can't, a priori, opine that the

10  emails are going to not be relevant. In Zubalocky the

11  emails were very relevant.  I realize this isn't Zubalocky

12  and the issues here are substantially different, but I'm

13  not sure I have a basis for an informed decision on an

14  issue so broad as to whether or not the emails are going to

15  contain relevant material information or not.  I don't

16  know.  And I don't think it's something that's --

17          MS. KELLER:  We've seen their proposed search

18  queries.  I guess we'll have to have a discussion about

19  those, and if necessary come back and talk to Your Honor.

20          THE COURT:   I mean just usually what happens with

21  ESI is the parties have a meet and confer first and they

22  sort of at least identify more specific issues, you know,

23  start talking about issues with respect to custodian search

24  terms, time limits, how the search can be conducted.  I

25  mean oftentimes a big issue there is what your capabilities

86

1

2   are, whether things are on backup tapes, whether they're

3   accessible or inaccessible.  There are a lot of subtle

4   issues there that usually require some consultation between

5   the parties to sort of crystallize the specific issues for

6   the court to adjust – address, excuse me.

7        MS. KELLER:   I understand, Your Honor.  It may be

8   premature to address it right now.  Thank you, Your Honor.

9        THE COURT:   Yeah, I think it is.

10       MR. HOSP:   Your Honor, one other issue of

11  clarification, just on what Your Honor has ordered so far.

12       THE COURT:   Go ahead.

13       MR. HOSP:   With respect to the revenue

14  information, my understanding from plaintiffs is that

15  they've only agreed to produce aggregate revenue

16  information for 2011 and 2012.  In order to actually track

17  any potential impact, I think we do need to go back

18  further, if not ten years, you know, at least five years.

19  That shouldn't be burdensome at all.  So that we can

20  actually – they're talking about introducing documents that

21  won't show a change because they only start after the

22  announcement of Aereo.  We do need some historical data in

23  order for our experts to actually analyze this information,

24  and they've said just 2011 and 2012, I think.

25       MS. KELLER:   Your Honor, we thought you sustained

87

1  our objection.

2

3          THE COURT:  Yeah.  They're admitting that there's

4  no quantifiable harm.  So --

5          MR. HOSP:  But they had agreed to produce

6  aggregate information, and my understanding was that Your

7  Honor's ruling was only related to program-by-program

8  information.  And that's fine, but there is also a dispute

9  over whether or not what they have produced with respect to

10  aggregate information is sufficient because they've only

11  agreed to produce 2011 and 2012.  They've agreed that

12  that's relevant or at least they've agreed to produce that

13  --

14          THE COURT:  They've agreed, yeah.  I'm not sure -

15  what is - if they - in light of their concession that

16  defendants are not, or plaintiffs are not asserting that

17  defendants presently cause measurable, quantifiable harm

18  that would be reflected in revenue, profit and expense

19  information related to advertising, retransmission consent,

20  and licensing on a work-by-work basis, what is - excuse me

21  - what is financial information from 2007 going to get you?

22          MR. HOSP:  Well, again, it's going to get us at

23  least the ability for our expert to make a determination as

24  to whether or not there's an argument that could be made

25  that, in fact, this is all benefitting ultimately the

88

```
1    plaintiffs.  And so it is --

2           THE COURT:   There are so many factors that affect

3    sales.  I mean how are you going to tease out – how would

4    you tease our areas?

5           MR. HOSP:   Well, I don't know because I don't

6    know what the revenue information says, and I haven't been

7    able to actually share it with our expert.  But that is

8    something that we would like to investigate the possibility

9    of arguing it.  You know, it's not overly burdensome.

10   We're not talking about a significant amount of

11   information.  It's not --

12          THE COURT:   It's not the annual – you want the

13   annual reports?

14          MR. HOSP:   Quarterly would be more helpful I

15   think to our --

16          THE COURT:   Aren't these publicly available?

17          MR. HOSP:   I don't believe so, not with – I don't

18   believe so.  Not with respect to the specific individual

19   companies.

20          THE COURT:   Are there any defendants that are not

21   public companies, I mean plaintiffs that are not public

22   companies?

23          MS. KELLER:   We will give Mr. Hosp the publicly

24   filed quarterly reports.
```

1

2          THE COURT:   Is that what you're looking for?

3          MR. HOSP:   Well, no, because I don't believe that

4   that will actually cover the individual plaintiffs.  I mean

5   the plaintiffs, we do need to divide this from plaintiff

6   outstanding plaintiff --

7          THE COURT:   No, but I mean --

8          MR. HOSP:   You're right, I agree with you.  If

9   what we're going to get is a parent company filing that

10  says the entire entity made Z amount and that includes film

11  departments, that includes foreign licensing, that includes

12  all of, you know, then you're right, that's not going to be

13  helpful.

14         THE COURT:   I'm not – in light of their

15  concession that you're not having a measurable,

16  quantifiable impact, I'm not sure what any of this is going

17  to show.

18         MS. KELLER:   Nor does it even remotely, I mean

19  it's absurd to suggest that you're going to be able to look

20  at this top line data and say that a company with 3,000

21  subscribers has affected – the effect of it can be seen at

22  this level currently.  I mean this really does seem like

23  excessive fishing, Your Honor, considering the --

24         THE COURT:   I'm not sure it's going to yield

25  anything meaningful.  I mean if – there are so many

90

factors.  I would presume there are a multitude of factors

that affect the plaintiffs' profitability.  How would one -

-

            MR. HOSP:   If I --

            THE COURT:   I'm not sure how a change could be

attributed to Aereo or not attributed to Aereo.

            MR. HOSP:   If I could answer Your Honor, I would

actually be an expert rather than a lawyer.  But what I can

say is an expert can draw conclusions and then look at the

data and tell whether or not the data actually supports

their conclusions or disproves it.  It may not actually in

and of itself prove it specifically, but it may be, the

expert may actually take other data and say here are our

conclusions, and, in fact, if you look at the aggregate

data, this actually supports our conclusions.  It certainly

doesn't disprove our conclusions.

            Again, it's not a significant amount of

information --

            THE COURT:   Well, how many subscribers do you

have?

            MR. HOSP:   Your Honor, I genuinely do not know

how many subscribers Aereo has.

            THE COURT:   Does anyone know how many subscribers

Aereo has?

91

1

2          MS. KELLER:   We think someone knows.

3          (interposing)

4          MR. ELKIN:   General Counsel of Aereo is sitting

5 right behind Mr. Hosp.

6          THE COURT:   Well, let me ask defendants, does

7 anyone representing Aereo know how many subscribers Aereo

8 has?

9          MS. KELLER:   You have company representatives

10 here, Your Honor.

11          THE COURT:   Yeah, I mean you want to consult with

12 your clients and see how many Aereo customers there are?

13          MR. HOSP:   I don't believe that anybody here has

14 any information about specifically how many --

15          THE COURT:   Are there more than 5,000?

16          MR. HOSP:   I don't know, Your Honor.

17          THE COURT:   Well, can you ask your client if they

18 know whether they're above or below 5,000?

19          MR. HOSP:   Your Honor, first of all, any numbers

20 regarding subscriber information has already agreed to be

21 highly confidential.  It's been bandied about in open

22 court, notwithstanding the fact that it is, in fact, highly

23 confidential.

24          THE COURT:   Write it down on a piece of paper and

25 show it to your adversary, then hand it to Mr. Hampton.

92

1   Whatever you know about the number of subscribers.

2         MR. HOSP:   We don't know --

3         THE COURT:   Less than X, more than X --

4         MR. HOSP:   No one --

5         THE COURT:   -- between X and Y.

6         MR. HOSP:   No one in this room has the number.

7         THE COURT:   Well, do you know if it's – can you

8   tell me less than X or more than Y, between X and Y?

9         MR. HOSP:   Well --

10        THE COURT:   Even if you don't have the precise

11  number – look, I mean whether or not this financial

12  information is going to yield anything meaningful I think

13  has, to some extent, a function of Aereo's presence in the

14  marketplace, a dimension of Aereo's presence in the

15  marketplace.  And I'm trying to understand, you know, do

16  they have a huge number of subscribers or something toward

17  the other end of the spectrum?

18        MR. HOSP:   Your Honor, with all due respect,

19  we're trying to understand what is the import of how many

20  subscribers Aereo currently has to the issues.

21        THE COURT:   Because if they have 20 subscribers,

22  getting the financial data from the plaintiffs isn't going

23  to tell you anything.  If they have 20 million, maybe then

24  there's more of a basis for interpreting changes in

1
2  plaintiffs' profitability to Aereo's presence in the
3  marketplace.
4        MR. HOSP:   But --
5        THE COURT:   If they have 20, I mean you're
6  talking about a drop in the bucket.
7        MR. HOSP:   But, you know, there again there is -
8  the issue that they're trying to prevail on the court is
9  somehow the, how much money, a financial impact our client
10 is making with respect to the effect on the market.
11       THE COURT:   No, I'm not asking you about how much
12 your client's making.  You know, I'm just trying to find
13 out how much of a presence you in the market for --
14       MR. HOSP:   Well, put it this way, Your Honor,
15 they sued us before there was any presence.  It didn't
16 matter to them.  And so the very notion that we can exist -
17 -
18       THE COURT:   Look, I'm trying to determine --
19       MR. HOSP:   -- is a problem.
20       THE COURT:   -- whether or not your request for
21 financial information is reasonably calculated to lead to
22 relevant evidence.
23       MR. HOSP:   And I think --
24       THE COURT:   And to do that I think I need to know
25 to some extent, you know, I think it's a stretch, but I'm

1  willing to explore the matter as far as is reasonable, and

2  I'm trying to understand how much presence Aereo has in the

3  marketplace.  If it's a de minimum presence, there's no

4  rational basis to conclude that you're going to be able to

5  draw anything relevant from the plaintiffs' financial --

6         MR. HOSP:  Your Honor --

7         THE COURT:  -- the aggregate financial figures.

8         MR. HOSP:  Your Honor, because --

9         (interposing)

10        MR. HOSP:  -- because Your Honor feels that way,

11  the answer is we don't have that number, so we'll let Your

12  Honor's decision stand, and we can come back --

13        THE COURT:  Well, I haven't decided yet.  I

14  haven't said you win or you lose.  I'm trying to --

15        MR. HOSP:  No, I --

16        THE COURT:  -- maybe you win, but --

17        MR. HOSP:  No, no, I know --

18        THE COURT:  -- I think I need to know more to --

19        MR. HOSP:  And, Your Honor, the answer is we

20  don't have the ability to really give you that information,

21  and so we can go back to Your Honor's view of just what it

22  is that they've agreed to, and if necessary, we can come

23  back to you.  But the answer is we don't have that

24  information, and so if that's what you require, then I

1  don't believe we're gonna be able to change your mind.

2          THE COURT:   All right.

3          MR. HOSP:   And that's acceptable.

4          THE COURT:   All right.  With one of the things –

5  I'm looking at page 12 of the March 8 submission and

6  documents concerning advertising revenue.  Maybe the best

7  place to start is to have plaintiffs tell me what you've

8  already provided with respect to advertising revenue, then

9  I'll hear from defendant as to what else defendant is

10 seeking.  And I'd also note that advertising revenue is one

11 of the areas where you convinced, where the plaintiffs

12 convinced Judge Nathan they would suffer irreparable harm

13 here.  So go ahead, what have you already produced?

14          MS. SHEPARD:   Your Honor, we've already produced

15 annual advertising revenues for 2011 and 2012, and we have

16 also produced, as it bears on the issue of advertising,

17 voluminous Nielsen reporting which is the Nielsen is the

18 standard by which advertisers pay.  And so we have given

19 live reporting plus DVR reporting and C3 which is the

20 measure that actually advertisers use for 2011 and 2012.

21          THE COURT:   Okay.

22          MS. SHEPARD:   In addition obviously to all the

23 documents relating to Aereo itself, I mean we do produce

24 those as well.

96

1

2          THE COURT:   What else is defendants looking for

3   with respect to advertising?

4          MR. HOSP:   Well, and Your Honor, we're a little

5   bit hamstrung only in the sense that most of these

6   documents have been produced only very recently so we

7   haven't actually been able to go through them.  So we don't

8   know specifically what has been produced and what hasn't

9   been produced.

10          THE COURT:   Okay.

11          MR. HOSP:   My understanding is any Nielsen data

12   has only been done in the aggregate, not on a program-by-

13   program basis, is that correct?

14          MS. SHEPARD:   No, that's actually totally

15   incorrect.

16          MR. HOSP:   Okay.

17          MS. SHEPARD:   The advertising or the Nielsen

18   reporting has been done on a program-by-program basis where

19   it is available and there's also been some summary reports

20   that have been produced.

21          THE COURT:   All right.  I mean, look, do you want

22   to withdraw this topic without prejudice?

23          MR. HOSP:   I guess the question, one question

24   that we have is it depends on when the productions are

1
2  going to end because we don't want this to continue

3  dragging out, having to keep coming back and getting more

4  documents and more documents.  It is the --

5            THE COURT:   Well, is the plaintiffs' production

6  on this score complete?

7            MS. SHEPARD:   Yes, Your Honor, the Nielsen data

8  has all been produced as well as all the advertising

9  revenues have been produced.

10           THE COURT:   All right.  So from their point of

11  view, it's complete.

12           MR. HOSP:   And again, it only goes back through

13  2011 which this is an instance where there claim is that

14  somehow that just the existence of Aereo is going to reduce

15  advertising revenue somehow.  So this is something that it

16  would be helpful to be able to show a trend.

17           MS. SHEPARD:   I don't believe that was the claim.

18  I think the claim was that Aereo people would shift over to

19  view Aereo and therefore, they would not be counted.  Aereo

20  has only launched in March of 2012, Your Honor, so it could

21  only siphon viewers as of March of 2012.  So we gave them

22  at least a year and quarter worth of Nielsen data before

23  that, as well as advertising revenue, before that.  It's

24  not the existence of Aereo on this front.

98

```
1
2          THE COURT:   Yeah, I mean it sounds like 2011
3   would be the base year.
4          MR. HOSP:   Well, another question --
5          THE COURT:   Because Aereo was not in the market
6   in 2011.
7          MR. HOSP:   Fair enough.  We believe we can come
8   back to Your Honor on this issue if necessary because we do
9   need to see what actually has been produced and we simply
10  haven't had enough time to see what's been produced.
11         THE COURT:   All right.
12         MR. HOSP:   Because it's all been done very, very
13  recently.
14         MS. SHEPARD:   And I would just ask Your Honor if
15  there is -- and I think it would help the Court as well --
16  if they do identify something before they submit something
17  to the Court, that they actually meet and confer with us
18  with respect to that.
19         THE COURT:   Yeah, well that goes without saying
20  with respect to all discovery disputes, there should be a
21  meet and confer.  All right.  I think the next -- again,
22  I'm looking at the March 8th submission and I'm looking at
23  the bullet points in the March 8th submission.
24         And the next one that we haven't talked about yet,
```

99

documents concerning ad-skipping.  Again, let me do what I

just did and ask plaintiff first what, if anything they've

produced on ad-skipping, and then I'll hear from

defendants.

MS. SHEPARD:  Well, one point of clarification,

Your Honor, the Aereo systems does not allow for ad-

skipping, which is completely skipping advertising so --

THE COURT:  If you use their remote DVR feature

can you fast-forward through the ads?

MS. SHEPARD:  You could fast-forward through it,

Your Honor, yes, but you cannot skip ads.  And true ad-

skipping technology has only been launched by DISH.  But

with respect to fast-forwarding, again, the Nielsen data

that they have, Your Honor, provides for that information,

use of DVRs.  Because the C-3 number, Your Honor, that I

was talking about actually is the measure of people who

view commercials in the Nielsen data and we have provided

it for 2011 and 2012 again.

We have also offered, with respect to remote DVRs

market -- and I want to make sure I get the language right

-- but market -- any analysis or report that was

commissioned by or prepared by us with respect to remove

DVR fast-forwarding, to address their concerns to the

 1

 2  extent such documents could exist.

 3          MR. FABRIZIO:   Your Honor, just to add to that

 4  this --

 5          THE COURT:   Go ahead.

 6          MR. FABRIZIO:   -- this request, it's not an issue

 7  in the case.  It's not a case about ad-skipping.  This is a

 8  case about whether or not because currently and for the

 9  foreseeable future, Aereo subscribers are not within the

10  Nielsen ratings, we are suffering any harm or if Aereo-type

11  activities become widespread in the future would suffer

12  harm.

13          It's not an ad-skipping case.  It's not even a

14  fast-forwarding case.  It's a they-just-siphon-off-

15  measurable-eyeballs case.  That's why this category is

16  simply not relevant.

17          MR. HOSP:   Your Honor, my understanding is that

18  they actually asked us for information about the use of

19  Aereo to skip ads.  They've asked --

20          THE COURT:   Well, let me ask you, what, if

21  anything else, you're looking for with respect to documents

22  concerning ad-skipping?

23          MR. HOSP:   And to be clear, Your Honor, you have

24  now ordered them to produce additional documents,

 1

 2   particularly with respect to DVRs and other devices.  We

 3   would simply ask that those documents include any impact

 4   with respect to fast-forwarding.  When we talk about ad-

 5   skipping, we're not talking about the --

 6            THE COURT:   We just heard that they're going to

 7   produce that or to the extent -- or they either have or

 8   have already produced whatever analysis as performed

 9   regarding remote DVR fast-forwarding --

10            MR. HOSP:   Right, and Your Honor has now ordered

11   them to produce information regarding home DVRs.  So we

12   would expect that we would then get any analysis done

13   regarding -- I mean they've also said that they're not

14   aware of any analysis they've done regarding RS DVRs; it's

15   only with respect to home DVRs and they haven't produced

16   that.  We would expect --

17            THE COURT:   I think it was the opposite.

18            MS. SHEPARD:   You're right, Your Honor.  What I

19   said was we had agreed to produce market research reports

20   and analysis commissioned or conducted by us that measure

21   fast-forwarding of advertising embedded in our program

22   using a remote DVR.

23            THE COURT:   Right, so --

24            MS. SHEPARD:   That's what we've agreed to

1

2   produce.

3            THE COURT:   Yeah.

4            MR. HOSP:   So now they would have to do that for

5   Home DVRs as well because you've ordered any market-impact

6   related documents regarding home DVRs to be produced.

7            MR. KELLER:   Mr. Hosp is trying to reinterpret

8   your order.

9            THE COURT:   Yeah, that's not the prior provision

10  of the -- that's not what I talked about a few moments ago

11  or more than a few moments ago.   I mean do you want fast-

12  forwarding, any analysis of fast-forwarding with respect to

13  Home DVRs?

14           MR. HOSP:   Yes, yes, Your Honor, absolutely

15  because that's the nature of any market harm that -- from

16  DVR functionality.

17           THE COURT:   What does plaintiff say?

18           MR. KELLER:   This goes to the point that I tried

19  to make earlier and perhaps I was not crisp enough about

20  it.

21           THE COURT:   I heard what you said.

22           MR. KELLER:   This is not a relative analysis.

23  This is not what people do with their home DVRs or VCRs as

24  opposed what Aereo does.   It's all about what Aereo users

103

1
2    do and what Aereo does in facilitating the unauthorized
3    uses by itself and perhaps by its users as well, because we
4    have s contributory infringement claim in the case, and
5    that's it, full stop.
6          It doesn't matter what others do, licensed or
7    unlicensed, in home with their VCRs.  It's an absolute
8    analysis.  It's not a comparative, how much worse is Aereo.
9    It's not -- it's just that's not the law.
10          MR. HOSP:   Your Honor, there --
11          THE COURT:   Does Aereo does someone who
12    subscribes to Aereo have the capability of fast-forward
13    through ads?
14          MR. HOSP:   If they have recorded it, yes.  Pardon
15    me, if they have recorded it for later viewing.
16          THE COURT:   I understand.  I understand what
17    you're saying.  I understand what you're saying.  I'm with
18    you all the way.  I'm with you.
19          MR. HOSP:   Yes, yes, it's all recorded to the
20    extent that they have saved it and they are behind they can
21    fast-forward.
22          THE COURT:   If they're watching contemporaneously
23    they can't.
24          MR. HOSP:   Exactly

1

2      THE COURT:   If they're watching it using the

3 remote DVR facility, they can.

4      MR. HOSP:   They can.  And Your Honor, the

5 testimony that was given at the preliminary injunction

6 stage was that in fact the ability to do that using Aereo

7 was going to harm plaintiffs in the same way that doing

8 that with DVRs harms plaintiffs.  That was part of the --

9 that was part of the testimony.  We can change, plaintiffs

10 can change their claims now, I suppose, but that wasn't

11 what -- that wasn't the basis of their claims when we were

12 a preliminary injunction.

13      MS. SHEPARD:   Your Honor, the issue of the viewer

14 should provide via remote DVR fast-forwarding through

15 commercial, again, they have the measure that is used by

16 Nielsen, which is the C-3 numbers.  We have produced that.

17 We are producing with respect to any analysis with -- or

18 with respect to the remote DVR.  The --

19      THE COURT:   The C-3 would -- sorry to interrupt

20 you -- the C-3 would capture fast-forwarding by home DVRs?

21      MS. SHEPARD:   It is the measure, yes, it's the

22 measure if people are actually viewing the commercials they

23 get live numbers, they get live plus same day, live plus

24 three; all that's full viewing of the program.  The C-3

1  number is actually the viewers of the commercials, so they

2  have that data, and they've never explained why that is not

3  going to be sufficient for them to identify what the impact

4  is of viewing via fast-forwarding.

5

6        MR. HOSP:   Your Honor, here's what we're looking

7  for.

8        THE COURT:   Well let me -- is there anything else

9  that addressed fast-forwarding through commercials by

10  individuals with DVRs, home DVRs?

11        MS. SHEPARD:   Your Honor, there are not in our --

12  not in -- as far as analysis we do but there are --

13  Nielsen, which is the --

14        THE COURT:   The C-3.

15        MS. SHEPARD:   Well, there's Nielsen but Nielsen

16  also does reporting.  They've subpoenaed Nielsen.  With

17  respect to, like, quarterly reports do any of the quarterly

18  reports of Nielsen talk about it generally, people fast-

19  forwarding, undoubtedly.

20        I mean there's publications all over the place in

21  the media with respect to the issues on how people view --

22  how people view television and are they using DVRs more or

23  less.  And that's public information available to Aereo.  I

24  mean if they -- they could get any of these reports through

106

1    different services.  They'd look at -- *The Hollywood*

2    *Reporter* talks about it at various times.  Kagan talks

3    about it at various times.

4           THE COURT:   Let me come back to my question.

5    Apart from the C-3, the C-3 reports, do the plaintiffs have

6    any analysis of the use of home DVRs for ad-skipping?

7           MS. SHEPARD:   I don't know specifically if they

8    have reports.  What they look at, Your Honor, is they look

9    at Nielsen.  I mean, that's the data that they look at.

10          MR. HOSP:   Your Honor, Your Honor, I can answer

11   this.

12          THE COURT:   Fine.  Go ahead.

13          MR. HOSP:   I can answer this and it is a highly

14   confidential document, so I will not say anything about it.

15   What I'm going to do it hand it up --

16          THE COURT:   Just show it -- show it to your

17   adversary and then hand it to Mr. Hampton, okay?

18          MR. HOSP:   Yep.

19          MS. SHEPARD:   We don't have access to their

20   documents.

21          (interposing)

22          MS. SHEPARD:   We won't have access to their

23   documents --

107

1       (interposing)

2       MS. SHEPARD:   I won't have access to it because

3 this is under the protective order that only ABC --

4       MR. KELLER:   Right, it's our document, Your

5 Honor, so he showed it to the wrong person.

6       MR. HOSP:   And Your Honor, I'm handing it up.

7       MS. SHEPARD:   I didn't look at it.

8       MR. KELLER:   It's okay.   That's okay.

9       MR. HOSP:   And Your Honor, without commenting on

10 what is actually --

11       THE COURT:   Just last -- that last solid bullet

12 or the last hollow bullet?

13       MR. HOSP:   The last solid bullet --

14       THE COURT:   Okay.

15       MR. HOSP:   -- two hollow bullets underneath it.

16       THE COURT:   Okay.

17       MR. KELLER:   Right, but Your Honor, this has

18 nothing to do with ad-skipping or fast-forwarding.

19       THE COURT:   Well, let me read it first.

20       (Pause in proceedings on the record.)

21       THE COURT:   All right.   Do you want to say

22 something?   Go ahead.

23       MR. KELLER:   It doesn't address the issue that

108

1
2   we're focused on now, which is fast-forwarding or ad-

3   skipping.  But the bigger point is the fact that they have

4   it shows we've already produced it.  Why are we fighting

5   about this?  We've given them what we have.

6           MR. HOSP:   No, Your Honor, they haven't produced

7   any of the research that this is based on.  It indicates

8   that there are other documents.  It indicates that there is

9   internal --

10          MR. KELLER:   Your Honor, that they have it means

11  we made a good-faith search, found the relevant documents,

12  and produced it.  That's why it's in their hot little

13  hands.

14          MR. HOSP:   What this shows, Your Honor, there are

15  lots of documents that are not being produced.

16          THE COURT:   Well, it doesn't show that there are

17  lots of documents.  I don't know what there is beyond this

18  but, I mean I don't know if there's raw data underlying

19  this or not.

20          MR. HOSP:   We don't know because we don't have

21  any insight.  We don't have any transparency into what they

22  have.  They haven't even ==

23          THE COURT:   You know, you never really get that

24  in a document production but with respect to ad-skipping,

109

1  if they -- if the plaintiffs have any analysis regarding

2  ad-skipping by home DVRs, that is to be produced.

3          MR. KELLER:   Within the same time limitation,

4  Your Honor?

5          THE COURT:   Yeah, January 2010 to present.  The

6  last item in this letter that we haven't addressed is

7  documents related to consumer use of antennas.  I'm not

8  sure exactly what you're looking for, what the defendants

9  are looking for here.

10         MR. HOSP:   Yes, Your Honor, I can give you an

11 example.  Again, it's highly confidential so I can give you

12 an example of the sorts of things that we believe was only

13 produced because it actually mentions Aereo specifically.

14         THE COURT:   All right.  Again, show it to your

15 adversary and then hand it to Mr. Hampton.

16         THE CLERK:   Which document is it?

17         MR. HOSP:   It's actually one we shared between

18 NBC and Fox, so I think you can see both, take a look at

19 it.

20         MR. KELLER:   Any particular spot?

21         MR. HOSP:   Yeah, let me --

22         MS. KELLER:   Just refer us to what you're going

23 to refer the Court to.

110

1    (pause in proceedings on the record)

2         THE COURT:   All right.  And what specifically, on

3    page ENC0007489, what -- the whole page, or?

4         MR. HOSP:   Yes, to be clear, without disclosing

5    the contents of this, just note that this is a, appears to

6    be a report --

7         THE COURT:   All right.  Well, you don't need to

8    say anything.

9         MR. HOSP:   -- between the parties.

10        THE COURT:   But you're directing my attention to

11   the whole page.

12        MR. HOSP:   Yes, and -- and --

13        THE COURT:   Okay.  All right.

14        MR. HOSP:   And to be clear, OTA is an acronym for

15   over the air, meaning broadcast -- broadcast signals.

16        THE COURT:   I could figure that out.

17        (Pause in proceedings on the record.)

18        MR. HOSP:   To be clear, Your Honor --

19        THE COURT:   Let me just read it, okay?

20        (Pause in proceedings on the record.)

21        THE COURT:   I'm not sure I understand.  I'm still

22   not sure I understand what you're looking for or how --

23        MR. HOSP:   Yes, let me -- yes.

111

1                                                     111

2              THE COURT:   -- how the document relates to the

3      issues in the case or what you're looking for with respect

4      to documents related to consumer use of antennas.

5              MR. HOSP:   Yes, and let me try to clarify that a

6      little bit.  At the preliminary injunction, Sherry Brennan,

7      who was a witness for the plaintiffs, testified that one of

8      the ways in which the plaintiffs would be harmed was

9      because they had invested substantial amounts in their

10     over-the-air broadcasting systems and their efforts to

11     encourage that.

12             We believe that we're entitled to any documents

13     related to efforts to discourage the use of over-the-air

14     signals, and we believe that documents like this show that

15     this is one of the things that they're doing, they're

16     actually discouraging it because they believe that

17     notwithstanding the fact that it's every consumer's right,

18     they don't want people doing it.  They don't want people

19     using the OTA.

20             And so what we're looking for, we are clearly not

21     --

22             THE COURT:   This was not something that Judge

23     Nathan even discussed in her treatment of irreparable harm.

24             MR. HOSP:   It was not.  It was a claim that they

1                                                                         112

2   made that Judge Nathan did not specifically address this

3   issue.  It was just one of the issues that they testified

4   to.

5            MR. KELLER:  Well, Your Honor, it was a question

6   asked and answered during examination.  That is not a basis

7   for claiming that it's relevant, and I think it probably

8   useful for your decision to understand the reason this

9   document was produced to them in the first place, is

10  because they asked for it and we agreed, to establish the

11  markets that we are entering.

12           And this document actually relates to the remote

13  accessibility of over-the-air signals mobile technology

14  that we ourselves are developing so that people don't have

15  to be in their houses to receive through licensed

16  authorized distribution channels over-the-air signals so

17  you can watch it through a licensed device, as opposed to

18  the unlicensed area of devices, and if you want to go to

19  the park and watch television.  That's why this -- they

20  have this document, that's why it's relevant, but it has

21  nothing to do with the notion.  And if you think that the

22  burden imposed by the prior ruling, which we will abide by,

23  to search for DVR-related documents is significant enough

24  to raise ESI issues just think about what any sort of order

113

1

2   asking us to search for antenna documents is going to

3   impose, a technology that's been around for over 50, 60

4   years now.  It's just ridiculous.

5            MR. HOSP:   And Your Honor --

6            MR. KELLER:   The use of antenna technology, Your

7            Honor, is not what we're arguing about.  We're

8   talking about the markets in which we deliver licensed

9   authorized distributed copyrighted content.  It's really --

10  and again, this goes back to the relative analysis.  If,

11  you know, you use antennas --

12           THE COURT:   Well, let me --

13           MR. KELLER:   -- and that doesn't hurt in this way

14  then how can Aereo hurt so much more.

15           THE COURT:   Let me -- let me ask you this, I

16  mean, is there a damage theory here that what Aereo is

17  doing is somehow damaging plaintiffs by affecting their

18  over-the-air viewership?

19           MS. SHEPARD:   Yes.

20           THE COURT:   The viewership that watches TV

21  through home antennas?

22           MR. KELLER:   In the sense -- in the sense --

23           (interposing)

24           MS. KELLER:   -- through home antennas only in the

25  sense - if -- that's not where they're hurting us.  The

114

1

2      hurt comes, the harm comes the disruption to the market

3      comes, for the fact that aerial watcher siphon off

4      measurable viewership.  In-home viewership is in-home

5      viewership.  Aerial, to the extent that aerial decreases

6      the measurable audience, right, because then they're

7      watching aerial and they're not measured, I suppose that's

8      a form of harm, too.  But that's the nature of the harm,

9      it's the siphoning off of measurable eyeballs through the

10     aerial distribution system.

11          THE COURT:   And let me ask you a question.  Does

12     Nielsen -- does an individual who provides data to Nielsen,

13     a Nielsen family, or someone who is within this Nielsen

14     samplee (phonetic), does Nielsen distinguish how that

15     viewer gets the signal on his or her television?

16          MR. KELLER:   That's an excellent question and

17     that's what Mr. Hosp was alluding to in one of his

18     submissions recently.  Until now they measure by virtue of

19     something affixed to your television set which is why, and

20     that's still a current state of affairs, that's what they

21     measure.  And so it's the siphoning off people away from

22     that measurable device, the television set, that we're

23     troubled by, obviously.

24          THE COURT:   But do they -- I mean if I'm watching

25     program X, do they -- does Nielsen distinguish or does

115

Nielsen measure whether I'm watching program X by virtue of

an antenna on my roof or by virtue of a cable TV provider

or by virtue of a satellite TV provider?

MR. KELLER:   No, it's through the set.

THE COURT:   They just know I'm watching program

X.   They don't know how program X got into my house.

MS. SHEPARD:   You're included in the number, the

people that view over-the-air through the antennas, are

included in the number.   But they are not distinguished and

broken out by cable or broken out by --

THE COURT:   Right, in other words, Nielsen can

tell you that on Monday night 17,000 people watched program

X, or they predict, or based on their sample, they estimate

17,000 people watch program X.   But they don't break down,

you know, 5,000 watched it on cable, 7,000 watched it over

the air, and another 5,000 watched it through satellite.

MS. SHEPARD:   But there are, no, you're right,

Your Honor.   They don't break it out that way.   There are

numbers and they have -- we've given them reports, we

produced aerial reports, about the over-the-air viewing.

The numbers are around 49 million watch over the air via

over-the-air television or via over-the-air antennas.

MR. KELLER:   And the issue for you today, Your

Honor, is that that breakdown is less important.   Why?

```
 1                                              116
 2  Because all of those are licensed distribution channels.
 3          MR. HOSP:   Your Honor, if I may, just a couple of
 4  issues.  First, the statement was made that there was no
 5  real theory of damage or harm from the over the air
 6  themselves.  I refer you to declaration of Sherry Brennan
 7  which was submitted as testimony at the --
 8          THE COURT:   Where is it?  Is it part of the March
 9  8th submission?
10          MR. HOSP:   Yes, it is -- I'll have an exhibit
11  number for you in just a moment, Your Honor.
12          THE COURT:   Okay.
13          MR. HOSP:   She lists a number of different ways
14  in which plaintiffs are harmed, numbering each of them.
15          MS. SHEPARD:   It's Exhibit 8, Your Honor.
16          MR. HOSP:   It's Exhibit 8.
17          THE COURT:   Exhibit 8?
18          MS. WILSON:   It's Exhibit 10.
19          MR. HOSP:   Pardon me, Exhibit 10.
20          THE COURT:   Ten?
21          MR. HOSP:   Exhibit 10 and in paragraph --
22          MS. WILSON:   Exhibit 8, she's right.
23          MR. HOSP:   Pardon me, Exhibit 8 on page 7.
24          THE COURT:   Wait, Exhibit 8 I have a declaration.
25          MR. HOSP:   A declaration of Sherry Brennan.
```

117

THE COURT:   Page 7.  Okay.

MR. HOSP:   This was offered into evidence as testimony.  Page 7, paragraph 19, talks about --

THE COURT:   Okay.  Eleventh, Fox has invested and continues to invest substantial amounts in its broadcast infrastructure to insure that the viewing public continues to receive the high-quality viewing experience they've come to expect from Fox.  By way of example, Fox has upgraded its production in transmission facilities in order to provide high-definition programming.  Fox also invests in technologies to secure its programming from piracy such as copy protection flags that accompany Fox's transmission.

MR. HOSP:   So the eleventh aspect of harming they are arguing is that they're going to be harmed because it's going to hurt their over-the-air broadcast in some ways; I don't believe that it is.  I don't believe that they suffer any harm from this.  But ultimately, they put this at issue.  That is testimony that they put in a preliminary injunction stating we're entitled to discovery regarding this.  Now, we are absolutely willing, because believe me--

THE COURT:   Well, what is it exactly that you're seeking?

MR. HOSP:   Well, what we're seeking is any documents related to any harm that they claim with respect

118

to over-the-air broadcast as well as any efforts --

THE COURT:   Well, that's --

MR. HOSP:    -- any efforts --

THE COURT:    That's an awfully broad category.

MR. HOSP:   It is, but it's a broad category of what they've argued.  It's a broad category because of the damages that they are claiming, the harm that they are claiming.

It's also important to again, as we believe that document that we've handed up demonstrates, we believe they're actually taking -- making efforts to discourage over-the-air broadcasts, which is something that is very relevant in this case because it does call into question the credibility of the plaintiffs' arguments in this case.

THE COURT:   Well, if they wanted to -- if they wanted to go off the air they could do that in a heartbeat, I would think.

MR. FABRIZIO:   And Your Honor, the passage that they quote on, which they base this entire far-fetched argument is that we invest money in our broadcast equipment.  One struggles to find the relevance between what they're offering up for the sole foundation for this demand and the demand they're making.

MR. HOSP:   Well, no, we're offering that and the

119

1      documents.

2            THE COURT:   Well, let me -- let me ask the

3      plaintiffs a question.  I mean are you pursuing a harm

4      theory here or a damage theory that the defendants have

5      damaged your over-the-air market?

6

7            MR. KELLER:   Your Honor, as my colleague just

8      said, when advertising, when we make an argument that

9      advertising is going to be injured by any lost customers

10     that --

11           THE COURT:   No, that's distinct from the

12     question.

13           MR. KELLER:   Other than that, then the answer is

14     no.  That's --

15           THE COURT:   Okay.  All right.  I --

16           MR. HOSP:   Your Honor, at the very least, we

17     should be entitled to any documents related to any attempts

18     to encourage or discourage the use of over-the-air

19     broadcast for delivery or the use by those broadcasts by

20     consumers.

21           THE COURT:   Every time they advertise their

22     station they're trying to encourage over-the-air viewers,

23     aren't they?

24           MR. HOSP:   Well, we actually --

25           THE COURT:   I mean if I see a poster in the

                                                                120

1

2    subway, you know, to watch Dancing with the Stars, or 60

3    Minutes, or some other feature, I mean they're looking to

4    increase viewership regardless if whether I'm doing it on

5    cable, over the air, or.

6          MR. HOSP:   They would prefer that viewership to

7    be on cable.  That's -- that's been made very clear.

8          THE COURT:   No, but I mean I'm not sure, you

9    know, documents that encourage over-the-air viewership I'm

10   not sure what that -- I'm not sure how that's a meaningful

11   description of what you want.

12         MR. HOSP:   Well, it's meaningful in the sense

13   that as over-the-air broadcasters, they're actually under a

14   legal obligation to make -- to make --

15         THE COURT:   No, if they take out an ad in the

16   daily news that says, you know, watch Dancing with the

17   Stars Wednesday night, we're going to have --

18         MR. HOSP:   We don't want that.

19         THE COURT:    -- these celebrities.  Is the

20   encouraging over-the-air broadcast or viewership?

21         MR. HOSP:   Fair enough, Your Honor, we don't want

22   that and in terms of the implementation with this and ESI

23   issues, we are absolutely willing to work with them in

24   terms -- we don't want -- we don't want a bunch of junk

25   either.  We want documents like this but we don't want just

1  this document.  I mean for example, this document indicates

2  that there are other drafts of this document and those

3  haven't been produced.

4

5      MR. KELLER:   Your Honor, you have to start with a

6  base level of relevance.

7      THE COURT:   Yeah, I think I need a reasonable --

8  a description with reasonable particularity as to what it

9  is you want with respect to antennas.  I think your

10  adversary's point is well taken to some extent.

11      I mean the antenna technology, as I understand,

12  has been around since the inception of television

13  broadcasting.  So you need -- you may be entitled to

14  something but you need something that they can read and

15  understand what it is you're seeking.

16      MR. HOSP:   Okay.  Let me try -- let me try to

17  limit in a reasonable way then.  We are seeking any

18  documents related to the encouragement or discouragement of

19  over-the-air broadcast, vis-à-vis cable.  Tie those two

20  issues together issues together.  In other words -- in

21  other words any documents --

22      THE COURT:   Well, what -- what -- how is that

23  relevant to the copyright infringement claim?

24      MR. HOSP:   It's relevant --

25      THE COURT:   There's a -- there's a document that

1
2   says -- let's hypothesize and says there's a document that

3   says, boy, it would be great to move 20 percent of our

4   over-the-air viewership to cable.  What does that relate to

5   with -- what claim or defense does that relate to?

6           MR. HOSP:   It goes directly to the fair-use issue

7   because fair use is an equitable doctrine and these are

8   plaintiffs who are under an obligation by federal law to

9   provide and to encourage use of the over-the-air broadcast.

10          Do we believe that that is relevant to the

11  question of whether or not they're entitled to whether or

12  not the consumer's use of those over-the-air broadcast are

13  fair use or not fair use, yes, we absolutely do.

14          MR. KELLER:   Your Honor, if that were true we

15  couldn't have satellite and cable companies distributing

16  our signal.  That can't be right.  That's bizarre.

17          THE COURT:   First of all, unclean hands relates

18  to the transaction upon which a party is suing, it's not

19  unclean hands in general, number one.  Number two, a TV

20  station does not have the ability to force a consumer to do

21  anything.  They can try to persuade a consumer to use a

22  cable company by offering bells and whistles or by offering

23  some kind of premiums.  But, you know, maximizing profits

24  is what companies are all about.

25          So I mean the fact that they engage in a strategy

123

that may increase their profits, that's what companies are
supposed to do.

MR. HOSP:   Well, except that -- except that this
is a slightly different situation, Your Honor, because
these are companies that are entrusted with a public trust
of the over-the-air broadcast waves.

THE COURT:   Right.

MR. HOSP:   So this is not just a question of
whether or not they have a responsibility solely to
maximize profit.  They actually have --

THE COURT:   How is -- how is encouraging and how
is a marketing plan to try to increase cable viewership
inconsistent with their being given broadcast rights?

MR. HOSP:   If it -- if it is at the expense of
people having access to the over-the-air broadcast signals
it's a violation of their duties.  And, yes, that actually
does play into the fair-use argument.

The companies that are entrusted with the over-
the-air broadcast waves cannot sit there and essentially
come up with ways to try to defeat people from using the
over-the-air broadcasts to get their signals.

They can't enter into license agreements with
retransmission agreements with cable systems or satellite
providers but for the FCC license give to them.  They don't

1  get that FCC license unless they permit the public to

2  access those over-the-air linear signals.  What they're

3  doing, the point that is being made here, is that they're

4  undermining their own obligation to the public by --

5  because they --

6  
7              THE COURT:   If they want to get out of the over-

8  the-air business they could do it in a heartbeat.

9              MR. HOSP:   They -- they're not in a position --

10             MR. KELLER:   Your Honor, all the --

11             MR. HOSP:   They're not in a position to do that

12  by abrogating their responsibilities.  They wouldn't be in

13  a position.  If they didn't have the license from FCC they

14  couldn't enter into these agreements.  So I don't

15  respectfully think that's correct.

16             MR. KELLER:   Your Honor, I mean think about the

17  logic or illogic here.

18             THE COURT:   Yeah, I will be.  This just seems so

19  attenuated that it really doesn't have any relevance here.

20  To the extent you're seeking documents concerning the

21  consumer use of antennas, the objection is sustained.

22             All right.  Those are all the issues in the March

23  8th submission.  Let me turn to Mr. Hopkins and Ms. Wilson

24  who have been waiting patiently.  Ms. Wilson or Mr.

25  Hopkins, maybe why don't you --

125

1

2          MR. HOPKINS:   Your Honor, Ms. Wilson (inaudible).

3          THE COURT:   Ms. Wilson's going to -- could you

4    use the podium because we have a digital recording system.

5          MS. WILSON:   Sure.

6          THE COURT:   We'll get your thoughts recorded

7    here.  Go ahead.

8          MS. WILSON:   Do you want me to start, Your Honor?

9          THE COURT:   Yes, please.  This is with respect to

10   the licensing agreements --

11          MS. WILSON:   That are at issue in this case.

12          THE COURT:   -- with Netflix, Hulu and Amazon?

13          MS. WILSON:   Hulu, Amazon and Netflix.  Thank

14   you, Your Honor, for the opportunity to hear the nonparties

15   on their highly confidential and sensitive agreements.

16   We've been working even before we got here, with the

17   parties, to try to figure out some change to the protective

18   order which would protect some -- which would address some

19   of our concerns, and it's a good first step.

20          I think it would be helpful to the Court if I gave

21   you a little bit of background about the agreement and how

22   they're treated by my clients.

23          Some of these agreements are hundreds of pages

24   long and contain information that a competitor could use to

25   duplicate the nonparties business strategy, unfairly

126

compete for its customers, or interfere with or learn their

business plans, thus causing them competitive injury.  The

contents of the nonparty's agreements are fiercely guarded

by each of the nonparties who don't share the information

with each other.

          The agreements are also heavily negotiated with

the studios and those agreements aren't shared.  Indeed,

all of the agreements contain confidentiality agreements

and information is given on a need-to-know basis.  And yet

Aereo, a direct competitor, whose recent blog boasts that

it plans to move into 22 new markets this year, is asking

for unfettered access to these highly confidential,

commercially sensitive agreements whose inadvertent

disclosure could cause serious competitive injury to my

clients.

          And the risk of inadvertent disclosure is not an

idle concern.  When the parties were working with us to try

to see if we could resolve this informally, Netflix was

given, inadvertently, an Amazon agreement that they

shouldn't have had.  So inadvertent disclosures happen and

there's no way to make sure that --

          THE COURT:  Who gave the Amazon agreement to

Netflix?

          MS. WILSON:  Do I have to rat 'em out, Judge?

1

2          THE COURT:   Pardon?

3          MS. WILSON:   Do I have to rat 'em out?  It's just

4    one of the parties.

5          THE COURT:   Well, I don't want -- I mean was it--

6          MS. WILSON:   It was an accident.

7          THE COURT:   Was it your mistake or their mistake?

8          MS. WILSON:   It was their -- well, we received

9    this so it was their mistake.

10          THE COURT:   All right.  Okay.  Go ahead.

11          MS. WILSON:   And also by way of example, you

12   know, when I was sitting here and watching everyone there

13   are a couple of times that some of the lawyers got

14   documents they shouldn't have gotten, and it was easy here

15   to turn them back.  But it's the kind of thing that

16   happens, especially in complex litigation.

17          Now on top of that, the concern I just discussed,

18   there's also some indication that at least -- or at least

19   enough to raise question about some of Aereo's outside

20   counsel's roles, whereas here, some counsel of record may

21   also be providing business advice to Aereo such that they

22   could be said to be involved in advising the company on

23   competitive business decisions.

24          By example, Your Honor, from information on the

25   firm's website, Google, Martindale Hubble, Westlaw, we know

1
2  that Seth Greenstein -- I hope I'm not butchering his name

3  -- was been involved with Aereo from the very beginning and

4  is quoted in an article that implies that a business

5  relationship and the dispensing of competitive business

6  advice in the past, at least, and presumably in the future.

7          The article reads lawyers for Aereo in fact are

8  anything but shy about their role in reversed engineering

9  the Second Circuit's opinion to design Aereo.  Quote -- and

10 this is supposedly a quote from Mr. Greenstein – "It was

11 something we had been thinking about for a long time,

12 really since Cablevision.  How could you design a system

13 for streaming broadcast channels that complied with the

14 law?

15          "Seth Greenstein, an attorney for Aereo's outside

16 firm, Constantine Cannon, told me" -- he's talking about

17 the author – "when I ran into him at CES," quote.  So when

18 Aereo's CEO Chet came to us we had a pretty good idea of

19 how -- pretty good idea of how it would have to work.  Thus

20 an implication there of giving business advice.

21          Mr. Michael Elkin, in addition to litigating,

22 provides clients, presumably like Aereo, with advice on

23 capital markets and IP licensing agreements.  He also helps

24 companies raise financing through securitization, venture

25 capital, public offerings, and the like.

129

And in this regard, Your Honor, it seems like he could potentially be involved in actually counseling Aereo on licensing terms.  To the extent, knowledge and appropriately gleaned from nonparty's agreements, if they were to get out, as to its terms or the BOD market in general, that could have an influence on the business advice he might give to clients like Aereo in the future.

Now case law recognizes, and there are many, but Brown Bag versus Symantec, that it is impossible to keep locked up in one's mind the knowledge learned from certain agreements that you see.  Thus, the opportunity for accidental disclosure or subconscious influence of actions and advice are too great.  And that counsels this Court --

THE COURT:  Can I -- can I interrupt you for a second.  Let me just ask you a few questions.  The three entities that you represent, are the licensing -- do all three enter into licensing agreements for the same duration or do they each have their own durations?

In other words, do they each have one-year agreements, six-month agreements, two-year agreements?

MS. WILSON:  All different durations.

THE COURT:  Okay.  And were any of the agreements renegotiated after May 2011?

MS. WILSON:  I do not know the answer to that

130

1  question.

2          THE COURT:   Do we know if any of the documents

3  concerning any renegotiations with your clients reference

4  to Aereo?

5          MS. SHEPARD:   Your Honor, I can say we would --

6  we would agreement to produce those documents if they did

7  exist.  I haven't seen any --

8          THE COURT:   But they haven't been produced yet.

9          MS. WILSON:   That's --

10         MS. SHEPARD:   We have not produced any.

11         THE COURT:   Okay.

12         MR. KELLER:   Your Honor, question.  I just want

13  to make sure --

14         THE COURT:   Well, let me -- let me -- go ahead.

15         MR. KELLER:   Well this -- I just want to make --

16  I'm following your train of thought and trying to be

17  helpful here.  The argument with respect to these license

18  agreements isn't that they've been directly impaired by

19  Aereo as much as it is we are establishing the existence of

20  these markets in the best way possible.  We're showing that

21  we have license agreements in place.

22         The details of the license agreements, as far as

23  we're concerned, don't matter.  It's the fact of the

24  license agreements that we need to establish because there

131

1   are many ways that we can establish, not necessarily

2   through a diminution, direct diminution, of royalty streams

3   from those license agreements, but the fact that we occupy

4   this space as an authorized distribution medium, online

5   distribution medium, whether it's by subscription, whether

6   it's by program, by program download, are things that Aereo

7   will have an adverse impact on.

8           And the way that we're going to prove that, there

9   are certain secrets here, is through testimony of

10  witnesses, perhaps through experts, and it's not so much

11  that any of these agreements in and of themselves has taken

12  a financial hit from our perspective since Aereo began

13  operating.

14          THE COURT:   Yeah, no, I understand what you're

15  saying and I understand the theory which I think of what

16  Judge Nathan talked about.  If Aereo can take for free what

17  Netflix is paying for, Netflix is going to not pay anymore.

18          MR. KELLER:   It's inevitable.

19          THE COURT:   Yeah.

20          MR. KELLER:   And you don't need all that much

21  proof on the point.

22          THE COURT:   Yeah.  All right.  Go ahead, Ms.

23  Wilson.  Let me -- Ms. Wilson how -- the documents that are

24  responsive --

132

```
 2            MS. WILSON:   What we would say --

 3            THE COURT:   Do we know how voluminous they are?

 4            MS. WILSON:   I'm sorry, Your Honor?

 5            THE COURT:   The documents, the Hulu, Netflix and

 6  Amazon documents that would be responsive here, do we know

 7  how voluminous they are?

 8            MS. WILSON:   They, all together with amendments,

 9  are in the thousands, would you say?

10            MS. SHEPARD:   Thousands of page or thousands of

11  documents?

12            MS. WILSON:   Pages, thousands of pages.

13            MS. SHEPARD:   Pages.

14            MS. WILSON:   Pages, that's fair.

15            MR. KELLER:   But just so we understand, Your

16  Honor, these are the documents that the plaintiffs

17  produced.  These are not documents that are within the

18  custody, possession or control of these third parties that

19  are being represented by counsel.

20            THE COURT:   That's my understanding.

21            MR. KELLER:   Just so that we're clear.

22            THE COURT:   That's my understanding.

23            MS. WILSON:   I thought we were clear.

24            THE COURT:   So Ms. Wilson, am I understanding you

25  correctly, you don't even think that an eyes-of-counsel-
```

133

1
2   only protective order would be sufficient here because of
3   the risk of lawyers giving business advice and the risk of
4   inadvertent disclosure?
5          MS. WILSON:   Not the way that Aereo counsel wants
6   to do it which is to have absolutely no redactions.  I
7   think that the -- we think that the fair way to do it would
8   be to have the people who are most knowledgeable about the
9   confidential provisions, the highly sensitive nature, have
10  an opportunity to redact them and then meet and confer as
11  necessary as to the scope of those redactions.
12         THE COURT:   I mean part of the issue here from my
13  point of view is that one of the claimed species of
14  irreparable harm asserted by plaintiffs, maybe -- I'll read
15  you the relevant passage here from Judge Nathan's decision:
16  Similarly, the evidence shows that by poaching viewers from
17  cable or other companies that license plaintiffs' content,
18  Aereo's activity will damage plaintiffs' ability to
19  negotiate retransmissions agreements, as those companies
20  will demand concessions from plaintiffs to make up for this
21  decrease in viewership.
22         Now the defendants want to rebut that theory by
23  showing that there has not been a change, that there either
24  hasn't been discussion or hasn't been a change in the
25  licenses for the retransmission agreements.  I'm wondering,

134

1

2  you know, and I hear what you're saying about Aereo being a

3  direct competitor.  Well, before I give voice to my ideas,

4  why don't you tell me what -- why don't you finish your

5  comments, and then I'll hear from defendants, and then I'll

6  see maybe if my suggestion makes sense, but go ahead.

7           MS. WILSON:   So with respect to these highly

8  confidential agreements, and you know, I note that the GC

9  for Aereo's here today, so is heavily involved in the case

10 as it turns out, that there is some risk of inadvertent

11 disclosure.  Not that anybody's going to do anything that's

12 untoward --

13           THE COURT:   I understand.

14           MS. WILSON:   -- you know, or bad characters, but

15 things --

16           THE COURT:   The bell can't be unrung.

17           MS. WILSON:   Right.  And it is standard practice,

18 Your Honor, in complex litigation especially when you have

19 nonparties, and even where you have outside counsel's eyes

20 only, that the agreements which are hundreds of pages long,

21 with highly sensitive information, a lot of it irrelevant,

22 for example -- I cane give you three examples -- terms like

23 security and usage rules, assignment provisions, terms that

24 relate to film, terms that talk about made for digital

25 productions that are not broadcast TV series, those types

135

of things that are highly sensitive in this very, very

competitive environment, those types of things could easily

be redacted and there's not reason for them not to be.

　　　　Part of that, the reason the redaction's

important, is that it protects the signatories of the

agreements, right, because they're full of agreements out

there somewhere, when people move, clerks move, lawyers

move, partners move, judges become judges.  And it also

protects --

　　　　THE COURT:   Judges never move.

　　　　MS. WILSON:   It also protects the law firms

because imputed knowledge leads to more conflicts and

frankly, will lead to disqualification motions.  So my

point is that the nonparties are in the best position to

negotiate and to identify the critical areas of redaction,

particularly here, where there have been mistakes.  There

have been inconsistent redactions of provisions.  There

have been incomplete redactions of competitive information.

There have been poorly or improperly redacted agreements

with respect to Hulu and Amazon that should never have been

produced.

　　　　So it seems to us that the fair thing to do and

consistent with the practice in this area, not asking for

anything new or anything special, is to have the nonparties

136

provide reacted copies of the agreement on shortened time

so we're not delaying anything, and agree to meet and

confer on the scope of the redactions if necessary.  And

assuming --

THE COURT:  I am thinking you could describe the

nature of what's redacted.  I mean if it's something like

assignment provisions or even rate provisions, I mean you

could redact it, you could indicate the margin rate

provisions, just so they have some idea of the nature of

the information that's redacted, but not the specific

content of the information.

MS. WILSON:  Well, I really in my heart of heart

want to give them a blank page, but yes, we could

absolutely do it that way.

THE COURT:  What lawyer doesn't?

MS. WILSON:  Absolutely do it that way.  One

other thing, Your Honor -- I'm done with respect to the

redactions and I figure I will probably lose the argument

that I don't think the agreements are relevant because

they're not really retransmission agreements, but you read

that, so.

THE COURT:  Yeah, it's in play.

MS. WILSON:  Yeah, it's in play.  So the only

other thing I would ask is that if the Court is agreeable

137

1
2  to our proposal, and I know the Court has its own, that we

3  would also get back the documents from Aereo that Hulu and

4  Amazon, that were produced from Hulu and Amazon that should

5  not have been, and that are improperly redacted.  And then

6  we would replace those with a set of properly redacted

7  documents.  Thank you.

8           THE COURT:  All right.  Who want to -- yes, go

9  ahead.

10          MR. HOSP:  Yes, Your Honor, a couple of --

11          MS. WILSON:   Should I stay?

12          THE COURT:  I'm sorry?

13          MS. WILSON:   Should I stay?

14          THE COURT:  Yeah, well, if you want to sit down

15  while Mr. Hosp is speaking, feel free.  But just come back

16  to the podium when I have more questions for you.

17          MR. HOSP:  Yes, Your Honor, a couple of points

18  for clarification.  The first is that, and Mr. Elkin

19  mentioned this but I think it bears repeating.  These are

20  not third-party documents, these are plaintiffs' documents

21  that are --

22          THE COURT:  I know, but they implicate third-

23  party rights.

24          MR. HOSP:  Absolutely.

25          THE COURT:  Okay.

138

1

2          MR. HOSP:   Absolutely, as do --

3          THE COURT:   It's sort of like a doctor having

4  patient records.  They're the doctor's records but --

5          MR. HOSP:   Yes.

6          THE COURT:   -- the patient has a privacy interest

7  in them as well.

8          MR. HOSP:   As did the retransmission agreements

9  that plaintiffs had with other third parties that have

10 already been produced in this action in response to Judge

11 Nathan's order.  And in fact, I mean we noted this in our

12 letter to you in response to the third party's letter.

13 This again goes back to the April 13, 2012 letter.

14          And in fact there's no question about the

15 relevance of these documents.  These documents are

16 exceptionally relevant --

17          THE COURT:   Agreed.  Agreed.  Relevance is not an

18 issue.

19          MR. HOSP:   And Judge Nathan specifically said,

20 when she ordered these documents produced by plaintiffs, to

21 the extent that they're worried about confidentiality,

22 plaintiffs just produce the retransmission agreements

23 requested by the defendants.  The agreements may, of

24 course, be designated confidential or highly confidential

25 under the protective order which, when we talk about the

```
 1
 2   standard proceedings there is a designation for highly
 3   confidential information.
 4           Now the suggestion has been made that somehow
 5   outside counsel are not going to be able to abide by this
 6   Court's order.  There doesn't appear to be any basis for
 7   that.  I believe that in fact the information read out
 8   about Mr. Elkin came just from his firm bio.  It actually
 9   had nothing to do with anything having to do with this
10   case.  There's no --
11           THE COURT:   I presume firm bios are accurate.
12           MR. HOSP:   Well, yes, but there's not suggestion
13   that because he participates with certain clients with
14   respect to licensing agreements that somehow this is going
15   to -- he's going to disregard this Court's order.
16           Judge Nathan has already suggested, has already
17   indicated, what the appropriate remedy for worries about
18   confidentiality in this case are with respect to this exact
19   type of document.
20           I mean, Mr. Keller stood up and said, you know
21   what, none of this should matter anyway because we're not
22   using this for the purpose that Aereo suggests.  Again,
23   that's an argument that was made with respect to the
24   retransmission agreements also and was directly addressed
25   by Judge Nathan.  And she actually says, she actually goes
```

1    through -- I won't read it -- but she goes for about two

2    pages of how this is all relevant and then comes back and

3    says to the extent that there are concerns about

4    confidentiality there is a confidentiality order in place.

5              THE COURT:   And that was before, though, the

6    nonparties had a chance to be heard.

7              MS. WILSON:   Correct.

8              MR. HOSP:   It was, but it was -- it was --

9              THE COURT:   Okay.  So there were factors, the

10   factors that Ms. Wilson has just brought to our attention

11   were not factors that Judge Nathan was able to consider

12   because --

13             MR. HOSP:   Well, no, but they were the exact same

14   concerns that were raised by plaintiffs.  Plaintiffs fought

15   very vigorously to have all of these documents prevented

16   from any disclosure.

17             THE COURT:   No, I'm not sure that's the exact

18   same concern because I think there is traction to Ms.

19   Wilson's point, that her clients are more -- are in more

20   direct competition with Aereo than plaintiffs are.  So I

21   don't think that plaintiffs' interests are exactly

22   coincident with Ms. Wilson's clients.

23             MR. HOSP:   Well, again, plaintiffs have argued

24   that plaintiffs are in -- that Aereo is directly competing

141

1   with them.  So I'm not, you know, I mean -- and plaintiffs

2   argued certainly that Aereo was directly competing with --

3        THE COURT:   Aereo's not producing Dancing with

4   the Stars so I'm not sure that they're in direct

5   competition.

6        MR. HOSP:   No, but -- no, but the other -- but

7   the other parties, for example, the cable companies, the

8   DISH networks, those actually are in, at least according to

9   plaintiffs, their argument is Aereo competes directly with

10  these other individuals, these other parties in the market.

11  So there really is not difference between the

12  considerations that were raised with respect to the

13  retransmission agreements and the concerns that are

14  addressed now.  And Judge Nathan said produce the

15  documents.  She didn't say redact the documents, she said

16  produce the documents.  And if you were --

17        THE COURT:   Yeah, and she -- and she hadn't heard

18  from Hulu, Amazon and Netflix on the issue.

19        MR. HOSP:   But she heard the exact same

20  arguments.

21        MR. HOPKINS:   You know, Your Honor, just there's

22  one other point, since Mr. Hosp keeps coming back to the

23  retrans ruling at the very outset of this case, which was a

24  ruling that was also different from other rulings in this

1
2  courthouse.  But he never mentions that they got the

3  unredacted retransmission agreements.  We had a preliminary

4  injunction hearing and Aereo didn't even cite to one of

5  those agreements throughout the Court.

6         So you have to balance this urgent need against

7  the reality of what actually happens in terms of how

8  they're going to be used going forward.  It's only because

9  we keep coming back and plowing over the same ground, I

10 want the record to be complete on just what they did with

11 those retrans agreement during the hearing, which was

12 nothing.

13        MR. HOSP:   And you know why, Your Honor?  Because

14 those retransmission agreements, despite the fact that

15 Judge Nathan ordered them, were produced after the

16 depositions of those studio executives.  He said that in

17 the papers before, and I can't believe I'm hearing it.

18        MR. HOPKINS:   Your Honor, I'm so sorry, Mr. --

19        THE COURT:   We're getting -- we're getting far

20 afield from -- from --

21        MR. HOPKINS:   We are, but Mr. Elkin misspoke

22 because I sat in a deposition, Your Honor, where they were

23 used.

24        THE COURT:   Let's -- let's come back -- please

25 don't speak over me, okay?  Let's come back to the issue

143

```
 1              that Hulu, Amazon and Netflix are raising here, okay?

 2              Well, what I'm thinking about, what might make sense here,

 3              because I appreciate the points that the nonparties are

 4              making here, and the nonparties and Ms. Wilson's argument I

 5              think is persuasive.

 6                        Let me make a proposal and let me hear from

 7              counsel on this.  What I think might make sense is to

 8              direct that the Hulu, Amazon and Netflix documents, that

 9              the originals and all copies, be returned to Perkins Coie

10              that Hulu, Amazon and Netflix have a chance to -- have the

11              opportunity to redact what they think should be redacted.

12              That they produced redacted copies to defendant if there is

13              specific information that -- they'd be redacted with an

14              indication of the nature of the information that's being

15              redacted, a meaningful description of what's being

16              redacted.  And if then there are specific sections that

17              defendant wants you can have a meet and confer with Ms.

18              Wilson or Mr. Hopkins.  And if you can't resolve it you can

19              come before me and I'll resolve it.

20                        I appreciate, I mean it sounds like it is

21              sensitive information and Hulu, Amazon and Netflix are not,

22              obviously not parties here and I'd hate to see them

23              disadvantaged by the proceedings here.

24                        MR. HOSP:  Your Honor, we've already offered a
```

144

1

2    concession to not produce any economic information to

3    outside counsel.  There is a protective order in place.

4          THE COURT:  Beyond outside counsel.

5          MR. HOSP:  Beyond outside counsel, pardon me,

6    beyond outside counsel.  So no one in that area is going to

7    see any financial information.  There is an issue here with

8    respect to what it is that our experts need to do.  Our

9    experts need to analyze these agreements in full because

10   some of the provisions, the value of an agreement does

11   depend on material terms.  And the material terms,

12   particularly to the extent that they are bundled, are

13   relevant.

14         And when you are comparing whether or not -- you

15   need to be able to compare apples to apples in order to see

16   whether or not there is a difference.  And our experts

17   can't do that if there are massive redactions.  And in

18   fact, this is also -- this is already the case with respect

19   to what plaintiffs have produced.  Plaintiffs have already

20   produced documents that --

21         THE COURT:  Well, I'm not saying -- look, I mean

22   to some extent this is an interim, this would be an interim

23   resolution.  It would not necessarily preclude further

24   disclosure.  As I said, if you needed something else, you

25   can come back.  And if you can't resolve it amicably with

145

1

2 the Perkins Coie firm, you can come back to me and I'll

3 resolve it.  I mean there may be multiple ways -- there may

4 be multiple ways to resolve it.

5      Let's assume that -- let's assume that there was

6 some term that your expert deemed material, deemed of

7 material value to a licensee.  Maybe all your expert needs

8 to know is that it didn't change between year one and year

9 two and there are ways of disclosing that without giving

10 you the agreement.

11      I mean maybe I take a look at paragraph 17 and

12 check it with my clerks and say, yeah, paragraph 17 in the

13 year one license is identical to paragraph 17 in the year

14 two license word for word.

15      I mean that would seem to give your expert what he

16 or she would need in terms of whether or not the license

17 terms changed after Aereo came on the scene but would also

18 protect the third parties' confidential interest.

19      MR. HOSP:  Well, and just to be clear, just so I

20 understand what you're suggesting, this would also mean

21 presumably that parties other than the three entities here,

22 the other agreements would need to be produced in

23 unredacted form.

24      THE COURT:  Well, look, if a third party is not

25 here, I think there's another one that I signed a

146

1    stipulation on their time to file their objections has been

2    extended, or their time to raise the issue and respond to

3    something has been extended, look, if a licensee doesn't

4    care enough to raise the objection they're not entitled to

5    any protection but --

6

7              MR. HOSP:   Okay.  Because that's --

8              THE COURT:   -- Hulu, Amazon and Netflix have

9    raised the objection here so I'm hearing what counsel has

10   to say.

11             MR. HOSP:   Fair enough.  Fair enough.  Because as

12   of right now there are agreements, three transmission

13   agreements and license agreements, that have been produced

14   with respect to other third parties that are not here, that

15   have been heavily redacted to the point where we can't tell

16   what's there.

17             So I mean to start out with there seems to be no

18   basis for those redactions whatsoever, and those should be

19   reproduced in unredacted form.

20             MR. HOPKINS:   Well, Mr. Hosp is trying to raise a

21   different --

22             THE COURT:   You're going into an issue that

23   really is not germane to Hulu, Amazon and Netflix.

24             MS. WILSON:   Correct, Your Honor, and we can --

25             THE COURT:   Mr. Hopkins and Ms. Wilson have been

147

1  very patient listening to a lot of things that have nothing

2  to do with them.  Let's stick with their dispute so we can

3  try and get them out, okay?

4  

5          MR. HOSP:   May I suggest this, Your Honor?  And I

6  know where the Court is going and I'll be brief.  I know

7  it's late as well.  The crux of this motion is based on

8  impugning the integrity of the outside counsel and doing

9  something --

10         THE COURT:   No, no, that --

11         MR. HOSP:   Your Honor, that --

12         THE COURT:   No, no, no, that's not -- that's --

13         MR. HOSP:   There's no --

14         THE COURT:   Ms. Wilson -- no.  I've got to

15  interrupt you.  Ms. Wilson was very careful to talk about

16  inadvertent disclosure.  She was not impugning anyone's

17  character or saying anyone was going to do something wrong.

18         MR. HOSP:   There's not history that any counsel,

19  I think for either side here, has done anything that has --

20  comes anywhere close to a transgression.  There's no

21  history at all, and I think if the Court is inclined, as it

22  apparently is, to lend credence to the concerns, despite

23  the fact that it's outside counsel eyes only, I think the

24  situation should be that they should identify the areas

25  where redaction is requested and that there should be

148

briefing on that.

        But for us to have to return the documents, give
it to them, I think we're going to spend a lot more time
before Your Honor.  I think there's going to be issues
relating to not only expert needs and other things --

        THE COURT:   If not you, it'll be somebody else,
so.  If not you, it'll be somebody else.

        MR. HOSP:   Well, let me just say this, and maybe
it's just, it's a fairly nuanced dynamic, but once they
have the documents back, and I'm sure they're going to
proceed in good faith, there is the temptation to be a
little bit more discriminating in terms of having some
overarching needs for protection.

        I just think the exercise, and I appreciate what
Your Honor is proposing, but I think it's fraught with
peril.

        THE COURT:   Well, no, I'm trying to balance the
respective interests here and I understand your interest.
You want to disprove the plaintiffs' theory that their
ability to license or their ability to negotiate
retransmission licenses is being adversely affected, or may
be adversely affected, by Aereo's presence on the scene.

        And you want to shoot holes in that by showing
that their retransmission agreements or their negotiations

149

have not been affected by Aereo's presence on the scene.
And I suppose one way you might do that is show that a
licensed agreement entered pre-Aereo has the same terms
post-Aereo, right?

MR. HOSP:   I think that's in part.  It's not in
total but it's in part.  There are some economic issues
which relate to damages that are separate and apart from
that point, but sure.

THE COURT:   But that's a big part of -- I mean
that would get you substantially closer to where you want
to be if you could show that the terms have not been -- the
terms as to plaintiffs were not less favorable after
Aereo's entry into the market than before Aereo's entry
into the market.

That, you know, and maybe that can be shown in a
way that meets your interest and meets the third parties'
interest.  Maybe I will get them and say, yeah, the royalty
rate is the same or the X rate is the same or the, you
know, the terms have not materially changed.

MR. HOSP:   But -- but --

THE COURT:   Why would that not be a fair
resolution?

MR. HOSP:   I think you have a part of it but the
other part, if I may again, and I -- I'll just argue back

150

1
2  to damages.  They're going to claim that their damages in
3  part flow from the value of these works as they're
4  licensed.  If the redactions come back and we are unable to
5  determine the actual value of that exploitation of that
6  program, even if it's --
7          THE COURT:   The licenses are not on a program-by-
8  program basis.
9          MR. KELLER:   And we've elected to statutory
10 damages, Your Honor.
11         THE COURT:   They're not on program-by-program
12 basis.
13         MR. HOSP:   Well, now we're getting -- first of
14 all, we're getting circular because --
15         THE COURT:   Well, no, forget --
16         MR. HOSP:   -- actual harm does relate to
17 statutory --
18         THE COURT:   Forget what plaintiffs' counsel just
19 said.  It doesn't --
20         MR. HOSP:   We covered that earlier.
21         THE COURT:   Yeah, go ahead, but they're not on a
22 program-by-program basis.
23         MR. HOSP:   Well, that's the Court's ruling and we
24 have to abide by that.  But so it's not as simple as that.
25 We're not -- and it's not because we're all over the lot

151

1

2  but they're very discreet issues that do relate and we

3  think, frankly, the standard here, if I may say so, as Your

4  Honor knows better than anyone here, it's reasonable

5  calculates lead to admissible evidence.  And we're not

6  talking about whether something is coming in, into evidence

7  at this point, whether it's reasonably calculated to lead

8  to admissible evidence.

9          I think that that showing is here.  I'm very, very

10  concerned about having to turn the documents back.

11  Completely understand if they want make arguments.

12          THE COURT:  They clearly will, but I mean I'm not

13  -- relevance is not an issue.  The only issue here is

14  trying to protect the competing commercial interests.

15          MR. HOSP:  So my view is that if they have some

16  specific areas, they should identify what they are, we

17  should address them before Your Honor, and then if there

18  are further redactions, fine.  That would be my

19  counterproposal, as it were.

20          MS. WILSON:  Your Honor, that puts all of the

21  burden on the third parties.  This isn't --

22          THE COURT:  Just go up to the microphone so we

23  can --

24          MS. WILSON:  This puts all the burden on the

25  third parties and this is not our fight.  And we have

152

agreed to do it on shortened time.  There's been no

indication that we did anything but above board.  And so I

understand counsel might have been in this case a long time

so he's a little pessimistic.  But I think that we can do

this as professionals and I don't think it's going to be

that big of a problem to do it Your Honor's way.

MR. HOSP:   Your Honor, my only last point would

be that I'm not sure that the competing interest on our

side are that significant when we've agreed not to show

material to inside counsel.  Maybe, you know, maybe the

appropriate responses to allow them to conduct redactions

and only those versions can be shown to inside counsel, or

something along those lines, but I'm not sure that there is

a significant competing interest on this side.

THE COURT:   Well, does litigation counsel here

providing any advice to Aereo?

MR. KELLER:   You're asking -- do you want to

interview all of us or have --

MR. FABRIZIO:   What she -- first of all, what

counsel did, she went to all those statements were not

attributable to me.

THE COURT:   Nobody wants to answer the Court's

question.  When counsel stands up and doesn't answer my

question directly.

```
 1                                              153
 2            MR. KELLER:   The answer is no.
 3            MR. HOSP:   No, we do not provide any licensing
 4   advice to Aereo.
 5            MR. ELKINS:   But I am offended, and I'm sorry to
 6   say this, that an excerpt would be taken out of my bio and
 7   somehow used to somehow ascribe any notion that I would
 8   take a document produced under and eyes only restriction
 9   and have it bleed over --
10            THE COURT:   I don't think that was the
11   suggestion.
12            MR. ELKINS:   I find it offensive.
13            THE COURT:   I don't think that was the
14   suggestion.
15            MS. WILSON:   But let's -- let's --
16            THE COURT:   I don't think that was the suggestion
17   at all.  Once information is in your mind you can't unring
18   the bell.
19            MR. ELKINS:   Well, if that's the case, Your Honor
20   there would never be any protection afforded under a
21   protective order where there's an outside counsel's eyes
22   only.  This is not the only intellectual property case
23   that's been before this Court, why are there special rules
24   being carved out and promulgated here?
25            THE COURT:   Okay.  What did you want to say?
```

154

1

2          MS. SHEPARD:   I just want to point Your Honor to

3    Exhibit G and the 8th, I think the 8th bullet point.   And

4    it just reconfirms the issues -- it's to my declaration.

5          THE COURT:   Exhibit?

6          MS. SHEPARD:   Exhibit G which won't discuss in

7    open court, and the 8th bullet point there.   But there are

8    real issues --

9          THE COURT:   Just give me one second to get it in

10   front of me.   Exhibit G in the 8th bullet point.

11         MS. SHEPARD:   It's an Aereo document, Your Honor.

12         THE COURT:   The bullet point begins "You don't"?

13         MS. SHEPARD:   Correct, Your Honor.   There are

14   real issues with respect to competitive nature here.   And

15   this situation and thinking about what is at issue with

16   respect to the third-party agreements is that it's not a

17   situation where it is just an Amazon agreement that's being

18   produced, Your Honor, with Fox, say.

19         This is, the nature of what is at issue are the

20   major online providers of content with the major providers

21   of broadcast television.   It's the whole panoply of

22   agreements, the whole competitive, the competitive

23   landscape of what is out there right now.   And that has to

24   give one pause.

25         This is not a normal protective order situation

155

1   with one, maybe, agreement at issue.  And so I think the

2   stepped approach that Your Honor has suggested with respect

3   to giving the agreements back and having the redactions

4   considered by the Court makes sense, given the significant

5   issues and the third-party concerns that are presented by

6   Ms. Wilson.

7          THE COURT:   And how quick can you make the

8   redactions, Ms. Wilson?  You talked about an expedited

9   turnaround.  I'm just trying to get some specificity.

10         MS. WILSON:   Well, no, I knew I should have asked

11  the IT people what that meant.

12         MR. HOSP:   Just to ask -- remind the Court, as I

13  understand it --

14         THE COURT:   Well, let me get an answer to my

15  question first, okay?

16         MR. HOSP:   I think it relates to that.

17         THE COURT:   Just one second.  Just one second.

18  Let me get an answer to my question first.

19         MS. SHEPARD:   I would say by no later than next

20  Friday, even maybe before then.  I don't -- but Ms. Wilson

21  would know more about what's --

22         THE COURT:   I mean how long can you -- how long

23  do you need to make the redactions after you get the

24  documents?  You need how many days to make the redactions?

1

2          MS. WILSON:   Oh, I would think a little over a

3  week, I would think.

4          THE COURT:   A week?

5          MS. WILSON:   After we get them all back.

6          THE COURT:   What do you want to say, sir?

7          MR. HOSP:   I mean the notion there could be a

8  representation that it could be done quickly without

9  knowing what is involved, there are thousands and thousands

10 and thousands of pages, Your Honor, that comprise these

11 documents they're going to undertake to redact.  And then

12 if there are issues, guess where all that goes eventually,

13 goes to Your Honor.

14         So I think this, again it looks like you cross the

15 Rubicon here in terms of making a decision, but I --

16         THE COURT:   If I had I wouldn't be hearing you,

17 so.

18         MR. HOSP:   But I think this is a mistake.

19         MR. ELKINS:   I'm just -- I'm just seeking

20 clarification because it looks like it may be plaintiffs'

21 counsel who are doing the redactions in terms of --

22         THE COURT:   Well, plaintiffs know -- plaintiff

23 knows what the terms are.

24         MS. SHEPARD:   We -- let me clarify.  We have

25 produced, in some senses, produced redacted agreements

1   which are the ones that Ms. Wilson is asking claw back for.

2   But there are other ones and to resolve this situation, as

3   Ms. Wilson has indicated, we have been trying to come up

4   with redacted versions.

5           So there are proposed redacted versions that have

6   been submitted for approval purposes to Hulu, Netflix and

7   Amazon.  So we're not starting, Your Honor, from a blank

8   slate.  My understanding is that there are additional

9   redactions that they need and consistency levels and other

10  things like that.  But those will be what will be worked

11  out in the next week, not -- we're not, as again, starting

12  from a blank slate.

13          (interposing)

14          THE COURT:  And how many pages -- let me hear

15  from Ms. Shepard.  Ms. Shepard, how many pages are involved

16  to you -- from your knowledge, to your knowledge?

17          MS. SHEPARD:  Well, I have the WNET plaintiffs a

18  group of agreements and then ABC plaintiffs would have to

19  speak to theirs.  But I would say my agreements are

20  probably two full binders, full of this.

21          But I will say that I think the issues themselves

22  are going to fall within fairly discreet categories, like

23  five to ten categories of types of redactions so it isn't--

24          THE COURT:  All right.  Let me -- let me come

1

2  back to Ms. Wilson for a minute.  Ms. Wilson, are there --

3  I'm trying to think of a way that minimizes the burden on

4  every -- minimizes a method here that's going to minimize

5  the burden on any -- on everybody.

6           Are there, you know, I presume that within an

7  agreement that is a hundred pages long there are some parts

8  that are particularly sensitive and some parts that are not

9  so sensitive.  I mean, I presume if there's a choice of

10 form provision or an applicable law provision, your clients

11 really wouldn't care about that, or an arbitration

12 provision.  I mean there's a lot of things like that --

13          MS. WILSON:   Yeah, there's a lot of things they

14 wouldn't care about.

15          THE COURT:   They're not commercially sensitive,

16 so.

17          MS. WILSON:   Right, but the other problem we're

18 going to have -- and perhaps I spoke too quickly about the

19 week -- is the agreements that are inconsistently redacted

20 that have to -- you have to go back and, you know, do one

21 of these.

22          THE COURT:   What I'm wondering about is how long

23 would it take you to identify -- well, let me back up a

24 second.  Do you have copies of what's already been turned

25 over to defendants?

159

 1
 2          MS. SHEPARD:   Yes, yeah, you would have.
 3          THE COURT:   Okay.  How long would it take you to
 4  identify the pages that contain material that's so
 5  sensitive you don't even want outside counsel to see?
 6          MS. WILSON:   I'm just trying to -- I can't
 7  remember how big a stack it was.
 8          MS. SHEPARD:   That's a fairly discreet set of
 9  documents.
10          MS. WILSON:   A few days.
11          THE COURT:   I mean this is --
12          MS. WILSON:   And I say a few days, assuming I can
13  get with in-house counsel.
14          THE COURT:   Yeah.  No, I mean, I would presume
15  that there's a relatively small subset that's so sensitive
16  you don't even want in-house counsel to see it.  Am I
17  correct in that assumption?
18          MS. WILSON:   Oh, yes, we have -- we've agreed
19  that in-house counsel will not be seeing the agreements.
20          THE COURT:   Wait.  Who's agreed to that?
21          MS. WILSON:   The parties.
22          MR. HOSP:   We've consented already for inside
23  counsel not to look at these documents.  That's --
24          THE COURT:   Maybe I -- Maybe I misspoke.  No, I
25  presume there's a very small number of pages that you don't

160

want even outside counsel to see, am I correct?

MS. WILSON:   I'm not sure I understand your question again, Judge.

THE COURT:   Sure, let me try it again.  It's your contention that there are some parts of these agreements, some parts of these documents, that are so sensitive you don't even want outside counsel to see them, correct?

MS. WILSON:   Partly correct.

THE COURT:   What part's incorrect?

MS. WILSON:   Well, it's not -- it's the -- it's the outside counsel who may have business relationships that we would want them to see anything.  And the idea, Your Honor, is that the documents we redacted that Netflix, Hulu, Amazon are in the best position to do so, could turn it around pretty quickly because they are our documents and the studio's documents.

And to get back the ones that were improperly redacted and replace them with a properly redacted ones and then meet and confer --

THE COURT:   But the universe, the universe of documents that need to be redacted, the universe of pages that need to be redacted, I take it is a fairly small universe.  All that needs to be redacted, from your point of view, are the pages that are so sensitive, outside

161

1      counsel shouldn't even be allowed to see them, correct?

2              MS. WILSON:   I'm sorry.   I'm just sort of

3      struggling with your question.

4              THE COURT:   Sure.   No, look, in other words, if

5      these licensed, these documents are presumed contain

6      information of varying levels of sensitivities --

7              MS. WILSON:   Right.

8              THE COURT:   -- that some is more sensitive than

9      others, correct?

10             MS. WILSON:   Right.

11             THE COURT:   And all we're talking about, I mean

12     with respect to documents -- or with respect to sections

13     that your clients are okay with outside counsel for aerial

14     reviewing or seeing, there's no issue as to those sections.

15     The only issue here is with respect to those portions of

16     the documents that are so sensitive that you don't even

17     want outside counsel to see them.

18             MS. WILSON:   I'm being thoughtful, Your Honor,

19     because I don't want to overstep.

20             THE COURT:   It's okay.

21             MS. WILSON:   Let me see if I can say it a

22     different way.

23             THE COURT:   Okay.

24             MS. WILSON:   So we are concerned about our

162

documents going out unredacted and so we want to be able to

redact them for sensitive information, for information that

is not relevant to this case but also highly competitive,

and we think we're in the best position to do that.  And we

want to get the documents back that are out and replace

them, and that's really all we want.

THE COURT:  But look, my point is this, though,

my point is that, look, if you had -- let's assume page 7

of the agreement has the rate that Netflix is going to pay

and page 13 has the choice of law in an arbitration

provision.

And let's assume, for whatever reason, your client

thinks that the choice of law and the arbitration provision

is sensitive.  It may be sensitive but it's difficult to

understand how something like that is so sensitive that

outside counsel shouldn't even see it.

MS. WILSON:  Right.

THE COURT:  It may be a different level of

sensitivity than the rates.  The rates would probably be

the highest level of sensitivity.  The only thing we're

talking about redacting are things at the highest level of

sensitivity.  Things that outside counsel could see subject

to the protective order wouldn't need to be redacted.

MS. SHEPARD:  That, if I may say it, Your Honor,

163

1  that is -- I mean I have had communications with

2  particularly at least one in-house counsel with respect to

3  what they wanted redacted.

4  THE COURT:   Right.

5  MS. SHEPARD:   And because they are uniquely

6  situated, they spoke to me directly, versus having Ms.

7  Wilson involved in the phone call.  So that is the nature

8  of the material that they are asking to be redacted, is the

9  ones that are competitively sensitive with respect to the

10 nature of the business.  And frankly, they were -- so Your

11 Honor knows -- they were commenting on my redactions of

12 where and they were arguing why they needed more

13 redactions, to which I know what Aereo's arguments are, I

14 was anticipating what this Court's arguments would be with

15 respect to the redactions, and try to reach reasonable

16 middle ground for what is necessary, as well as revealing

17 in the way Your Honor has suggested, what the nature of the

18 redactions are so that Aereo has an opportunity to argue

19 why they need a particular.

20 Like just for example, does it matter that for --

21 that who uses kryptonite technology for how it protects the

22 content, no.  The fact that the content is protected when

23 it's delivered over the internet, yes, that's relevant.

24 The fact that this specific type of technology they employ

164

1

2   is not, but it is very highly competitively sensitive

3   information and that is important to them.

4          It's that type of the nature of what the

5   redactions are, Your Honor, and that's why I believe Your

6   Honor's suggestion of a stepped approach is the correct

7   one.  Because it's hard for this Court to argue in the

8   abstract, and I would also point out that plaintiffs have -

9   - I mean Aereo has had redacted versions of these

10  agreements and isn't articulating why they need a

11  particular unredacted.

12         And so I think it makes sense so that Your Honor

13  doesn't hear it in a piecemeal fashion, that we take the

14  approach, they return the agreements, they get the redacted

15  agreements promptly.  For organizational sake we can

16  produce them in a very clear fashion -- these are Hulu

17  agreements, these are Amazon agreements these are Netflix

18  agreements -- the redactions and the nature of the

19  redactions clear, we have our meet and confer, we talk

20  about them.  If we can't resolve them, we present them to

21  this Court in a very precise manner where we're arguing

22  Aereo's position, why do they need kryptonite protection,

23  or the information about specific technology.

24         We do the counterargument or Ms. Wilson does the

25  counterargument back and forth, in a discreet set, Your

1
2   Honor can rule on them.  We will have both redacted

3   agreements -- I mean actually, I think it would for the

4   Court's purposes, it would make sense to have an unredacted

5   set with the redactions highlighted so that you can see

6   easily -- that you were only looking at one agreement --

7   what it is that we've redacted, and you can say yay or nay,

8   this isn't a proper redaction.  That would be what I would

9   suggest.

10          MR. HOSP:   Your Honor, if I may, I think Your

11   Honor's question really highlights the reason why this

12   feels like such an unworkable issue.  Because as you

13   pointed out, third parties are going to be most interested

14   in redacting the most sensitive information, things like

15   price information.  That's the information that is most

16   relevant to what it is we need to use the documents for.

17          THE COURT:   Well, it seems to me that a delta in

18   the price information is what's most relevant, not whether

19   it's $10 or $20.  The question is did it change from $10 to

20   $5 or change from 20 to 10.

21          MR. HOSP:   Well, no, except that again, if there

22   are 15 provisions that are changed, a price may have

23   changed, but it may be --

24          THE COURT:   I understand what you're saying but

25   if the price is the same and the other provisions are the

1

2  same, the nature of the provisions really is not important.

3  What's important is the change in the provisions.

4          MR. HOSP:   No, I understand, but this is why we

5  have protective orders, it's to avoid issues like this.

6  Outside counsel are entrusted with being able to do this --

7          THE COURT:   Sometimes.

8          MR. HOSP:   -- in a manner that's reasonable.  And

9  in this instant, that's what Judge Nathan said.

10         THE COURT:   You're repeating yourself now.

11         MR. HOSP:   I understand.

12         THE COURT:   Don't repeat yourself.

13         MR. HOSP:   But it really, I mean what's

14  inevitably going to happen is we're going to have to come

15  back and say, well, we need everything because we don't

16  know what is --

17         THE COURT:   You're going to be back anyway.

18         MR. HOSP:   Can I ask you a question, Your Honor?

19  How would we know unless we have the price, the rate, the

20  amount of money that's reflected.  How are we going to -- I

21  don't know how we would be able to ascertain the diminution

22  or relative accretion to the programming that's going to be

23  at issue.  We certainly are going to take the position

24  that's something that we need to give to our experts.

25         But I think it's --

167

1

2          THE COURT:   Well, I mean maybe what happens is

3   you both come before me, and I look at the price term, and

4   I tell you -- maybe the answer's going to be it hasn't

5   changed.

6          MR. HOSP:   Your Honor, we're --

7          THE COURT:   Maybe I tell you that none of the

8   material provisions have changed.

9          MR. HOSP:   I am sure this Court is overburdened

10  enough than to have to sift through thousands and thousands

11  of pages of documents --

12         THE COURT:   That's what I get paid to do.

13         MR. HOSP:   -- in order to arrive at that end.

14         THE COURT:   Well, we're not going to sift through

15  thousands and thousands of pages.

16         MR. HOSP:   But what's interesting is that you

17  have counsel for Netflix, et al, who is not sure even what

18  provisions would even be subject to the redaction.  You've

19  got Ms. Shepard who's trying to be a faithful arbitrator as

20  to what she believes may be relevant, and useful, and

21  sensitive.

22         If they have an issue, these documents have

23  already been shared with us, we've looked at them.  You

24  want to unring that bell.  I don't understand why they

25  shouldn't come to court, identify the areas they want to

168

1   have redacted, and let Your Honor decide.

2           THE COURT:   Okay.  The documents have been

3   produced and they're Bates numbered, I presume?

4           MS. SHEPARD:   Yes, Your Honor, I sent a callback

5   letter a couple of weeks ago.  They've all been identified

6   to the ones that have been produced so far.

7           THE COURT:   This is what I'm going to direct.  Is

8   everybody around next week?  There are some holidays next

9   week.  I don't know if anybody's out of pocket for the

10  holidays.

11          MR. FABRIZIO:   Your Honor, I will be away with my

12  family next week.

13          THE COURT:   I'm sorry?

14          MR. FABRIZIO:   I will be away with my family next

15  week.

16          THE COURT:   Okay.

17          MR. KELLER:   And the following I'm going to have

18  spring, I mean, with the kids.  I'm going to be gone that

19  week.

20          THE COURT:   The week of April 1st?

21          MR. KELLER:   On the week of April 1st, yeah.

22          THE COURT:   Ms. Wilson, you're around next week?

23          MS. WILSON:   I can be, Your Honor.

24          THE COURT:   Well, I'm not -- you have preexisting

169

1   plans, I don't want to interfere with them.  I'm trying to

2   accommodate you.

3

4           MS. WILSON:   I just meant I live San Francisco.

5           THE COURT:   Okay.

6           MR. HOSP:   Your Honor, Thursday and Friday is not

7   -- we're not available at all.

8           THE COURT:   Okay.  This is what I'm going to

9   direct.  By April 3, that's a week from next Wednesday, by

10  April 3, the third parties, Hulu, Amazon and Netflix, are

11  to identify by Bates number the specific pages that they

12  believe are so sensitive that outside counsel should not

13  even be permitted to have access to.

14          By April 10, at week thereafter, defendants are to

15  return those Bates numbered pages and all copies to Ms.

16  Wilson and Perkins Coie.  What did you want to say?

17          MR. HOSP:   Thank you, Your Honor, is this what

18  would leave, once the redacted pages are presented, for the

19  defendants to object and bring the matter to the Court?

20          THE COURT:   No, first wait until I finish and

21  then maybe your questions will be answered, okay?

22          MR. HOSP:   Thank you.

23          THE COURT:   Okay.  So by April 10th they're to be

24  returned.  By April 19 Ms. Wilson is to provide defendants

25  with redacted versions of the pages returned to her with

170

1   identification of the nature of the material being

2   redacted.

3

4           MR. HOSP:   Your Honor --

5           THE COURT:   And then if you want to come back, if

6   defendants want to come back and challenge the redactions,

7   you're free to do so.

8           MR. HOSP:   Your Honor, just a clarification?

9           THE COURT:   Go ahead.

10          MR. HOSP:   The agreements as they have been

11  produced right now, I believe have redactions on just about

12  every page already.  I assume that the redactions that the

13  third parties are going to identify are against a clean

14  document as opposed to saying, okay, well, we don't need to

15  be worried about this page because this page is redacted

16  already.  Because --

17          THE COURT:   I'm not sure I understand your

18  question.  You've got -- let's assume you've got a

19  document, a license agreement with paragraph 17 redacted.

20          MR. HOSP:   Right.

21          THE COURT:   They tell you that paragraphs 4

22  through 5 are highly sensitive and they want the page with

23  paragraphs 4 through 5 returned, you send back the page

24  with paragraphs 4 and 5, they'll redact what they think

25  needs to be redacted from paragraphs 4 and 5.  I'm not --

```
 1                                          171
 2  I'm not sure --
 3         MR. HOSP:  But then paragraph 17 remains redacted
 4  as well?
 5         THE COURT:  If it's, yeah, if it's already
 6  redacted, it remains redacted.
 7         MR. HOSP:  Okay.
 8         THE COURT:  I mean if you want to challenge that
 9  you're free to challenge that after you have a meet and
10  confer with them.
11         MR. HOSP:  Okay.
12         THE COURT:  But my order does not address --
13         MR. HOSP:  Current redactions.
14         THE COURT:  -- the current redactions.
15         MR. HOSP:  Okay.  So we should have a meet and
16  confer with the plaintiffs about any redactions they've had
17  to their agreements and to the extent --
18         THE COURT:  To date, yeah.
19         MR. HOSP:  Yeah.
20         THE COURT:  You should always have a meet and
21  confer with your adversary before you bring a discovery
22  dispute to Court.  That's what the rules require.
23         MR. HOSP:  And to the extent that we can't
24  resolve those, we'll bring that back to you, Your Honor.
25         THE COURT:  Yeah.
```

172

```
 1
 2          MR. HOSP:   Thank you, Your Honor.
 3          THE COURT:   All right?
 4          MS. WILSON:   One clarification, Your Honor.
 5          THE COURT:   Yeah.
 6          MS. WILSON:   So this is just, you were talking
 7  just about the documents that are already out there.  What
 8  about the ones that are going to be produced that we ask to
 9  be involved in the redaction.
10          THE COURT:   There are additional documents that
11  have not yet been produced?
12          MS. WILSON:   Yes.
13          MS. SHEPARD:   Yes.
14          THE COURT:   Well, with respect to those documents
15  they should probably be included with the April 19th
16  production.  So by April 19th you should be producing all
17  pages that -- all redactions that you -- you should
18  identify all redactions that you seek to make.
19          MS. SHEPARD:   We will provide the agreements and
20  I think they need to be Bates numbered, Your Honor, which
21  would really be -- fall within our -- but I will get Ms.
22  Wilson's okay for the production and we will produce them
23  by April 19th with the approved redactions from Hulu,
24  Netflix and Amazon.
25          THE COURT:   Okay.
```

173

1

2          MR. HOSP:   And Your Honor, any meet and confers

3   regarding redaction issues, the guidance that we are taking

4   from you is that any redactions to these agreements must be

5   redactions only to information that is viewed as so

6   sensitive that even outside counsel should never see this,

7   is that right?

8          THE COURT:   That's, I mean, that's the issue that

9   I think Ms Wilson is raising, that there are some things

10  that her clients deem to be so sensitive that not even

11  outside counsel should see them.

12          If it's something -- you know, I come back to the

13  example I had before -- if it's the choice of law provision

14  or an arbitration provision where for whatever reason, Hulu

15  regards it as sensitive but not so sensitive that outside

16  counsel shouldn't see it.  There shouldn't be any

17  redaction.  That should be covered by the protective order.

18          My understanding is you've got information in the

19  agreements, some of which is very, very sensitive, some of

20  which is a little sensitive, some of which is moderately

21  sensitive, and some of which is not sensitive at all.  And

22  the only thing that we need to redact here, or that may

23  need to be redacted, is stuff at that very high ban, the

24  stuff you don't even -- material you don't even want

25  outside counsel to see.

174

1

2          MS. WILSON:   But that's what -- that's where when

3    I was having some trouble with your question.  When I made

4    my presentation it wasn't just for that category --

5          THE COURT:   Well that's --

6          MS. WILSON:   Because -- wait.

7          THE COURT:   Go ahead.  Go ahead.

8          MS. WILSON:   Because they're highly competitive

9    documents and there is information that isn't relevant to

10   this case, that if it got out could be very bad for my

11   clients.  All we're asking for is to redact that

12   information, especially given that there has been some

13   inadvertent disclosures and once the bell is rung, it's

14   rung.

15         THE COURT:   Okay.  Well --

16         MS. WILSON:   Can't get it back.

17         THE COURT:   I'm not going to rule in a vacuum

18   here but I mean the only -- you know there is a protective

19   order in place.  There is an eyes-of-outside-counsel-only

20   protective order, the protective order provides for a level

21   of confidentiality for outside counsel only.

22         I think I need specifics, to see specifics before

23   I can rule.  But you know, what we're talking about here is

24   the defendants are correct to some extent.  It is fairly

25   unusual to have information that is so sensitive that not

175

     1          even outside counsel should see it and that's what you're

     2          seeking to protect.  And I'm giving credence to your

     3          contention and giving you the opportunity to redact that

     4          material.  But it has to be extremely sensitive before I

     5          conclude that not even the protective order in place is

     6          sufficient protection.  But I can't make that determination

     7          until I have specifics.

     8                    I'm allowing you -- we've set up a mechanism by

     9          which you can identify the information and if your

    10          adversary has a disagreement I'll hear both of you and

    11          resolve it, but --

    12                    MS. SHEPARD:   But --

    13                    THE COURT:   We're only -- the only thing that's

    14          entitled to that ultimate protection is extremely sensitive

    15          information but I need to see specifics before I can rule.

    16                    MS. WILSON:   May I just be heard?

    17                    MS. SHEPARD:   Go ahead.

    18                    MS. WILSON:   Your Honor, it's not an unusual

    19          practice in a complex case, even when you have outside

    20          counsel only, for there to be redaction of information that

    21          is commercially sensitive or has some kind of trade secret

    22          value or -- because you don't it, one, to get out, ever.

    23          And two, it can create all sorts of problems when people

    24          move here and there and with DQ motions and conflicts.

```
 1                                                  176
 2              THE COURT:   I understand.
 3              MS. WILSON:   And if it's information that's
 4    irrelevant and we're the third party, not a party, what is
 5    the harm in the redaction if it protects our --
 6              THE COURT:   I need to see specifics before I --
 7    you know, otherwise, it's a theoretical discussion.
 8              MS. WILSON:   Okay.
 9              THE COURT:   Maybe you'll be right.  Maybe you'll
10    be right with some of them.  Maybe they'll be right.  Maybe
11    they'll be right with some of them.  I need to -- we need
12    to be talking about specific -- specific material before I
13    can really rule.
14              MS. SHEPARD:   I agree, Your Honor, and because
15    there are aerial redactions and documents that they're
16    producing.  So I think it is an overarching issue.
17              THE COURT:   All right.
18              MS. WILSON:   Thank you, Your Honor.
19              THE COURT:   Thanks.  Were there some other issues
20    the defendants wanted to raise?
21              MR. HOSP:   Yes, Your Honor, there's an issue
22    regarding repositories, a couple of different issues.  Your
23    Honor has ordered --
24              THE COURT:   Have you had a meet and confer?
25              MS. SHEPARD:   We haven't, no, we haven't, Your
```

177

1    Honor, they just sent the letter yesterday.

2         MR. HOSP:   Wanted a clarification to your prior

3    orders today and let me just --

4         THE COURT:   Have you had a meet and confer on it

5    with your adversary?

6         MR. HOSP:   No, this is just -- this is a question

7    on the clarification for what you have ordered today only

8    and I'm just asking for clarification, which is --

9         THE COURT:   One second.  Let me see if I have the

10   prior order.  All right.  This is the order dated February

11   26th?

12        MR. HOSP:   Yes.

13        THE COURT:   Go ahead.  What's your question?

14        MR. HOSP:   With respect to the additional

15   categories of documents that you have ordered the

16   plaintiffs to produce today, we assume that they are

17   responsible for providing repository information for those

18   as well.  They have not provided that yet.  The only

19   information --

20        THE COURT:   Your assumption is incorrect.

21        MR. HOSP:   Okay.

22        THE COURT:   Okay?

23        MR. HOSP:   May we ask that repository --

24        THE COURT:   Well, why don't you see -- why don't

178

1
2    you wait until you get the documents first.

3            MR. HOSP:   Thank you.

4            THE COURT:   Ordinarily, that's not part of a

5    document production, okay?  I mean ordinarily you need some

6    clause for that.  I mean why don't you wait until you get

7    the documents first.

8            MR. HOSP:   Okay.

9            THE COURT:   Okay?

10           MR. HOSP:   Thank you, Your Honor.

11           MR. KELLER:   Thank you, Your Honor.

12           MS. WILSON:   Thank you, Your Honor.

13           THE COURT:   Is there anything else that

14   defendants want to raise?

15           MR. HOSP:   I suppose this is something we can

16   only answer after we get done with all of the discovery

17   issues.  We're going to need to set a schedule at some

18   point, but I'm not sure we're ready for that today, so.

19           THE COURT:   All right.

20           MR. ELKINS:   Thank you, Your Honor.

21           MR. HOSP:   Thank you, Your Honor.

22           THE COURT:   Anything else from plaintiffs?

23           MR. KELLER:   Yes, briefly, sorry.  You have

24   letters from Mr. Hosp and from the -- on the issue of

25   contributory, or you have a reference to contributory

1    infringement claim.  I really want to avoid motion practice

2    on this.  I can't see any reason to have motion practice on

3    this.  But Mr. Hosp keeps saying he doesn't see the

4    complaint sufficient to state a contributory infringement

5    claim and we say if that's what you really think, you

6    should rule against the complaint.  But I do think it's

7    wasteful.

8         Do you have a view as to how you would like this

9    issue finally joined, because I think we need some guidance

10   from you on this point.

11        THE COURT:  I'm not even sure what the motion

12   would be here.  I mean there could be -- look, I haven't

13   read the complaint after I got your letters because I'm not

14   sure what application is being made.

15        MR. KELLER:  Well, we know the issues in the

16   case.

17        THE COURT:  If you wanted to make -- if you

18   wanted to make a motion to amend, that's a motion I

19   understand and for which there are standards.

20        There's no such thing, as far as I'm aware of, as

21   a motion for the Court to determine whether a claim is

22   asserted in the complaint or not.

23        MR. KELLER:  Absolutely.  It's either a motion to

24   amend or it's a motion for -- to strike the claim, a motion

180

1

2   to dismiss on the grounds that the contributory

3   infringement claim was not properly pled.  We've said it

4   is.  If they think it's not, they should move against it.

5           THE COURT:   Well, if they think -- if they think

6   it's not stated in the complaint, I'm not sure what they'd

7   be moving against.

8           MR. KELLER:   The sufficiency of the pleadings,

9   which we have taken the position, state the claim.

10          MR. HOSP:   No, that they are sufficient --

11          MR. KELLER:   But the point is bigger than this.

12  I don't want motion practice and I don't think you do

13  either.  We know the issue of contributory infringement is

14  in the complaint, you couldn't have heard it enough times

15  today.

16          We know that the cases are consolidated.  We know

17  that discovery's going forward on this issue.  Why are we

18  torturing ourselves as an academic exercise?  It's in the

19  case.

20          MR. ELKINS:   Your Honor, to the extent it's not

21  clear from the dispute that they are having, Aereo does not

22  dispute and has never disputed, that the WNET plaintiffs

23  have properly stated a claim of secondary liability.

24          THE COURT:   Yeah, no, my recollection is that

25  there is a dispute as to some plaintiffs but not all.

```
 1                                              181
 2          MR. ELKINS:   That's correct, Your Honor.
 3          THE COURT:   Yeah, but --
 4          MR. HOSP:   And Your Honor, we don't --
 5          THE COURT:   -- I'm not -- I'm not sure what you
 6  want me to do.  I'm not sure what form of judicial relief
 7  you're seeking from me.  There's no -- courts ordinarily
 8  don't make declarations as to what claims are stated in the
 9  complaint and which are not until you get to trial,
10  perhaps.
11          MR. KELLER:   Absolutely, and we think it's fair
12  and we know that discovery's going forward and therefore it
13  can't be possibly and prejudice to anybody.  We're content
14  to sit for now but if there's some other way to handle it,
15  we can consider that.
16          THE COURT:   Well, I can't give you legal advice,
17  okay?
18          MR. KELLER:   I understand --
19          THE COURT:   I'm not sure -- I'm not trying to be
20  coy or be snide or be nasty, but the dispute that you're
21  having is really not one that the federal rules provides a
22  resolution mechanism for.
23          MR. KELLER:   Fine.  We will talk more with Mr.
24  Hosp about it.  Let me ask you one more process question.
25          THE COURT:   Sure.
```

1

2          MR. KELLER:   I think many things that you've said

3  today would be very helpful for our clients to see.  I'm

4  assuming the digital recorder was working fine today

5  because we didn't get any indication to the contrary.

6          But I'm wondering, since this is the first time

7  I've had the opportunity to appear before you in this

8  process, how long will it take to get this transcript,

9  given that we've gone for four hours this afternoon?

10          THE COURT:   I really, I really don't know.  My

11  clerk can tell you who to call tomorrow and I think the

12  turnaround time, to some extent, is a function of how much

13  you want to pay.

14          I think it's a different -- it's like court

15  reporters.

16          MR. KELLER:   Understood.

17          THE COURT:   Daily copy costs more than weekly

18  copy, or hourly copy costs more than daily copy.  But --

19          MR. KELLER:   That's fine.  We'll work with --

20          THE COURT:   You know, you can -- you have some

21  control over that depending on what rate you want to pay.

22          MR. KELLER:   I appreciate it.  That's all I

23  needed because I think a lot was said that would be useful,

24  maybe to avoid future conferences like this.

25          THE COURT:   Okay.  All right.  I think these

183

1

2   documents go back to Mr. Hosp.  All right?  Thank you all.

3           MR. KELLER:   All right, Your Honor, thank you.

4           MS. WILSON:   Thank you.

5           MR. HOSP:   Thank you very much.

6           MS. SHEPARD:   Thank you.

7           (Whereupon the matter is adjourned.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

184

## C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of ABC, et al. v. AEREO, Docket #12-cv-1540, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature_____

Date:    March 22, 2013